## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MISSOURI

| | | |
|---|---|---|
| THOMAS A. CONNELLY, IN HIS CAPACITY AS EXECUTOR OF THE ESTATE OF MICHAEL P. CONNELLY, SR., | ) ) ) ) | Case No. 4:19-cv-01410-SRC |
| Plaintiff, | ) ) ) | |
| v. | ) ) | |
| THE UNITED STATES OF AMERICA, DEPARTMENT OF THE TREASURY, INTERNAL REVENUE SERVICE, | ) ) ) ) | |
| Defendants. | ) ) ) | |

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Thomas A. Connelly, in his capacity as executor of the Estate of Michael P. Connelly, Sr. (Hereinafter "Plaintiff") by and through undersigned counsel, respectfully moves for summary judgment pursuant to Fed.R.Civ.P. 56, in that the material facts are undisputed and demonstrate that Plaintiff is entitled to judgment as a matter of law for purposes of receiving a refund for the overpayment of estate tax claimed in Plaintiff's Complaint.

## FACTUAL BACKGROUND

The pivotal issue in this case is whether the proceeds of a life insurance policy acquired for the sole purpose of funding Crown C Supply Company, Inc.'s ("Crown C") obligation to purchase a decedent shareholder's shares pursuant to a Stock Purchase Agreement are includable in the fair market value of the corporation for estate tax purposes. Decedent owned 385.90 out of 500 shares of his closely-held family company, Crown C Supply Company, Inc. (Exhibit 3). Decedent's brother, Thomas, owned the remaining 114.10 shares.

1

The Connelly Brothers and Crown C subsequently entered into an Amended and Restated Stock Purchase Agreement ("Stock Purchase Agreement") to provide a mechanism to redeem the stock in the event one of them died. (Exhibit 3). The Agreement was entered into so that the family business could continue operations without enduring financial strain to purchase the deceased stockholder's shares. (First Stipulation, ¶ 2). In order to fulfill the requirements of the Stock Purchase Agreement, Crown C purchased life insurance for both Connelly Brothers. (First Stipulation, ¶ 6). Essentially, the Stock Purchase Agreement dated August 29, 2001, required the company to redeem the shares of the shareholder who predeceases the other in the event the company received life insurance proceeds due to a stockholder's death. (Exhibit 3, pg. 12, Art. VIII(B).

Michael died on October 1, 2013. As a result, Crown C received death benefits from three of Michael's life insurance policies in the amount of $3,503,915. (See Exhibit 6, Plaintiff's Response to Defendant's Fourth Set of Requests for Admission, ¶¶ 170, 175, 180). On November 13, 2013, pursuant to the Stock Purchase Agreement, Crown C entered into the Sale and Purchase Agreement to redeem all of Michael's shares as required. (Exhibit 4). This Sale and Purchase Agreement was entered into by Michael's Estate, by Thomas Connelly, and by Crown C. Michael's outstanding shares constituted 77.18 percent of the 500 shares, and as a result, the company redeemed them for $3,000,000.00. The additional $503,915.00 was employed to fund company's operations. (Exhibit 5, Pg. C000640)

During the audit process, the Service issued a Notice of Deficiency based on the position that the calculation of the valuation of stock should additionally include the $3,000,000 in life insurance proceeds received by Crown C following Decedent's death that were used to redeem Decedent's Crown C stock. (Exhibit 1). The parties have agreed to Crown C's underlying value

(Second Stipulation, ¶3), thus the sole issue before the Court is the handling of the insurance proceeds that were obligated to be used for the redemption of the Decedent's shares.

## LEGAL STANDARDS

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party moving for summary judgment must "cit[e] to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials" to support its position that it is entitled to summary judgment. Fed. R. Civ. P. 56(c)(1)(A).

A factual dispute is "genuine" if "a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986). A fact is "material" if the fact could affect the outcome of the lawsuit under the governing law. *Id.* The moving party bears the initial burden of identifying those portions of the record demonstrating a lack of a genuine factual dispute. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); If the movant shows that there is no evidence to support the non-moving party's case, the burden then shifts to the non-moving party to demonstrate that there are, in fact, genuine factual disputes which preclude judgment as a matter of law. *Bedford v. Doe*, 880 F.3d 993, 997 (8th Cir. 2018).

