

PLAINTIFF'S
EXHIBIT
7

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| Thomas A. Connelly,<br>in his Capacity as Executor of the<br>Estate of Michael P. Connelly, Sr., | )<br>)<br>)<br>) | |
| Plaintiff, | )<br>) | |
| v. | )<br>) | Case No. 4:19-cv-01410-SRC |
| The United States of America,<br>Department of the Treasury,<br>Internal Revenue Service | )<br>)<br>)<br>) | |
| Defendants. | )<br>) | |

**EXPERT REPORT OF KEVIN P. SUMMERS**

I.    **Introduction**

A.    My name is Kevin P. Summers. I am a Certified Public Accountant in St. Louis, Missouri. I am a partner in the firm of Anders Minkler Huber & Helm LLP. My Curriculum Vitae is attached hereto and incorporated herein by reference (see Exhibit 1). Also included with this report is a listing of the matters in connection with which I have given a sworn statement within the past four years (see Exhibit 2) and presentations on technical topics within the past ten years (see Exhibit 1).

B.    I have been retained by Danna McKitrick, P.C. on behalf of their client, Thomas A Connelly, in his capacity as Executor of the Estate of Michael P. Connelly, Sr. ("Plaintiff") to review certain information and provide opinions in connection with this matter. The opinions I have formed are set forth herein and are those opinions that I hold to a reasonable degree of certainty and probability. A listing of the documents which I considered in forming the opinions that are set forth in this report is attached hereto and incorporated herein by reference (see Exhibit 3).

C.    I have prepared this report to summarize the opinions which I may express at deposition and/or trial in this matter. My opinions are based upon the documents I reviewed, the assumptions and facts set forth herein, and my professional experience, education and training. It is usual and customary for a Certified Public Accountant who is Accredited in Business Valuation and Certified in Financial Forensics to rely on such information in forming opinions.

D.    This engagement has been performed in accordance with the *Statement on Standards for Forensic Services No. 1* issued by the American Institute of Certified Public Accountants.

1

E. This report is based upon information available and facts known by me at the time of its presentation. I reserve the right to amend or supplement this report if relevant information becomes available to me at a later date.

F. If requested by counsel, I may create trial exhibits based upon information and opinions contained in this report.

G. Throughout this report, the words "I", "me" and "my" shall mean myself or persons working under my direct supervision and control.

H. Compensation for my time and for personnel assisting me in this engagement is based upon hourly rates ranging from $250 per hour to $513 per hour. My hourly rate is $513 per hour.

I. This report is confidential, intended solely for use in connection with the above-referenced matter and may not be inspected, copied or used for any other purpose.

## II.   Background

### A. Complaint

1. As stated in Complaint, Plaintiff, Thomas A. Connelly, in his capacity as Executor of the Estate of Michael P. Connelly, Sr., brings this action for the recovery of $1,027,041.77 erroneously, illegally, and excessively assessed against and/or collected from Plaintiff as federal estate tax in his capacity as the Executor for the Estate of Michael P. Connelly, Sr., together with interest as provided by law.[1]

2. Plaintiff is the Executor of the Estate of Michael P. Connelly, Sr., late of St. Louis County, State of Missouri, having been appointed as such by the St. Louis County Circuit Court, Probate Division, and Letters Testamentary issued on October 1, 2013.[2]

3. Defendant is The United States of America, Department of the Treasury, Internal Revenue Service.[3]

4. At the time of Decedent's death, The Michael Patrick Connelly Indenture of Trust dated August 15, 1990 owned 385.90 shares of stock in Crown C Supply Company, Inc. (hereinafter "Crown C Supply"), which constituted 77.18 percent of the outstanding shares of Crown C Supply. The Decedent's Crown C Supply stock was subject to an Amended and Restated Stock Purchase Agreement dated as of August 29, 2001. Subsequent to the Decedent's death, in accordance with the requirements under the Amended and Restated Stock Purchase Agreement, Crown C Supply redeemed all of the Decedent's Crown C Supply stock for $3,000,000 pursuant to a Sale and Purchase Agreement dated November 13, 2013.[4]

5. An issue was raised during the course of the audit of the Decedent's Form 706 as to whether or not the value of Decedent's Crown C Supply stock shown on Form 706 was accurate. As a result of the issue involving the value of Decedent's Crown C Supply stock, Plaintiff obtained a calculation of value of the Decedent's Crown C Supply stock as of October 1, 2013, from Anders Minkler Huber & Helm, LLP

---

[1] *Complaint* filed May 23, 2019, at §5
[2] *Id.* at §1
[3] *Id.* at §2
[4] *Id.* at §14

2

("Anders Firm"). This calculation of value determined that Decedent's Crown C Supply stock as of the date of Decedent's death was $2,982,000.[5]

**B. Second Stipulation**

1. Plaintiff and Defendant are in the process of finalizing a "Second Stipulation". The most recent draft of the "Second Stipulation" reads as follows:

"Whereas, this is a federal estate tax refund case that requires the Court to determine the value of Michael P. Connelly, Sr.'s (the "Decedent") taxable estate, which necessarily takes in account the Amended and Restated Stock Purchase Agreement (the "Agreement," previously marked as Exhibit C) that was in full force and effect at the time of the Decedent's death. The paramount issue is whether the $3,000,000 of life insurance death benefits proceeds that Crown C Supply Company, Inc. ("Crown C") received upon the Decedent's death and then used to fulfill its obligation under the Agreement to redeem the Decedent's shares should be included in the value of Crown C and the Decedent's Crown C stock. Put another way the issue is, how to account for the life insurance proceeds, payable on the Decedent's death, that were used to redeem the Decedent's Crown C stock (the "Life Insurance Issue");

Whereas, the parties stipulate as follows:

1. This stipulation does not involve the Life Insurance Issue and has no effect thereon;

2. The plaintiff will not owe any additional federal estate taxes; and

3. At the conclusion of this case—whether by decision of this Court, the Court of Appeals for the Eighth Circuit, or Supreme Court—if the plaintiff is due a federal estate tax refund, for the purpose of determining the amount of such refund, the fair market value of the Decedent's interest in the Company was $3,100,000 (three million one hundred thousand dollars), as of October 1, 2013 as opposed to the $2,982,000 estimate of value submitted by the Decedent's estate to the IRS during the audit phase."[6]

**C. Amended and Restated Stock Purchase Agreement**

1. On August 29, 2001, an Amended and Restated Stock Purchase Agreement ("Stock Purchase Agreement") was executed by and among Crown C Supply, a corporation organized under the laws of Missouri; Michael P. Connelly, Trustee U/I/T dated 8/15/90, Michael P. Connelly, Grantor; and Thomas A. Connelly.[7]

---

[5] *Id.* at §15
[6] Second Stipulation dated November XX, 2020 (Draft Version as of Monday, December 7, 2020 at 8:47 AM)
[7] Amended And Restated Stock Purchase Agreement Dated August 29, 2001 (IRS ADMIN-0000068-0000090)

2.  Article V (Death) of the Stock Purchase Agreement states the following:[8]

"A.  In the event of the death of a Stockholder ("Deceased Stockholder") the Remaining Stockholders (for purposes of this Article V, Remaining Stockholders shall mean the Stockholders who are not deceased) shall have the same series of Stockholder options as provided in Paragraph A of Article II to purchase the Shares as if the Deceased Stockholder was an Offering Stockholder; provided, however, that the Remaining Stockholders shall and must purchase from the Deceased Stockholder's personal representative, executor, administrator or successor trustee of any trust, as the case may be ( collectively, the "Legal Representative"), and the Legal Representative shall and must sell to the Remaining Stockholders, their Proportionate Share of the Deceased Stockholder's Shares up to the amount of any insurance proceeds that are received by the Remaining Stockholders as a result of the Deceased Stockholder's death. Said option period shall commence on the date of the Deceased Stockholder's death. In the event a Remaining Stockholder elects to exercise his or her Stockholder Option, or is required to purchase the Shares as per the terms of this Article, said Stockholder must provide written notice to the Legal Representative within thirty (30) days of the Deceased Stockholder's Death. If one or more Remaining Stockholders fail to exercise their option, the Remaining Stockholders that do shall have the same series of options to purchase the non-purchased Shares as in Paragraph A of Article II. The purchase price to be paid by each Remaining Stockholder shall be his Proportionate Share of the purchase price provided in Article VII, the purchase price shall be paid as per the terms provided in Article VIII, and the purchase of the Shares shall be closed on the Closing Date as provided in Article IX.

B.  In the event that all of the Deceased Stockholder's Shares are not purchased by the other Stockholders, then the Company shall and must purchase from the Legal Representative and the Legal Representative must sell to the Company all of the Deceased Stockholder's Shares that are not purchased by the Remaining Stockholders. The purchase price to be paid by the Company shall be the purchase price provided in Article VII, the purchase price shall be paid as per the terms provided in Article VIII, and the purchase of the Shares shall be closed on the Closing Date as provided in Article IX."

3.  Article VII (Purchase Price For Shares) of the Stock Purchase Agreement states the following:[9]

"A.  In the event Shares are purchased pursuant to the terms of this Agreement, the purchase price per Share (the "Purchase Price Per Share") shall be the amount per Share set forth in the Certificate of Agreed Value, as that term is defined in Paragraph B of this Article VII; provided, however, that in the event the Stockholders fail or refuse to execute a new Certificate of Agreed Value within eighteen (18) months following the date of the last

---

[8] *Id.* (IRS ADMIN-0000076-0000077)
[9] *Id.* (IRS ADMIN-0000077-0000079)

executed Certificate of Agreed Value (i.e., the last executed Certificate of Agreed Value is more than eighteen (18) months old), the Purchase Price Per Share shall be the "Appraised Value Per Share," as that term is defined in Paragraph C of this Article VII. The purchase price ("Purchase Price") of a Selling Stockholder's Shares shall equal the Purchase Price Per Share (or the Appraised Value Per Share, as the case may be) times the number of Shares being sold and purchased.

B.  For purposes of this Agreement, "Certificate of Agreed Value" means a certificate (in the form attached to this Agreement as Exhibit A) signed by all of the Stockholders and filed with the records of the Company, which establishes the agreed per Share value of the Shares or a method of ascertaining the same. Within thirty (30) days after the end of each tax year of the Company, all the Stockholders shall, by mutual agreement, determine the agreed value per Share by executing a new Certificate of Agreed Value in the form of Exhibit A. A Certificate of Agreed Value shall be effective only when executed by all of the Stockholders.

C.  For the purposes hereof, the "Appraised Value Per Share" of the Company shall be determined as follows: If the Certificate of Agreed Value is more than eighteen (18) months old, within ten (10) days after the date an option is exercised or a mandatory purchase is required ("Appraisal Date"), the transferring Stockholder or his successor in interest shall appoint an appraiser and the Company or purchasing Stockholder(s), as the case maybe, shall appoint an appraiser. Both appraisers shall have at least five (5) years of experience in appraising businesses similar to the Company. If either party fails to name such an appraiser within the specified time, the other party may upon five (5) days written notice to the failing party, select the second appraiser. Each appraiser shall independently determine and submit to the parties, in writing, with reasons therefor, an appraisal of the fair market value of the Company. The appraisers shall take into consideration the goodwill of the Company in determining the fair market value of the Company. The appraisers shall not take into consideration premiums or minority discounts in determining their respective appraisal values. Upon receipt by the parties of both appraisals, if the fair market value of the Company is determined to be the same or if the difference between the appraisals is less than ten percent (10%) of the lower of the appraised values, then the fair market value of the Company shall be the average of the two appraisals. If the appraisals so submitted differ by more than ten percent (10%) of the lower of the appraised values, the accountants then servicing the Company shall appoint a third appraiser. The third appraiser so appointed shall, as promptly as possible, determine the value of the Company on the same basis as above set forth, and that prior appraisal which is closer in value to such third appraisal shall, thereupon, be the appraisal which is binding on all parties in interest hereunder. The "Appraised Value Per Share" shall equal the amount determined by dividing the binding appraisal by the total number of Shares of the Company issued and outstanding as of the Appraisal Date. Each party shall pay the fee and expenses of the appraiser selected by such party and the fee of the third appraiser shall be borne equally by the parties appointing the two appraisers."