To satisfy its burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rather, the non-movant must go beyond the pleadings and "identify affirmative evidence" which creates a genuine dispute of material fact. *Crawford-El v. Britton*, 523 U.S. 574, 600 (1998).

3

Here, the parties have agreed that, if Plaintiff is due a federal estate tax refund, for the purpose of determining the amount of such refund, the fair market value of the Decedent's interest in Crown C was $3,100,000.00 as of October 1, 2013 as opposed to the $2,982,000 estimate of the value submitted by the Decedent's estate to the Service during the audit phase. (Second Stipulation, ¶ 3). As a result, no genuine dispute of fact exists as to the valuation for estate purposes. Instead, the controversy stems from the question whether the inclusion of the insurance proceeds Crown C was contractually obligated to use to redeem the deceased shareholder's shares are includable in the fair market value of the corporation for estate tax purposes. This legal dispute has been decided by uncontroverted caselaw. Thus, as a matter of law, summary judgment should be granted.

## ARGUMENT

WELL-ESTABLISHED CASE LAW DEMANDS THE EXCLUSION OF INSURANCE PROCEEDS FROM THE VALUATION OF THE COMPANY

The courts have determined that valuation of stock should not include life-insurance proceeds when a Stock Purchase Agreement obligates its use to redeem the deceased shareholder's stock because the proceeds are offset dollar-for-dollar with this obligation. In 2005, the 11th Circuit addressed this specific issue of whether the life insurance policy proceeds that are received by a company and subsequently used to redeem a decedent's stock should be added to the value of the stock to be redeemed for estate tax purposes in the *Estate of George C. Blount v. Commission*, 428 F.3d 1338 (11th Cir. 2005). The court ultimately concluded that insurance proceeds that were required to be used to purchase the shares of a deceased shareholder should not be included in the valuation of a closely-held corporation. *Id.* at 1346.

In *Blount*, a shareholder was subject to a shareholder agreement that required the corporation to use life insurance proceeds on the life of a key shareholder to acquire his stock

4

upon death. *Id*. at 1340. The court found that this arrangement created a liability for the corporation to pay the life insurance proceeds that entirely offset any asset that it may create for the corporation. *Id*. at 1345. This is because the corporation is unable to keep the proceeds to use for its own purposes, which would have thereby increased the corporation's value. *Id*. The court additionally noted that the company purchased the life insurance for the purpose of ensuring that the business could continue operations. *Id*.

The *Blount* court, in addressing Treas. Reg. 20.2031-2(f), concluded that excluding life insurance proceeds from the corporation's value was "consistent with common business sense." *Id*. Finally, the court emphasized that "the insurance proceeds are not the kind of ordinary nonoperating asset that should be included in the value of [the corporation] under treasury regulations. . ." because "the life-insurance proceeds are offset dollar-for-dollar by [the corporation's] obligation to satisfy its contract." *Id*. at 1346; *citing Estate of John L. Huntsman v. Commissioner of Internal Revenue*, 66 T.C. 861, 875, 1976 WL 3635 (1976). This was true without regard to whether or not the value provided in the shareholder's agreement was binding for estate purposes under Section 2703. *Blount,* 428 F.3d at 1345.

The Ninth Circuit reached a similar assessment in the *Estate of Robert E. Cartwright v. Commissioner*, 183 F.3d 1034 (9th Cir. 1999). The court specifically addressed the question of fair market value when determining the valuation of stock. *Id*. In *Cartwright,* the court found that the value of life insurance proceeds would not necessarily affect what a willing buyer would pay for stock because it was offset by the firm's obligation to pay the policy benefits to Mr. Cartwright's estate. *Id*. at 1038. The court concluded the threshold issue in determining the value of interest in closely-held businesses for estate tax purposes is what a willing buyer would pay to

a willing seller neither being under any compulsion to buy or sell and both having knowledge of the relevant facts. *Id.*

These cases provide clear instruction for this matter. There should not be the inclusion of life insurance proceeds in valuing a corporation when an agreement exists that obligates the company to use the proceeds to redeem the shares of a deceased shareholder, as is our case. Like in *Blount*, Crown C and the Connelly Brothers entered into the Stock Purchase Agreement to ensure continuous operation of the business. Similarly, the company secured life insurance policies for the sole purpose of funding the obligation contained in the Stock Purchase Agreement. The Stock Purchase Agreement ultimately required Crown C, if it received life insurance proceeds due to a stockholder's death, to redeem the shares upon a shareholder's death. When assessing fair market value of the company's stock, the life insurance proceeds should not be included in this assessment because those proceeds would not be realized as an asset because they are offset dollar for dollar by the company's obligation to fulfill its contract. The proceeds will never and can never be used for the company's own purpose other than utilizing them to redeem the deceased shareholder's stock.