4.  Article VIII (Payment of Purchase Price) of the Stock Purchase Agreement states the following:[10]

"A.  The payment of the Purchase Price for Shares sold pursuant to this Agreement shall be made on the Closing Date as follows: one-third (1/3) of the Purchase Price shall be paid in cash on the Closing Date, and the balance of the Purchase Price shall be evidenced by the execution and delivery of a negotiable promissory note to the Stockholder or his Legal Representative or Disability Representative, as the case may be, who is selling Shares (collectively "Selling Stockholder") in the form and having the substantive provisions of the "Promissory Note," attached hereto as Exhibit B and incorporated by this reference herein. The Promissory Note shall be payable in thirty-six (36) equal monthly installments of principal and interest, the first of which shall be payable one (1) month after the Closing Date, with interest thereon at the prime rate of interest publicly announced by Firstar Bank as of the date of the Promissory Note. The Promissory Note shall further provide that the maker shall have the right to prepay the whole or any part thereof prior to the maturity date without any charge, penalty or additional interest, such prepayment to be applied first to interest and then to principal in the inverse order of maturity.

B.  In the event of a sale and purchase under Article V (Death), and the proceeds collected from any life insurance owned by the surviving Stockholders or the Company on which the Decedent Stockholder was the insured are sufficient to pay the Purchase Price in full, the full amount of said Purchase Price shall be paid on the Closing Date to the Legal Representative of the Decedent Stockholder, and any remaining proceeds may be retained by the beneficiary thereof. If the Purchase Price exceeds the proceeds of any life insurance collected, the insurance proceeds shall be paid on the Closing Date directly to the Legal Representative of the Decedent Stockholder and the balance of the Purchase Price shall be evidenced by a promissory note identical (except for principal amount) to the Promissory Note described in Paragraph A of this Article VIII, which shall be delivered to and in favor of the estate of the Decedent Stockholder, with the maker being the Remaining Stockholder(s)."

## D.  Estate of George C. Blount v. Commissioner of Internal Revenue

1.  In *Estate of George C. Blount v. Commissioner of Internal Revenue*, the United States Court of Appeals, Eleventh Circuit ("Court of Appeals") held as follows: "We AFFIRM the Tax Court's determination that the stock-purchase agreement does not fall within the statutory exception, which would allow the parties to conclusively establish the value of the corporation for taxation purposes at an agreed upon purchase price. Because the Tax Court should not have added the insurance proceeds to the value of the corporation when calculating its fair market value, we REVERSE the court's computation of that value."[11]

---

[10] *Id.* (IRS ADMIN-0000079-0000080)

[11] *Estate of George C. Blount v. Commissioner of Internal Revenue*, 428F.3d 1338, 1340 (United States Court of Appeals, Eleventh Circuit, 2005)

2. The following background and discussion excerpts are from the Court of Appeals' opinion:

   a. Blount Construction Company ("BCC") is a closely held Georgia corporation that constructs roads and similar projects for private entities and Georgia municipalities. In 1981, the corporation's only shareholders, William C. Blount and James M. Jennings, and BCC entered into a stock-purchase agreement that required shareholder consent to transfer stock and established that BCC would purchase the stock on the death of the holder at a price agreed upon by the parties or, in the event that there is no agreement, for a purchase price based on the book value of the corporation.[12]

   b. In the early 1990s, BCC purchased insurance policies solely for the purpose of ensuring that the business could continue operations, while fulfilling its commitments to purchase stock under the agreement. These policies would provide roughly $3 million, respectively, for the repurchasing of Jennings and Blount's stock. In 1992, BCC also began an employee stock ownership program ("ESOP") to which the company made annual contributions, either by purchasing stock from Blount and Jennings or by new issuances. Annual valuations were completed by a third party to facilitate the ESOP purchases. For example, as of January 1995, BCC was valued at roughly $7.9 million.[13]

   c. In January 1996, Jennings died owning 46% of BCC's outstanding shares. BCC received about $3 million from the insurance proceeds, and paid a little less than $3 million to Jennings's estate. BCC used the previous year's book value to determine the amount to be paid to Jennings's estate.[14]

   d. In October 1996, Blount was diagnosed with cancer, and his doctor predicted only a few months to live. Concerned that the buyout requirement of the 1981 stock-purchase agreement would deprive BCC of the liquidity it needed to function, he commissioned several studies regarding the amount of money his estate could receive for his shares and still leave the company in a healthy financial condition. Apparently, Blount was not concerned about his family, because they were wealthy independent of the proceeds from the sale of his BCC stock.[15]

   e. In November 1996, Blount executed an amendment to the 1981 stock-purchase agreement that bound himself and BCC to exchange $4 million for the shares that Blount owned at his death. The 1996 agreement was substantially similar to the subsection in the 1981 agreement regarding the purchase of shares upon the death of the holder. Unlike the 1981 agreement, however, the 1996 agreement did not provide for future price adjustments in accordance with book value, which functionally locked the price at the January 1996 value of BCC. The 1996 agreement also differed from the 1981 agreement by removing the ability of BCC to pay its obligation in installments.[16]