The Plaintiff's expert, Kevin Summers, a Certified Public Accountant who is Accredited in Business Valuation and Certified in Financial Forensics, reviewed the precedent on the matter, applied standard valuation techniques, and considered the contracts at hand when drafting his opinion and concluded:

> "Section VIII(B) of the Stock Purchase Agreement required that in the event of a sale and purchase under Article V (Death), the proceeds collected from any life insurance owned by the surviving stockholders or the Company on which the decedent stockholder was the insured must be used to pay the purchase price. If the purchase price was less than the insurance proceeds, then the remaining proceeds may be retained by the beneficiary. If the purchase price exceeds the life insurance proceeds, then the insurance proceeds must be paid on the closing date to the legal representative of the decedent stockholder and the balance of the

6

purchase price must be evidenced by a promissory note." (Exhibit 7- Expert Report of Kevin Summers, pg. 11).

In discussing the purpose of such contract, Summers found sound business judgement, supporting the court's finding in *Blount*. He noted:

> "The life insurance proceeds provided liquidity to Crown C Supply so that the company could meet its enforceable contractual obligation to purchase a decedent stockholder's shares in accordance with the Stock Purchase Agreement. The approach Crown C Supply took in order to fund an enforceable contractual obligation under the Stock Purchase Agreement with life insurance is consistent with common business sense." (Exhibit 7- Summers Report, pg. 11).

It is important to point out that small family-owned businesses have relied upon the holding in *Huntsman* since the mid-1970's, which was subsequently validated by *Cartwright* in 1999 and by *Blount* in 2005. The Connelly brothers properly effectuated a business contract that was in line with the commonly employed business practices of closely-held companies. The failure to acknowledge Crown C's obligation to redeem shares would disregard the validity of its contract and established case law.

FEDERAL LAW MANDATES THE APPLICATION OF THE STOCK PURCHASE AGREEMENT AND AFFIRMS THE COMPANY'S RESULTING OBLIGATION TO REDEEM THE STOCKS OF THE DECEASED SHAREHOLDER

Even if the Court is not persuaded by the identical scenario found in *Blount*, federal law mandates the exclusion of the proceeds as well. Federal estate tax will apply to the transfer of a citizen's taxable estate. I.R.C. § 2001(a). The value of the taxable estate is determined by the fair market value of the decedent's property at the date of death. See TREAS. REG. § 20.2031-2. As a result, the IRS has promulgated regulations to determine the proper calculation of fair market value. *Id*. Courts have consequently clarified this guidance into an exception to the general rule for property that is subject to a valid Buy-Sell Agreement. *See generally Estate of True v. Comm'r*, 390 F.3d 1210, 1218 (10th Cir. 2004).

7

Under the Section 2703 valuation rules, the value of property is generally determined without regard to any restriction. TREAS. REG. § 25.2703-1(a)(1). However, a restriction is **not** disregarded if it is (1) a bona fide business arrangement; (2) not a device to transfer property to the natural objects of the Decedent's bounty for less than full and adequate consideration; and (3) when looking at the time the restriction was created, the terms of the restriction are comparable to similar arrangements entered into by persons in arms-length transactions. TREAS. REG. § 25.2703-1(b)(1).

In order to be deemed binding for estate tax purposes, the agreement must provide for a formula price that is either fixed or determinable under the agreement; the agreement must have been binding on the parties during life and after death; and the agreement must have been entered into for bona fide business reasons and not as a substitute for a testamentary disposition. 26 C.F.R. § 20.2031–2(h); *Estate of Gloeckner v. Comm'r*, 152 F.3d 208, 213 (2d Cir. 1998); *Estate of Lauder v. Commissioner*, 64 T.C.M. (CCH) 1643, 1656 (1992); *Estate of Carpenter v. Commissioner*, 64 T.C.M. (CCH) 1274, 1278 (1992).

a. The price of the stock is determinable under the Agreement.