---

[12] *Id.*
[13] *Id.*
[14] *Id.*
[15] *Id.*
[16] *Id.* at 1340-1341

f.  When Blount died in September 1997, he owned 43,080 shares, or roughly 83% of BCC. BCC paid $4 million to the estate of Blount ("Taxpayer") in November of that year "in accordance with the November 11, 1996 Shareholders Agreement."[17]

g.  In 1997, the Taxpayer filed a return declaring $4 million as the value of the shares, and the IRS filed a notice of deficiency claiming that the stock was worth $7,921,975. Implicit in this valuation of Blount's shares is a claim that BCC's fair market value exceeded $9.5 million. The Tax Court held that the 1981 agreement, as modified by the 1996 amendment, was to be disregarded for the purpose of determining the value of the shares. *Estate of Blount v. Comm'r,* 87 T.C.M. 1303, 1312, 2004 WL 1059517 (2004). The court also held that the amount of tax should have been calculated by adding the insurance proceeds to the other assets of BCC in order to arrive at the fair market value of the corporation. *Id*. at 1322.[18]

h.  On the issue of the fair market value of BCC, each party offered one expert. The IRS's expert, James Hitchner, concluded that the company was worth $7 million, and the Taxpayer's expert, Gerald Fodor, computed the value at $6 million. Both experts used a blend of asset-based and income-based approaches to determine fair market value.[19]

i.  The Tax Court began with Fodor's estimate but concluded that the expert should not have offset the value by the ESOP buyout obligation-for which Fodor made a $750,000 downward adjustment-and that BCC, therefore, was worth $6.75 million. The court found that Hitchner overvalued BCC's cash reserves and that, when this overvaluation was corrected, Hitchner's analysis also would value the company near $6.75 million. Thus, the Tax Court concluded that both experts essentially reached the same base value for the corporation.[20]

j.  Taking this base value of $6.75 million, the Tax Court found that the proper value of the stock was $9.85 million, adding the insurance proceeds of $3.1 million to compute the fair market value of the company. *Id*. at 1322. This meant that the value of Blount's stock for estate tax purposes was $8.2 million, but the Tax Court limited the amount assessed to the value determined by the IRS in its original notice of deficiency, that is, just less than $8 million. *Id*. As a result of the Tax Court's valuation of the BCC stock, additional taxes of approximately $1.36 million were paid by the Taxpayer to cover the deficiency.[21]

k.  We review *de novo* the Tax Court's rulings on the interpretation and application of the tax code. *Roberts v. Comm'r,* 329 F.3d 1224, 1227 (11th Cir.2003) (per curiam). The Tax Court's fact findings are reviewed for clear error. *Davenport Recycling Assocs. v. Comm'r,* 220 F.3d 1255, 1258 (11th Cir.2000). In this case, we conclude that the $6.75 million valuation for BCC is not clearly erroneous. However, we find the conclusion of the Tax Court, that the

---

[17] *Id.* at 1341
[18] *Id.*
[19] *Id.*
[20] *Id.* at 1342
[21] *Id.*

insurance proceeds of $3.1 million should be added to the value of BCC, to be in error.[22]

l.  To establish the fair market value of BCC, the Tax Court blended the analyses of the experts to arrive at a value of $6.75 million. The IRS and the Taxpayer, albeit alternatively, agree that this is the base value for the assets and liabilities of BCC as of the date of Blount's death. We accept the accuracy of this value as not clearly erroneous. The Tax Court then added the insurance proceeds that BCC would receive on Blount's death to the value of the company, concluding that the value of BCC would have been $9.85 million. In doing so, the Tax Court erred.[23]

m.  In valuing the corporate stock, "consideration shall also be given to nonoperating assets, including proceeds of life insurance policies payable to or for the benefit of the company, to the extent that such nonoperating assets have not been taken into account in the determination of net worth." Treas. Reg. §20.2031-2(f)(2). The limiting phrase, "to the extent that such nonoperating assets have not been taken into account," however, precludes the inclusion of the insurance proceeds in this case. Likewise, in *Estate of Cartwright v. Commissioner*, the Ninth Circuit approved deducting the insurance proceeds from the value of the organization when they were offset by an obligation to pay those proceeds to the estate in a stock buyout.183F.3d 1034, 1038(9thCir.1999); see also *Estate of Huntsman v. Comm'r*, 66 T.C. 861, 875, 1976 WL 3635 (1976).[24]

n.  The rationale in Cartwright is persuasive and consistent with common business sense. BCC acquired the insurance policy for the sole purpose of funding its obligation to purchase Blount's shares in accordance with the stock-purchase agreement. Even when a stock-purchase agreement is inoperative for purposes of establishing the value of the company for tax purposes, the agreement remains an enforceable liability against the valued company, if state law fixes such an obligation. Here the law of Georgia required such a purchase.[25]

o.  Thus, we conclude that the insurance proceeds are not the kind of ordinary nonoperating asset that should be included in the value of BCC under the treasury regulations. To the extent that the $3.1 million insurance proceeds cover only a portion of the Taxpayer's 83% interest in the $6.75 million company, the insurance proceeds are offset dollar-for-dollar by BCC's obligation to satisfy its contract with the decedent's estate. We conclude that such nonoperating "assets" should not be included in the fair market valuation of a company where, as here, there is an enforceable contractual obligation that offsets such assets. To suggest that a reasonably competent business person, interested in acquiring a company, would ignore a $3 million liability strains credulity and defies any sensible construct of fair market value.[26]