In order for the redemption price to be acceptable for estate tax purposes, the price of the stock must be fixed or determined by a formula within the agreement. *Gloeckner*, 152 F.3d at 213; *Lauder*, 64 T.C.M. (CCH) at 1656. Here, there is an explicit methodology spelled out if the shareholder failed to obtain their valuation every eighteen months. The method stipulated is found in Article VII of the Amended and Restated Stock Purchase Agreement. It reads:

> "In the event Shares are purchased pursuant to the terms of this Agreement, the purchase price per Share (the "Purchase Price Per Share") shall be the amount per Share set forth in the Certificate of Agreed Value, as that term is defined in Paragraph B of this Article VII; provided, however, that in the event the Stockholders fail or refuse to execute a new Certificate of Agreed Value within eighteen (18) months following the date of the last executed Certificate of Agreed

Value i.e. the last executed Certificate of Agreed Value is more than eighteen (18) months old), the Purchase Price Per Share shall be the "Appraised Value Per Share," as that term is defined in Paragraph C of this Article VII. The purchase price ("Purchase Price") of a Selling Stockholder's Shares shall equal the Purchase Price Per Share (or the Appraised Value Per Share, as the case may be) times the number of Shares being sold and purchased." (Exhibit 3).

Therefore, while there was not a Certificate of Agreed Value available in Plaintiff's case, there was a precise and ascertainable methodology permitting an appraised value per share. Under the rationale of *Gloeckner*, this satisfies the requirement of establishing a determinable method of valuation.

b. The Connelly Brothers and Crown C entered into a buy-sell agreement while both brothers were alive, and the buy-sell agreement obligated Crown C to purchase the stock upon a Decedent's death.

The next requirement that must be met in order for the redemption price to be acceptable for estate tax purposes is that the agreement must establish the obligation of transfer during the life of the decedent and must also provide for the mandatory transfer of stock at a shareholder's death. *Gloeckner*, 152 F.3d at 213.

First, the Stock Purchase Agreement was enforceable under the state law. *See Carpenter*, 64 T.C.M. (CCH) at 1278-1279 (where the court found that buy-sell agreements must be enforceable under applicable state law in order to be binding in estate tax purposes). The Service has not articulated any argument suggesting the contrary.

Second, the parties to the Stock Purchase Agreement entered into the contract during the lifetime of the parties. (Exhibit 3). They predetermined and pre-obligated the company to redeem the deceased shareholder's shares. Article VIII(B) provides:

"In the event of a sale and purchase under Article V (Death), and the proceeds collected from any life insurance owned by the surviving Stockholders or the Company on which the Decedent Stockholder was the insured are sufficient to pay the Purchase Price in full, the full amount of said Purchase Price shall be paid

on the Closing Date to the Legal Representative of the Decedent Stockholder, and any remaining proceeds may be retained by the beneficiary thereof." (Exhibit 3).

Therefore, Crown C was required to redeem the shares from the life insurance proceeds Crown C received as a result of Michael Connelly's death. Because Crown C had the obligation to purchase the deceased shares and the Estate of the deceased was required to sell the shares, this second requirement is satisfied.

### c. The Agreement is a bona fide business arrangement and not a device to pass the Decedent's shares to his heirs for less than adequate and full consideration.

The next requirement that must be met in order for a redemption price to be acceptable for estate tax purposes is that the agreement must: "[r]epresent a bona fide business arrangement and not a device to pass the decedent's shares to the natural objects of his bounty for less than an adequate and full consideration in money or money's worth." TREAS. REG. § 20.2031-2(h); *Gloeckner*, 152 F.3d at 213. Here, Plaintiff must establish the agreement was both a bona fide business arrangement and not simply a device to pass the decedent's shares to his beneficiaries. *Gloeckner*, 152 F.3d at 213.

#### i. Bona fide business arrangement.

The test for whether an agreement represents a bona fide business arrangement is sufficiently satisfied when the purpose of a restrictive agreement is to maintain current managerial control, whether by family or outsiders. *Gloeckner*, 152 F.3d at 214; *St. Louis Cty. Bank v. United States, 674 F.2d 1207, 1210 (8th Cir. 1982)*. If an agreement is entered into for the purpose of maintaining control of a business in its current management and the owners enter into such agreement at arms-length to define the price at which the beneficiaries of a shareholder must relinquish all of his shares, then that ascertained value is sufficient for estate tax purposes.