---

[22] *Id.*
[23] *Id.* at 1345
[24] *Id.*
[25] *Id.*
[26] *Id.* at 1346

**E. General Overview – Guidelines for Estate, Gift, and Income Valuations**

1. The following excerpts are from *Financial Valuation: Applications and Models* (Fourth Edition) [27] by James R. Hitchner, who served as the IRS' expert in the *Estate of George C. Blount v. Commissioner of Internal Revenue* matter:

   a. For estate, gift, and income tax planning purposes, minimization of taxes is one of the primary objectives for owners of closely held businesses. This chapter presents a general overview of the guidelines for estate, gift, and income tax valuations as set forth in the Internal Revenue Code, Treasury Regulations, and Internal Revenue Service ("IRS") Revenue Rulings. [28]

   b. General guidelines for estate and gift valuations are primarily set forth in the Internal Revenue Code ("IRC"), Treasury Regulations, and Revenue Rulings. Additional guidance is found in the IRS positions as set forth in Technical Advice Memorandums and Private Letter Rulings. Court cases are also very helpful. [29]

   c. The IRC provides general guidance on the valuation of closely held companies as well as the applicable valuation dates for estate and gift taxes. [30]

   d. Treasury Regulations represent the interpretation of the IRC by the U.S. Department of the Treasury. Key Treasury Regulations address the applicable standard of value for estate and gift taxes, guidelines for valuing closely held businesses, and disclosure requirements for gift tax returns. [31]

   e. Revenue Rulings provide official interpretation of IRC, related statutes, tax treaties, and regulations by the IRS and application of the law to a specific set of facts. [32]

   f. The IRS may publish Actions on Decisions in its weekly Internal Revenue Bulletins and provides a complete list of Actions on Decisions from 1997 to the present online. The IRS describes an Action on Decision ("AOD") as "a formal memorandum prepared by the IRS Office of Chief Counsel that announces the future litigation position the IRS will take with regard to the court decision addressed by the AOD." Action on Decisions for selected cases are prefaced by the following description:

      The recommendation in every Action on Decision will be summarized as acquiescence, acquiescence in result only, or nonacquiescence. Both "acquiescence" and "acquiescence in result only" mean the that the Service accepts the holding of the court in a case and the Service will follow it in disposing of case with the same controlling facts. However, "acquiescence" indicates neither approval nor disapproval of the reasons assigned by the court for its conclusions; whereas "acquiescence in result only"

---

[27] James R. Hitchner, *Financial Valuation: Applications and Models*, 4th ed. (New Jersey: John Wiley & Sons, Inc., 2017)
[28] *Id.* at pg. 681
[29] *Id.*
[30] *Id.* at pg. 682
[31] *Id.* at pg. 683
[32] *Id.* at pg. 686

indicates disagreement or concern with some or all of those reasons. Nonacquiescence signifies that the Service does not agree with the holding of the court and, generally will not follow the decision in disposing of cases involving other taxpayers. In reference to an opinion of a circuit court of appeals, a nonacquiescence indicates that Service will not follow the holding on a nationwide basis. However, the Service will recognize the precedential impact of the opinion on cases arising within the venue of the deciding circuit.[33]

III.   **Opinions**

A. Based upon the background information provided above, my review of the documents and information as listed in Exhibit 3, and my professional experience, education, and training as a Certified Public Accountant who is Accredited in Business Valuation and Certified in Financial Forensics, my opinions are as follows.

B. **Stock Purchase Agreement**

1. The draft Second Stipulation states that the Stock Purchase Agreement was in full force and effect at the time of the Decedent's death. I am unaware of any claims by Defendant that the Stock Purchase Agreement was not an enforceable contract under Missouri law. Therefore, I have assumed that the Stock Purchase Agreement was an enforceable contract under Missouri Law.

2. Section VIII(B) of the Stock Purchase Agreement required that in the event of a sale and purchase under Article V (Death), the proceeds collected from any life insurance owned by the surviving stockholders or the Company on which the decedent stockholder was the insured must be used to pay the purchase price. If the purchase price was less than the insurance proceeds, then the remaining proceeds may be retained by the beneficiary. If the purchase price exceeds the life insurance proceeds, then the insurance proceeds must be paid on the closing date to the legal representative of the decedent stockholder and the balance of the purchase price must be evidenced by a promissory note.[34]

3. Here, Crown C Supply was the owner and beneficiary of life insurance on Michael P. Connelly, Sr. ("Mr. Connelly"). Thus, according to Section VIII(B) of the Stock Purchase Agreement, upon the death of Mr. Connelly on October 1, 2013, Crown C Supply had an enforceable contractual obligation to use the life insurance proceeds to purchase Mr. Connelly's stock in Crown C Supply.

C. **Estate of George C. Blount v. Commissioner of Internal Revenue**

1. Like in *Blount*, Crown C Supply owned life insurance policies for the sole purpose of funding its enforceable contractual obligation under the Stock Purchase Agreement.[35] The life insurance proceeds provided liquidity to Crown C Supply so that the company could meet its enforceable contractual obligation to purchase a decedent stockholder's shares in accordance with the Stock Purchase

---

[33] *Id.* at pg. 780
[34] Amended And Restated Stock Purchase Agreement Dated August 29, 2001 (IRS ADMIN-0000079-0000080)
[35] Discussion with Tom Connelly, December 9, 2020

Agreement.[36] The approach Crown C Supply took in order to fund an enforceable contractual obligation under the Stock Purchase Agreement with life insurance is consistent with common business sense.

2. Applying the Court of Appeals holding in *Blount*, the life insurance proceeds received by Crown C Supply were not the kind of ordinary nonoperating asset that should be included in the value of Crown C Supply. As such, the life insurance proceeds should be offset dollar-for-dollar by Crown C Supply's obligation to satisfy its contractual obligation with Mr. Connelly's estate. Thus, such nonoperating "assets" should not be included in the fair market value of Crown C Supply due to the enforceable contractual obligation that offsets such assets.

3. As referenced in Section II(E)1(f) above, I personally searched the IRS' Action on Decisions database. [37] Using both the "Decision" category and the "Issue" category, I entered the term "Blount" in the "Find Box" and received a message that "No Results Were Found That Match Your Entry In The "Find" Field". Next, I searched both the "Decision" category and the "Issue" category using the term "Life Insurance" in the "Find Box" and again I received a message that "No Results Were Found That Match Your Entry In The "Find" Field". Due to the fact the IRS has not issued an AOD with regards to the *Blount* case or the issue of life insurance, Plaintiff should be allowed to rely on the Court of Appeals decision in *Blount*.