Here, the Stock Purchase Agreement was entered into as a bona fide business arrangement. The Connelly Brothers and Crown C executed the Agreement to promote their mutual interests and the interests of the Company, as the Decedent wished to keep Crown C in operation after his death. (First Stipulation, ¶ 2). Crown C, as a closely-held company between two brothers, was determined to maintain business should one of them die. (First Stipulation, ¶ 2). Thus, to ease the transition and ensure the company stay within the family, the execution of the Stock Purchase Agreement was necessary.

Both brothers had a solid understanding of the business's finances when they developed the Stock Purchase Agreement and made a business decision to enter into the Amended and Restated Stock Purchase Agreement dated August 29, 2001. (First Stipulation, ¶ 1). When the insurance proceeds were expended, Thomas was well aware of what the company needed to stay afloat. The life insurance proceeds received by Crown C amounted to approximately $3,500,000. A little over $500,000 was needed to keep the business in operation and this amount was included in the valuation of Crown C. (Exhibit 5). Decedent's shares were subsequently redeemed for the $3,000,000, which was subsequently reaffirmed by the valuation performed by the Ander's Firm. Additionally, the Service accepted the value but allege that the insurance proceeds should be added in as well, thereby ignoring the company's preexisting obligation to redeem the shares. (See Second Stipulation). As stated above, when the purpose of a restrictive agreement is to maintain current managerial control within the family, this purpose is sufficient to meet the requirement that an agreement represents a bona fide business arrangement. Further, the Sale and Purchase Agreement was only executed after a thorough analysis of Crown C's financial situation and its prospects for future operations. (Exhibit 3). This was later confirmed

by the valuation from Certified Public Accountants at Anders Firm. (Exhibit 5). Thus, there is no doubt that the Stock Purchase Agreement was a bona fide business arrangement.

> ## ii. The Agreement was not a testamentary device.

An agreement is testamentary in nature when the purpose of the agreement is to convey property or value to the decedent's beneficiaries for less than full and adequate consideration. *Gloeckner*, 152 F.3d at 213. Here, it was clear that when the Stock Purchase Agreement was established in 2001, both Connelly brothers were in good health. The sole purpose of the Stock Purchase Agreement and the resulting life insurance policy that was required to fund its implementation was to ensure the company could continue to operate. This agreement further provides for the fair market valuation of the company in order to determine the value of the shares. There was not a preset value determination. This ensures that appropriate consideration was made to the current state of the business at the time of a shareholder's death. There was and is no intention to circumvent any tax regulation as the shares were redeemed for the proper fair market value.

## d. The purchase price term was comparable to similar arrangements entered into by persons at arms' length.

The price term is comparable to similar arrangements entered into at arms-length. An obligation or restriction is treated as comparable to similar arrangements entered into at arm's length if it is one that "could have been obtained in a fair bargain among unrelated parties in the same business dealing at arm's length." TREAS. REG. § 25.2703-i(b) (4) (i). A fair bargain is one that "conforms with the general practice of unrelated parties under negotiated agreements in the same business." *Id.* An analysis of comparability includes consideration of the expected term of the agreement, the current fair market value of the property, anticipated changes in value during the term of the arrangements and the adequacy of any consideration given. *Id.*

Here, it is common practice to for closely-held family corporations to acquire life insurance on behalf of its shareholders to ensure the continuation of operations in the event one of them dies. This well-established practice was cemented into law in 2005 with the *Blount* case and taxpayers have been relying on the law since the *Huntsman* ruling in 1976. It is standard practice that buyers would not include life insurance proceeds in a company's stock valuation when it is obligated to redeem a shareholder's stock with them. This is because the proceeds are offset dollar-for-dollar by the obligation. Further, the Service has agreed to the valuation being $3,100,000 for purposes of this refund action (Second Stipulation), which confirms that this was an arm's length transaction. Thus, this requirement has been met.

THE SERVICE IS ATTEMPTING TO FABRICATE A BRAND NEW LAW IN THE COURT BY DISREGARDING THE COMPANY'S OBLIGATION

It is believed that the Service views the 11th and 9th Circuit decision as erroneous. That is to say, they do not attempt to distinguish our situation from this settled law, but instead argue that this Court should take an unprecedented approach and decide the issue contrary to and conflicting with these other circuits. There are a number of routes that are and have been available to the Service to change the law to their now chosen stance since the ruling in *Blount* was handed down in 2005. The Service, if disagreeing with a court decision, may issue a nonacquiescence statement that provides taxpayers notice that the Service will not be following that decision. (Exhibit 7-Summers Report, pg. 10, ¶ F). A nonacquiescence statement was never issued in the *Blount* case. (Exhibit 7-Summers Report, pg 12, ¶ 3). As a result, there is no notice to taxpayers that they cannot rely on this case when establishing a buy-sell agreement for a closely-held business. The Service is attempting to force new law through the court; however, the proper venue for that course of action should be through the legislature.