**D.  IRS Disregards Obligation To Pay Life Insurance Proceeds To The Estate**

1. As stated in the Internal Revenue Service "Examining Officer's Activity Record", on October 26, 2016, Richard McChesney, the IRS examining officer, called Stephen Dybas, an appraiser for the IRS.[38] Mr. McChesney's notes read as follows:

> "Called Steve Dybas. He pointed out that the purchase and sale agreement required the stockholders to purchase the stock. The company would only purchase the stock if the stockholders did not. Therefore, the life insurance proceeds should not be reduced by $3,000,000. Worked on response to Cheryl Beebe-Snell's letter."[39]

2. However, on November 28, 2016, upon receiving additional information about the ownership of the life insurance policies, Mr. Dybas' position changed regarding Crown C Supply's requirement to purchase the shares. Mr. McChesney's notes read as follows:

> "Steve Dybas E-mailed me, asking if I had copies of the life insurance policies that reflected that the other stockholders were the owners of the policies. I responded that, per the Forms 712, Crown C Supply was the owner. He responded that, because Crown C Supply was the owner, based

---

[36] *Id.*

[37] https://apps.irs.gov/app/picklist/list/actionsOnDecisions

[38] "Department of the Treasury – Internal Revenue Service – Report of Estate Tax Examination Changes", pg. 7 (IRS ADMIN-0000551)

[39] Internal Revenue Service "Examining Officer's Activity Record", entry dated October 26, 2016 (IRS ADMIN-0001125)

on Article V of the 2001 stock purchase agreement, Crown C Supply was required to purchase the shares."[40]

3. Per an email dated November 28, 2016, Mr. Dybas explains his interpretation of the stock purchase agreement as follows:

"Richard,

This is my interpretation of the language in the stock purchase agreement.

If the Remaining Shareholders were not the beneficiaries then they did not receive any insurance proceeds and, therefore, were not obligated to purchase the shares. Per the language below of the stock purchase agreement, the obligation to purchase the shares would then go the Company.

Per Article V

B. In the event that all of the Deceased Stockholder's Shares are not purchased by the other Stockholders, then the Company shall and must purchase from the Legal Representative and the Legal Representative must sell to the Company all of the Deceased Stockholder's Shares that are not purchased by the Remaining Stockholders. The purchase price to be paid by the Company shall be the purchase price provided in Article VII, the purchase price shall be paid as per the terms provided in Article VIII, and the purchase of the Shares shall be closed on the Closing Date as provided in Article IX.

If my understanding is not accurate please let me know.

Steve"[41]

4. Per an email dated December 22, 2016, Mr. Dybas provided the following update to Mr. McChesney:

"Hi Richard,

Just following up on this case.

If the company had the purchase obligation then the only other potential argument, in my opinion, would be as to the reasonableness of a 6% specific company risk premium the valuator included in his cost of equity.

Merry Christmas!

Steve"[42]

5. Finally, on March 3, 2017, Mr. Dybas was asked the following question by Mr. McChesney: "If the $3,000,000 obligation to pay the life insurance proceeds to the estate is disregarded, is it still your position that, using the net asset value approach, the $3,000,000 in life insurance proceeds should be added to the value of the corporation?". Mr. Dybas responded as follows:

---

[40] *Id.*, entry dated November 28, 2016 (IRS ADMIN-0001127)
[41] Email from Steven M. Dybas to Richard P. McChesney dated November 28, 2016 (IRS ADMIN-0001152)
[42] Email from Steven M. Dybas to Richard P. McChesney dated December 22, 2016 (IRS ADMIN-0001152)

"Hi Richard,

Yes, you advised previously that, per the Forms 712, Life Insurance Statements, completed by the life insurance companies, Crown C Supply, and not the other stockholder, is the beneficiary of the life insurance policies. This being the case, then the insurance proceeds are an asset of the corporation.

If the obligation for the corporation to pay the life insurance proceeds to the estate is disregarded, then the corporation would retain the proceeds as an asset.

If you need anything else just let me know.

Steve"[43]

6. Based on the notes and emails described above, it appears Mr. Dybas, the IRS appraiser, agreed that Crown C Supply had an enforceable contractual obligation to use the life insurance proceeds to purchase Mr. Connelly's stock in accordance with the Stock Purchase Agreement. However, by simply disregarding Crown C Supply's liability associated with its enforceable contractual obligation, despite the Court of Appeals decision in *Blount*, the Defendant takes a position that is not consistent with common business sense and results in the fair market value of Crown C Supply being overstated by $3 million.

Respectfully submitted,

**ANDERS MINKLER HUBER & HELM** LLP

*Kevin P. Summers*

Kevin P. Summers, JD, CPA/ABV/CFF, CVA, CDFA, CEPA
Partner

St. Louis, Missouri
December 9, 2020

---

[43] Email from Richard P. McChesney to Steven M. Dybas (and response) dated March 3, 2017 (IRS ADMIN-0001150)

**EXHIBIT 1**

## *Curriculum Vitae* ━━━━━━━━━━━━━━

### KEVIN P. SUMMERS, JD, CPA/ABV/CFF, CVA, CDFA

**POSITION:**
- Partner & Director – Forensic & Litigation Services Group
  Anders Minkler Huber & Helm LLP
  800 Market Street, Suite 500
  St. Louis, MO  63101
  (314) 655-5547
  ksummers@anderscpa.com

**EDUCATION AND PROFESSIONAL LICENSURE:**
- B.S., Accounting, Maryville University, St. Louis, Missouri

- J.D., Saint Louis University, St. Louis, Missouri

- Certified Public Accountant, State of Missouri (CPA)

- Licensed Attorney, State of Missouri

- Accredited in Business Valuation (ABV)

- Certified in Financial Forensics (CFF)

- Certified Valuation Analyst (CVA)

- Certified Divorce Financial Analyst (CDFA)

**PROFESSIONAL SOCIETIES AND AFFILIATIONS:**
- American Institute of Certified Public Accountants
  Member – AICPA Litigation Services Task Force (2011 – 2016)
  Member – AICPA CFF Credentialing Committee (2018 – 2021)