Mr. McChesney, an employee of the Service, was aware that Crown C and not the

shareholders had an obligation to redeem Michael's shares when, on November 28, 2016, Mr.

Steve Dybas, an appraiser for the Service, emailed him noting that the company was the owner

of the life insurance policy not the shareholders. The email to Mr. McChesney reads:

> "If the Remaining Shareholders were not the beneficiaries then
> they did not receive any insurance proceeds and, therefore, were
> not obligated to purchase the shares. Per the language [in Article
> V] of the stock purchase agreement, the obligation to purchase the
> shares would then go the Company." (Exhibit 8).

On March 3, 2017, Mr. McChesney then wondered if the company's obligation were to

be disregarded, whether the proceeds could then be added to the value of the corporation. Mr.

Dybas responded in an email:

> "If the obligation for the corporation to pay the life insurance
> proceeds to the estate is disregarded, then the corporation would
> retain the proceeds as an asset." (Exhibit 9).

Therefore, the Service's argument relies upon disregarding Crown C's obligation to

purchase Decedent's shares. The Service's position is not supported by any kind of reliance upon

an internal revenue code or law that allows the Service to unilaterally disregard a contractual

obligation. Thus, the legal precedent created in the *Blount* matter must be followed in this matter.

Additionally, the Service's expert, Evan K. Cohen, was instructed to accept the valuation

by the Anders Firm except to include the insurance proceeds in the valuation of stock. (Exhibit

11, pg 4). As a result of including the $3,000,000.00 of insurance proceeds used to redeem the

stock, Mr. Cohen determined the valuation of shares to be $5,297,496.00. The increase of

$2,315,000.00 is reached by multiplying Michael's 77.18% interest by $3,000,000.00 in

insurance proceeds. While there is no disagreement with the results of the calculation performed,

there is disagreement with whether one should add that additional insurance proceeds amount in

14

the first place. However, it is explicitly clear that as a matter of law, they should not be added. Further, Mr. Cohen admittedly failed to even consider the case law relevant to the matter when he postulated his opinion. (Exhibit 12-Cohen Deposition, 67:12-23).

Therefore, by disregarding the *Blount* case, Mr. Cohen, purposely ignored the legal precedent in *Blount* as to how life insurance proceeds should be treated when the proceeds are used to redeem the shares pursuant to a Buy-Sell Agreement. By ignoring the law, he attempts to provide the Service an alternative argument that is completely unsupported by the Internal Revenue Code and the prevailing caselaw. This contradiction to the well-established law undermines the purpose of the courts as they have already discerned the appropriate action regarding insurance proceeds. This façade of a dispute has already been settled by law, and there are explicit instructions that dictate the handling of proceeds. Additionally, the Service is well-aware of the *Blount* decision and its application here since they were a party to the matter. It remains settled law that is indistinguishable from our case.

CONCLUSION

There are no genuine facts in dispute, as the value of the company at the time of the Decedent's death has been agreed to by the parties. The sole disagreement at hand is whether the insurance proceeds should be included in the valuation of stock in addition to the value of Crown C when those proceeds are contractually obligated to be used for redemption of the decedent's shares. This is a question of law, but a question that has been already settled by the courts. Based on established valuation principles and caselaw, which have not been reversed, the Service's position is unsupported to require the Estate of Michael Connelly to include the value of life-insurance proceeds in the valuation of Crown C and thus the Plaintiff is entitled to the refund it has documented and submitted in the matter.

15

Respectfully submitted,

/s/ *Robert L. Devereux*
ROBERT L. DEVEREUX
Danna McKitrick, P.C.
7701 Forsyth Blvd., Suite 1200
St. Louis, MO 63105
Phone: 314.726.1000
Fax: 314.725.6592
Email: rdevereux@DMFIRM.com
**ATTORNEY FOR PLAINTIFF
THOMAS A. CONNELLY, IN HIS
CAPACITY AS EXECUTOR OF THE
ESTATE OF MICHAEL P.
CONNELLY, SR.**