- Missouri Society of Certified Public Accountants
  Co-Chair – Forensic & Valuation Services Committee (2010 – 2012)
  Fraud Conference Planning Committee (2009 – 2019)

- National Association of Certified Valuation Analysts

- Institute for Divorce Financial Analysts

- American Bar Association

- The Missouri Bar

- St. Louis County Bar Association

- Bar Association of Metropolitan St. Louis

## EXHIBIT 1

- Estate Planning Council of St. Louis

- American Association of Attorney-Certified Public Accountants
  President – Missouri Chapter (2014 – 2017)

- Exit Planning Institute
  Vice President (Membership) – St. Louis Chapter (2015 – 2017)

### *AWARDS AND RECOGNITIONS:*
- Saint Louis University School of Law – Academic Excellence Award in Estate Planning (Spring 2009)

### *PRESENTATIONS, SPEECHES & PUBLICATIONS:*
- *Hot Topics In Forensic Accounting*, MOCPA 2019 Fraud & Forensic Accounting Conference, MOCPA St. Louis Learning Center, St. Louis, MO

- *Valuation Case Study: Market Approach – Guideline Company Transaction Method*, AICPA 2017 Forensic & Valuation Services Conference, Caesars Palace, Las Vegas, NV

- *Valuation Case Study: Market Approach – Guideline Public Company Method*, AICPA 2017 Forensic & Valuation Services Conference, Caesars Palace, Las Vegas, NV

- *Valuation Case Study: Reconciliation – Bringing It All Together*, AICPA 2017 Forensic & Valuation Services Conference, Caesars Palace, Las Vegas, NV

- *Quality of Earnings Reports*, Leading Edge Alliance 2017 North American Conference, Loews Chicago O'Hare, Chicago, IL

- *Jeopardy: ACFE 2016 Report To The Nations On Occupational Fraud & Abuse Edition*, MOCPA 2016 Fraud & Forensic Accounting Conference, MOCPA St. Louis Learning Center, St. Louis, MO

- *Valuation Case Study: Market Approach – Guideline Public Company Method*, AICPA 2016 Forensic & Valuation Services Conference, Gaylord Opryland Hotel, Nashville, TN

- *Complex Capital Structures*, AICPA 2016 Forensic & Valuation Services Conference, Gaylord Opryland Hotel, Nashville, TN

- *Expense Reimbursement Fraud: The Gateway Fraud*, MOCPA 2015 Fraud & Forensic Accounting Conference, MOCPA St. Louis Learning Center, St. Louis, MO

- *Getting Started in Forensics: The Divorce Case*, AICPA 2014 Forensic & Valuation Services Conference, Hyatt Regency, New Orleans, LA

- *Reporting Results: Forensic Accounting Engagements*, AICPA 2014 Forensic & Valuation Services Conference, Hyatt Regency, New Orleans, LA

## EXHIBIT 1

- *Valuation of a Medical Practice for Divorce in Missouri: Personal v. Enterprise Goodwill*, St. Louis Metropolitan Medicine, December 2011 / January 2012, Volume 33, Number 6

- *Making $ense of Lost Profit Calculations*, MOCPA 2011 Forensic & Valuation Services Conference, Doubletree Hotel, St. Louis, MO

- *What Is Your Practice Worth In Today's ACO Marketplace?  A Practice Valuation Will Tell You*, St. Louis Metropolitan Medicine, April / May 2011, Volume 33, Number 2 (Co-Authored with Jerrie Weith)

- *Marketability Discounts: Beyond Restricted Stock Studies*, MOCPA 2010 Business Valuation Conference, Embassy Suites Airport, St. Louis, MO

- *Do You Have What It Takes: Family Law Practice*, MOCPA 2010 Fraud & Forensics Conference, Embassy Suites Airport, St. Louis, MO

- *Discounts & Premiums: A Panel Discussion*, MOCPA 2009 Business Valuation Conference, Embassy Suites Airport, St. Louis, MO

- *Discount Rates Used In Lost Profits Cases: Landmark Cases*, MOCPA 2009 Fraud & Forensics Conference, Embassy Suites Airport, St. Louis, MO

**EXHIBIT 2**

## Kevin P. Summers
## Testimony Summary

| Case | Case Number | Testimony |
|------|-------------|-----------|
| Tracey Ellman v. Robert Ellman (*)<br>Circuit Court of St. Louis County, Missouri – Division 39<br>Marital Dissolution – Income Analysis; Tracing of Marital v. Separate Assets | 19SL-DR01304 | Trial – 11/17/20 |
| Jennifer Mueller-Sparrow (*) v. Gerald R. Sparrow<br>Circuit Court of St. Louis County, Missouri – Division 36<br>Marital Dissolution – Business Valuation; Tracing of Marital v. Separate Assets | 18SL-DR04119 | Trial – 02/20/20 |
| Kevin Tully (*) v. Alexandra Tully<br>Circuit Court of St. Louis County, Missouri – Division 65<br>Marital Dissolution – Modification of Maintenance | 08SL-DR00391-02 | Trial – 02/04/20 |
| Christopher S. Pruett (*) v. Shellie M. Pruett<br>Circuit Court of St. Louis County, Missouri – Division 39<br>Marital Dissolution – Business Valuation | 18SL-DR03708 | Special Master Hearing – 10/23/19 |
| Mary Elizabeth Wilson v. Thomas Edward Murawski (*)<br>Circuit Court of St. Louis County, Missouri – Division 37<br>Marital Dissolution – Maintenance & After-Tax Cash Flow Analysis | 18SL-DR03031 | Trial – 10/09/19 |
| Amy Brick v. Ryan Brick, et al. (*)<br>Circuit Court of Camden County, Missouri<br>Marital Dissolution – Business Valuation | 14CM-DR00193 | Deposition – 08/09/19<br>Trial – 09/05/19 |

**EXHIBIT 2**

## Kevin P. Summers
## Testimony Summary

| Case | Case Number | Testimony |
|------|-------------|-----------|
| Ferrell Mobile Homes, Inc. (*) v. Champion Home Builders, Inc.<br>United States District Court – Eastern District of Missouri – Southeastern Division<br>Breach of Contract, Promissory Estoppel, & Unjust Enrichment – Lost Profits | 1:17-cv-00065 | Deposition – 08/10/18 |
| Christopher E. Erker v. Kara L. Erker (*)<br>Circuit Court of St. Louis County, Missouri – Division 33<br>Marital Dissolution – Tracing of Marital v. Separate Assets, Herr Formula | 16SL-DR05826 | Deposition – 07/10/18<br>Trial – 09/06/18 |
| Angel S. Hoeckele v. Todd . Schilli (*)<br>Circuit Court of Perry County, Missouri<br>Marital Dissolution – Business Valuation | 15PR-DR00029 | Deposition – 02/24/17 |

19

## EXHIBIT 3

**In addition to and including documents cited within my report, I have reviewed and/or relied upon the following documents:**

1. Complaint dated May 23, 2019
2. Letter dated February 14, 2017 (IRS ADMIN-0000218-0000225)
3. Plaintiff Thomas A. Connelly's Response To Defendant's First Set Of Requests For Admission, In His Capacity As Executor Of The Estate of Michal P. Connelly, Sr. dated April 24, 2020
4. Plaintiff Thomas A. Connelly's Amended Response To Defendant's First Set Of Requests For Admission, In His Capacity As Executor Of The Estate of Michal P. Connelly, Sr. dated May 8, 2020
5. Plaintiff Thomas A. Connelly's Response To Defendant's Second Set Of Requests For Admission To Plaintiff Thomas A. Connelly, In His Capacity As Executor Of The Estate of Michal P. Connelly, Sr. dated May 14, 2020
6. Plaintiff Thomas A. Connelly's Response To Defendant's Third Set Of Requests For Admission To Plaintiff Thomas A. Connelly, In His Capacity As Executor Of The Estate of Michal P. Connelly, Sr. dated July 10, 2020
7. Plaintiff Thomas A. Connelly's Response To Defendant's Fourth Set Of Requests For Admission To Plaintiff Thomas A. Connelly, In His Capacity As Executor Of The Estate of Michal P. Connelly, Sr. dated August 28, 2020
8. Plaintiff Thomas A. Connelly's Response To Defendant's Fifth Set Of Requests For Admission To Plaintiff Thomas A. Connelly, In His Capacity As Executor Of The Estate of Michal P. Connelly, Sr. dated November 3, 2020
9. United States' Response And Objection To Plaintiff's Second Request For Production Of Documents dated November 20, 2020
10. United State Department of Justice, Tax Division, Memorandum and Attachments Regarding Expert Witness Services dated November 18, 2019 (USA000001-000032)
11. First Stipulation dated November XX, 2020 (Draft as of Monday, December 7, 2020 at 8:47 AM)
12. Second Stipulation dated November XX, 2020 (Draft as of Monday, December 7, 2020 at 8:47 AM)
13. *Estate of George C. Blount v. Commissioner of Internal Revenue*, T.C. Memo. 2004-116, United States Tax Court, May 12, 2004
14. U.S. Department of Justice, Tax Division, Subpoena Dated January 6, 2020
15. Response to U.S. Department of Justice, Tax Division, Subpoena Dated January 6, 2020 (ANDERS 1 – ANDERS 1179)

**EXHIBIT 3**

16. Deposition Transcript of Evan K. Cohen dated November 25, 2020, including the following
Plaintiff's Exhibits:

    a.  Plaintiff's Exhibit 1 – Notice of Deficiency dated June 7, 2017 (IRS ADMIN-0000057-
0000063)

    b.  Plaintiff's Exhibit 2 – Claim for Refund Form 843 dated December 28, 2017 (IRS ADMIN-
0000266-0000277)

    c.  Plaintiff's Exhibit 3 – Amended and Restated Stock Purchase Agreement dated August
29, 2001 (IRS ADMIN-0000068-0000090)

    d.  Plaintiff's Exhibit 4 – Sale and Purchase Agreement dated November 13, 2013 (IRS
ADMIN-0000091-0000096)

    e.  Plaintiff's Exhibit 5 – Crown C Supply Company, Inc. Calculation of Value of a 77.18%
Ownership Interest as of October 1, 2013 prepared by Anders Minkler Huber & Helm
LLP (C000613 – C000640)

    f.  Plaintiff's Exhibit 6 – IRS Estate Mandatory Lead Sheet & Examining Officer's Activity
Record (IRS ADMIN-0001115-0001129)

    g.  Plaintiff's Exhibit 7-10 – Emails (IRS ADMIN-0001150-0001153)

    h.  Plaintiff's Exhibit 11 – Department of the Treasury-Internal Revenue Service Report of
Estate Tax Examination Changes (IRS ADMIN-0000545-0000598)

    i.  Plaintiff's Exhibit 12 – Expert Report of Evan K. Cohen dated October 29, 2020

    j.  Plaintiff's Exhibit 13 – Excerpt from "Understanding Business Valuation – A Practical
Guide to Valuing Small to Medium Sized Business" by Gary R. Trugman

    k.  Plaintiff's Exhibit 14 – Notice CP220 dated October 23, 2017 (IRS ADMIN-0000064-
0000065)

    l.  Plaintiff's Exhibit 15 – Copy of Two Cashier's Checks (IRS ADMIN-0000067)

    m.  Plaintiff's Exhibit 16 – Promissory Note and Other Banking Documents (C001361 –
C001400)

    n.  Plaintiff's Exhibit 17 – *Estate of George C. Blount v. Commissioner of Internal Revenue*,
425 F.3d 1336, United States Court of Appeals, 11th Circuit (2005)