Item Six



## AMENDED AND RESTATED
## STOCK PURCHASE AGREEMENT

THIS AGREEMENT made as of this _29_ day of _August_ , 2001, by and among CROWN

C SUPPLY COMPANY, INC., a corporation organized under the laws of Missouri (hereinafter

referred to as the "Company"); MICHAEL P. CONNELLY, TRUSTEE U/I/T DATED 8/15/90,

MICHAEL P. CONNELLY, GRANTOR; AND THOMAS A. CONNELLY (hereinafter the above

individuals are collectively referred to as "Stockholders" and individually as a "Stockholder").

WHEREAS, the Company now has issued and outstanding Five Hundred (500) shares of

common stock (the "Shares"), which are owned as follows:

| STOCKHOLDER | SHARES |
|---|---|
| Michael P. Connelly, Trustee U/I/T dated 8/15/90, Michael P. Connelly, Grantor | 385.90 |
| Thomas A. Connelly | 114.10 |

WHEREAS, the Shares are subject to that certain Stock Purchase Agreement ("Stock

Agreement") effective as of January 1, 1983, by and among the Company, Mark Connelly, Michael

P. Connelly and Thomas A. Connelly; and

WHEREAS, Mark Connelly's interest in the Company was terminated prior to the date hereof;

and

WHEREAS, the Stockholders and the Company deem it to be in their respective best personal

and business interests if the Shares remain closely held and not generally distributed on the open

market; and

301213.WPD;3

1

IRS ADMIN-0000068

WHEREAS, the Stockholders desire to promote their mutual interests and the interests of the Company by amending and restating the Stock Agreement to impose certain restrictions and obligations on themselves, the Company and the Shares.

NOW, THEREFORE, in consideration of the mutual covenants herein contained and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

## ARTICLE I
### SCOPE

A.      Except as hereinafter provided, none of the Shares owned or hereafter acquired by any of the Stockholders shall be subject to any voluntary or involuntary transfer, by operation of law or otherwise, including, but not by way of limitation, encumbrance, sale, assignment, gift, pledge, disposal, hypothecation, bankruptcy, legal process, assignment for the benefit of creditors or any other transfer, in any manner whatsoever to any person, trustee, receiver, corporation, partnership, joint venture, association, charity or any other entity or person whatsoever.

B.      Notwithstanding any other provision of this Agreement to the contrary, a Stockholder ("Transferor-Stockholder") shall be free to transfer his Shares to a trust ("Trust-Stockholder"), provided all of the following conditions are met:

(i)      The Transferor-Stockholder shall notify the Company of the transfer and of the relevant terms and conditions of such trust in advance of such transfer.

(ii)      The Transferor-Stockholder is the then sole trustee of the trust.

(iii)      The Transferor-Stockholder, in his capacity as trustee, signs an instrument, satisfactory to the Company, providing that the Trust-Stockholder is bound by all terms and provisions of this Agreement.

301213.WPD;3

2

In the case of any such transfer of Shares to a trust, any event which would give rise to an option(s) to purchase or purchase of Shares owned by the Trust-Stockholder if the Transferor-Stockholder still held the Shares outright, i.e., the death of such Transferor-Stockholder, shall give rise to the same option(s) to purchase or purchase of the Trust-Stockholder's Shares under the same terms and conditions. Similarly, any rights or obligations a grantor may have under this Agreement shall be transferred to and become rights or obligations of the Trust-Stockholder. In addition, in the case of any such transfer of Shares to a trust, if the Transferor-Stockholder ceases to be the sole trustee of the trust, for whatever reason, such event shall be treated as if the Trust-Stockholder were an Offering Stockholder that provided Notice to the Company under Article II, and the Purchase Price shall be the price provided in Article VII.

C.      In the event any Shares are attempted to be sold, pledged or transferred contrary to, or in violation of, the provisions of this Agreement, the purported purchaser or transferee thereof shall not be entitled to have such Shares transferred on the books of the Company, or be vested with any voting rights or other rights of the Stockholder. Such Shares shall remain subject to all the provisions in this Agreement, and such purported sale, transfer or pledge shall be null and void and of no force or effect.

D.      Any additional Shares of capital stock of the Company acquired by any Stockholder subsequent to the date hereof shall be subject to this Agreement.

E.      The Shares shall remain subject to this Agreement notwithstanding any transfer, and no transfer of Shares otherwise permitted hereunder shall be effective until and unless the purported transferee first becomes a party to this Agreement pursuant to a written instrument signed by the purported transferee, in form and substance satisfactory to counsel for the Company. Without limiting any of the foregoing provisions of this Article I, a transferee, by accepting any transferred

301213.WPD;3

3

IRS ADMIN-0000070

Shares, shall be deemed to have become a party to this Agreement with respect to those transferred Shares, to the same extent as if the transferee had executed this Agreement as a Stockholder.

F.    When the Company has an option to redeem the Shares of a Stockholder under this Agreement, the Company shall act thereon by a special meeting of the Stockholders, at which time the Shares owned by all the Stockholders, including the Stockholder whose Shares are subject to the option, shall have voting rights.

ARTICLE II
RIGHT OF FIRST REFUSAL

A.    In the event any Stockholder (hereinafter referred to as "Offering Stockholder") desires to sell all and not less than all of his Shares ("Offered Shares") to a third-party from whom he receives a bona fide written offer to purchase all of such Offered Shares for cash and/or a promise to make deferred payments of cash (the "Offer"), such Offering Stockholder shall promptly give written notice (the "Notice") to all Stockholders whose shares are not subject to said offer (the "Non-Offering Stockholders"). The Notice shall state the identity of the third-party offeror, the purchase price (the "Offer Price") and the other terms and conditions of the Offer. Each Non-Offering Stockholder shall then have an option ("Stockholder Option") to purchase from the Offering Stockholder his proportionate share ("Proportionate Share") of the Offered Shares. For purposes of this Agreement, the term Proportionate Share shall mean a percentage obtained by dividing the number of Shares owned by each Non-Offering Stockholder by the total number of Shares owned by all Non-Offering Stockholders. In the event a Non-Offering Stockholder elects to exercise his Stockholder Option, said Non-Offering Stockholder must provide written notice to the Offering Stockholder, the Company and all other Non-Offering Stockholders within thirty (30) days after his receipt of the Notice from the Offering Stockholder. If any one or more Non-Offering Stockholders fail to exercise their option to purchase their Proportionate Share, all of those Non-Offering

301213.WPD;3

4

IRS ADMIN-0000071

Stockholders that have exercised their option to purchase their Proportionate Share shall have an option to purchase their Proportionate Share of the Shares allocated to the non-purchasing, Non-Offering Stockholders. This option may be exercised within ten (10) days following the lapse of the options of the non-purchasing, Non-Offering Stockholders in the same manner as the exercise of the Stockholder Options. This process shall continue indefinitely until all of the Offered Shares have been purchased or offered for purchase and declined by each of the Non-Offering Stockholders. The purchase price to be paid by each Non-Offering Stockholder shall be his Proportionate Share of the purchase price provided in Article VII, the purchase price shall be paid as per the terms provided in Article VIII, and the purchase of the Shares shall be closed on the Closing Date as provided in Article IX.

B.      In the event that all of the Offered Shares are not purchased by the Non-Offering Stockholders in accordance with Paragraph A of this Article II, then the Offering Stockholder shall promptly give Notice to the Company. The Company shall then have an option to purchase from the Offering Stockholder the Offered Shares that were not previously purchased ("Company Option"). In the event the Company elects to exercise its Company Option, the Company must provide written notice to the Offering Stockholder within thirty (30) days after the Company's receipt of the Notice from the Offering Stockholder. The purchase price to be paid by the Company shall be the purchase price provided in Article VII, the purchase price shall be paid as per the terms provided in Article VIII, and the purchase of the Shares shall be closed on the Closing Date as provided in Article IX.

C.      Notwithstanding the foregoing provisions in Paragraphs A and B of this Article II, if the Non-Offering Stockholders and Company fail to exercise their options above to purchase all of the Offered Shares, then the Offering Stockholder shall have thirty (30) days from the date the

301243.WPD;3

5

IRS ADMIN-0000072

Company Option expires to consummate the sale of all of the Offered Shares to the third-party offeror pursuant to the terms of the Offer, and none of the sales referred to in Paragraphs A and B of this Article II shall take place. If the Offering Stockholder does not complete the sale to the third-party offeror within said thirty (30) day period, then all of the Offered Shares shall once again become subject to the terms of this Agreement and the right of first refusal set forth in the Agreement. If the sale to the third-party offeror is completed within said thirty (30) day period, then such purchaser shall take all of the Offered Shares subject to all terms of this Agreement.

## ARTICLE III
### INVOLUNTARY TRANSFERS

A.    If, other than by reason of a Stockholder's death or disability, any Shares of a Stockholder ("Purported Transferor") are either transferred by operation of law or would be transferred by operation of law if such transfer ("Purported Transfer") was not rendered ineffective by virtue of this Agreement, to any person other than the Company or the other Stockholders (such as but not limited to a Stockholder's trustee in bankruptcy, a purchaser at any creditor or court sale, a spouse in any divorce or dissolution action or domestic relations property settlement, or to any conservator) (the "Purported Transferee"), the other Stockholders whose Shares are not subject to the Purported Transfer ("Remaining Stockholders") shall have the same series of Stockholder Options, as provided in Paragraph A of Article II to purchase the Shares subject to the Purported Transfer as if the Purported Transferor was an Offering Stockholder. Notice shall be deemed to have been given on the day the Purported Transfer is recorded on the books of the Company. In the event a Remaining Stockholder elects to exercise his or her Stockholder Option hereunder, said Remaining Stockholder must provide written notice to the Purported Transferor, and if known, the Purported Transferee within thirty (30) days following receipt of Notice of the Purported Transfer. The purchase of Shares and payment of purchase price by a Remaining Stockholder as provided for by

301213.WPD;3

6

IRS ADMIN-0000073

this Article shall be deemed to have occurred on the last day before such Purported Transfer. If one or more Remaining Stockholders fail to exercise their option, the Remaining Stockholders that do shall have the same series of options to purchase the non-purchased Shares as in Paragraph A of Article II. The purchase price to be paid by each Non-Offering Stockholder shall be his Proportionate Share of the purchase price provided in Article VII, the purchase price shall be paid as per the terms provided in Article VIII, and the purchase of the Shares shall be closed on the Closing Date as provided in Article IX.

B.      In the event that all of the Shares subject to the Purported Transfer are not purchased by the Remaining Stockholders as provided in Paragraph A of this Article III, then the Company shall then have the same Company Option as provided in Paragraph B of Article II to purchase all of the remaining Shares subject to the Purported Transfer not purchased by the Remaining Stockholders, as if the Purported Transferor was an Offering Stockholder. In the event the Company elects to exercise its Company Option, the Company must provide written notice to the Purported Transferor, and if known, the Purported Transferee within sixty (60) days following receipt of Notice of the Purported Transfer. The purchase of Shares and payment of purchase price by the Company as provided for by this Article shall be deemed to have occurred on the last day before such Purported Transfer. The purchase price to be paid by the Company shall be the purchase price provided in Article VII, the purchase price shall be paid as per the terms provided in Article VIII, and the purchase of the Shares shall be closed on the Closing Date as provided in Article IX.

C.      The terms of this Agreement shall be binding on both the Purported Transferor and the Purported Transferee. It is the intent of the parties that Purported Transfers are rendered ineffective by virtue of this Agreement and that any sale under this Article III shall take place between the Purported Transferor, the Remaining Stockholders and/or the Company. If however, in the opinion of counsel for the Company or pursuant to the final judgment of a court of competent

301213.WPD;3

7

jurisdiction, any such Purported Transfer is valid, the sale under this Article III shall take place between the Remaining Stockholders and/or the Company and the Purported Transferee.

## ARTICLE IV
## DISABILITY

A.      In the event any employee-Stockholder becomes Disabled (as hereinafter defined) (hereinafter "Disabled Stockholder"), the Remaining Stockholders (for purposes of this Article IV, Remaining Stockholders shall mean the Stockholders who are not Disabled) shall have the same Stockholder Option as provided in Paragraph A of Article II to purchase, followed by the Company having the same Company Option as provided in Paragraph B of Article II to purchase, from the conservator, attorney-in-fact, or other legal representative of the Disabled Stockholder (hereinafter referred to collectively as the "Disability Representative"), all of the Disabled Stockholder's Shares as if the Disabled Stockholder was an Offering Stockholder thereunder.  Notice shall be deemed to have been given on the day such Disabled Stockholder is deemed Disabled. The purchase price to be paid by each Remaining Stockholder shall be his Proportionate Share of the purchase price provided in Article VII, the purchase price shall be paid as per the terms provided in Article VIII, and the purchase of the Shares shall be closed on the Closing Date as provided in Article IX.

B.      If the Company or the Remaining Stockholders own a disability related policy the purpose of which is to fund a purchase of shares upon a Stockholder's disability (the "Policy"), such Stockholder shall be deemed "Disabled" in accordance with the definition of disabled under the Policy.  If such a Policy is not owned by the Company or the Remaining Stockholders, then a Stockholder shall become Disabled when the Stockholder (i) experiences a physical or mental incapacity or inability to perform his or her regular duties for a period of two (2) consecutive years; (ii) is adjudicated to be incompetent by a court of competent jurisdiction; or (iii) (a) an individual other than the Stockholder is voting the Shares of the Stockholder either pursuant to a trust or power of attorney and (b) disability is determined to be permanent disability by a physician of the

301213.WPD;3

8

IRS ADMIN-0000075

Stockholder. If the Stockholder or his or her Disability Representative and the Company cannot agree on whether a Stockholder has become Disabled, as defined in clause (i) of the preceding sentence, then such a determination shall be made by a disinterested physician to be appointed by the Dean of the Medical School at Washington University in St. Louis, Missouri. The costs of such determination shall be borne by the Company and shall be made at either party's request.

## ARTICLE V
## DEATH

A.    In the event of the death of a Stockholder ("Deceased Stockholder") the Remaining Stockholders (for purposes of this Article V, Remaining Stockholders shall mean the Stockholders who are not deceased) shall have the same series of Stockholder options as provided in Paragraph A of Article II to purchase the Shares as if the Deceased Stockholder was an Offering Stockholder; provided, however, that the Remaining Stockholders shall and must purchase from the Deceased Stockholder's personal representative, executor, administrator or successor trustee of any trust, as the case may be (collectively, the "Legal Representative"), and the Legal Representative shall and must sell to the Remaining Stockholders, their Proportionate Share of the Deceased Stockholder's Shares up to the amount of any insurance proceeds that are received by the Remaining Stockholders as a result of the Deceased Stockholder's death. Said option period shall commence on the date of the Deceased Stockholder' death. In the event a Remaining Stockholder elects to exercise his or her Stockholder Option, or is required to purchase the Shares as per the terms of this Article, said Stockholder must provide written notice to the Legal Representative within thirty (30) days of the Deceased Stockholder's Death. If one or more Remaining Stockholders fail to exercise their option, the Remaining Stockholders that do shall have the same series of options to purchase the non-purchased Shares as in Paragraph A of Article II. The purchase price to be paid by each Remaining Stockholder shall be his Proportionate Share of the purchase price provided in Article VII, the

301213.WPD;3

9

IRS ADMIN-0000078

purchase price shall be paid as per the terms provided in Article VIII, and the purchase of the Shares shall be closed on the Closing Date as provided in Article IX.

B.      In the event that all of the Deceased Stockholder's Shares are not purchased by the other Stockholders, then the Company shall and must purchase from the Legal Representative and the Legal Representative must sell to the Company all of the Deceased Stockholder's Shares that are not purchased by the Remaining Stockholders. The purchase price to be paid by the Company shall be the purchase price provided in Article VII, the purchase price shall be paid as per the terms provided in Article VIII, and the purchase of the Shares shall be closed on the Closing Date as provided in Article IX.

## ARTICLE VI

## [ INTENTIONALLY OMITTED ]

## ARTICLE VII
## PURCHASE PRICE FOR SHARES

A.      In the event Shares are purchased pursuant to the terms of this Agreement, the purchase price per Share (the "Purchase Price Per Share") shall be the amount per Share set forth in the Certificate of Agreed Value, as that term is defined in Paragraph B of this Article VII; provided, however, that in the event the Stockholders fail or refuse to execute a new Certificate of Agreed Value within eighteen (18) months following the date of the last executed Certificate of Agreed Value (i.e., the last executed Certificate of Agreed Value is more than eighteen (18) months old), the Purchase Price Per Share shall be the "Appraised Value Per Share," as that term is defined in Paragraph C of this Article VII. The purchase price ("Purchase Price") of a Selling Stockholder's Shares shall equal the Purchase Price Per Share (or the Appraised Value Per Share, as the case may be) times the number of Shares being sold and purchased.

304213.WPD;3

IRS ADMIN-0000077

B.      For purposes of this Agreement, "Certificate of Agreed Value" means a certificate (in the form attached to this Agreement as Exhibit A) signed by all of the Stockholders and filed with the records of the Company, which establishes the agreed per Share value of the Shares or a method of ascertaining the same. Within thirty (30) days after the end of each tax year of the Company, all the Stockholders shall, by mutual agreement, determine the agreed value per Share by executing a new Certificate of Agreed Value in the form of Exhibit A. A Certificate of Agreed Value shall be effective only when executed by all of the Stockholders.

C.      For the purposes hereof, the "Appraised Value Per Share" of the Company shall be determined as follows: If the Certificate of Agreed Value is more than eighteen (18) months old, within ten (10) days after the date an option is exercised or a mandatory purchase is required ("Appraisal Date"), the transferring Stockholder or his successor in interest shall appoint an appraiser and the Company or purchasing Stockholder(s), as the case may be, shall appoint an appraiser. Both appraisers shall have at least five (5) years of experience in appraising businesses similar to the Company. If either party fails to name such an appraiser within the specified time, the other party may upon five (5) days written notice to the failing party, select the second appraiser. Each appraiser shall independently determine and submit to the parties, in writing, with reasons therefor, an appraisal of the fair market value of the Company. The appraisers shall take into consideration the goodwill of the Company in determining the fair market value of the Company. The appraisers shall not take into consideration premiums or minority discounts in determining their respective appraisal values. Upon receipt by the parties of both appraisals, if the fair market value of the Company is determined to be the same or if the difference between the appraisals is less than ten percent (10%) of the lower of the appraised values, then the fair market value of the Company shall be the average of the two appraisals. If the appraisals so submitted differ by more than ten percent (10%) of the lower of the appraised values, the accountants then servicing the Company shall appoint a third

301213.WPD;3

11

appraiser. The third appraiser so appointed shall, as promptly as possible, determine the value of the Company on the same basis as above set forth, and that prior appraisal which is closer in value to such third appraisal shall, thereupon, be the appraisal which is binding on all parties in interest hereunder. The "Appraised Value Per Share" shall equal the amount determined by dividing the binding appraisal by the total number of Shares of the Company issued and outstanding as of the Appraisal Date. Each party shall pay the fee and expenses of the appraiser selected by such party and the fee of the third appraiser shall be borne equally by the parties appointing the two appraisers.

### ARTICLE VIII
### PAYMENT OF PURCHASE PRICE

A.      The payment of the Purchase Price for Shares sold pursuant to this Agreement shall be made on the Closing Date as follows:  one-third (1/3) of the Purchase Price shall be paid in cash on the Closing Date, and the balance of the Purchase Price shall be evidenced by the execution and delivery of a negotiable promissory note to the Stockholder or his Legal Representative or Disability Representative, as the case may be, who is selling Shares (collectively "Selling Stockholder") in the form and having the substantive provisions of the "Promissory Note," attached hereto as Exhibit B and incorporated by this reference herein. The Promissory Note shall be payable in thirty-six (36) equal monthly installments of principal and interest, the first of which shall be payable one (1) month after the Closing Date, with interest thereon at the prime rate of interest publicly announced by Firstar Bank as of the date of the Promissory Note. The Promissory Note shall further provide that the maker shall have the right to prepay the whole or any part thereof prior to the maturity date without any charge, penalty or additional interest, such prepayment to be applied first to interest and then to principal in the inverse order of maturity.

B.      In the event of a sale and purchase under Article V (Death), and the proceeds collected from any life insurance owned by the surviving Stockholders or the Company on which the Decedent
301213.WPD;3

12

IRS ADMIN-0000079

Stockholder was the insured are sufficient to pay the Purchase Price in full, the full amount of said Purchase Price shall be paid on the Closing Date to the Legal Representative of the Decedent Stockholder, and any remaining proceeds may be retained by the beneficiary thereof. If the Purchase Price exceeds the proceeds of any life insurance collected, the insurance proceeds shall be paid on the Closing Date directly to the Legal Representative of the Decedent Stockholder and the balance of the Purchase Price shall be evidenced by a promissory note identical (except for principal amount) to the Promissory Note described in Paragraph A of this Article VIII, which shall be delivered to and in favor of the estate of the Decedent Stockholder, with the maker being the Remaining Stockholder(s).

### ARTICLE IX
### CLOSING DATE

A.      The closing date ("Closing Date") of any and all sales and purchases of Shares by the Remaining Stockholders under this Agreement shall be as follows and shall have an effective date ("Effective Date") for all purposes, including federal tax purposes, as follows:

(i)      The Closing Date and the Effective Date under Article II (Right of First Refusal) shall be the last day of the month following the later of (a) the month in which the Remaining Stockholders elects to exercise their Stockholder Option or, (b) if the Remaining Stockholders elect to purchase only some of the Shares and the Company elects to purchase the remaining Shares, the month in which the Company elects to exercise its Company Option, as provided in Paragraph B of Article II.

(ii)      The Closing Date under Article III (Involuntary Transfers) shall be the last day of the month following the month in which the Remaining Stockholders elects to exercise their Stockholder Options as provided in Paragraph A of Article II.

301213.WPD;3

13

IRS ADMIN-0000080

(iii)     The Closing Date under Article IV (Disability) shall be sixty (60) days after the appointment of a Disability Representative, but in no event shall the Closing Date be more than one hundred twenty (120) days from the date a Stockholder is deemed Disabled. Notwithstanding the foregoing, the Effective Date of the purchase and sale of a Disabled Stockholder's Shares shall be the date the Stockholder is deemed Disabled.

(iv)     The Closing Date under Article V (Death) shall be sixty (60) days after the Decedent Stockholder's death. Notwithstanding the foregoing, the Effective Date of the purchase of a Decedent Stockholder's Shares shall be the date of death.

(v)     [ INTENTIONALLY OMITTED ]

3.     The Closing Date and Effective Date of any and all sales and purchases of Shares by the Company shall be as follows:

(i)     The Closing Date and Effective Date under Article II (Right of First Refusal) shall be the last day of the month following the month in which the Company elects to exercise its Company Option as provided in Paragraph B of Article II.

(ii)     The Closing Date under Article III (Involuntary Transfers) shall be the last day of the month following the month in which the Company elects to exercise its Company Option as provided in Paragraph B of Article III.

(iii)     The Closing Date and the Effective Date under Article IV (Disability), Article V (Death) and Article VI (Termination of Employment ) shall be the same as provided in Paragraphs A(iii), and A(iv) of this Article.

C.     In the event the Purchase Price has not been determined by the Closing Date, the Closing Date shall be three (3) days after the Purchase Price is determined. On the Closing Date, certificates for all Shares being sold shall be transferred to the purchaser duly endorsed in blank for

301213.WPD;3

14

IRS ADMIN-0000081

transfer by the Selling Stockholder, or accompanied by an appropriate irrevocable stock power, duly endorsed for transfer by the Selling Stockholder. The Selling Stockholder shall execute an agreement at Closing wherein the Selling Stockholder represents and warrants that it owns the Shares free and clear of all liens and encumbrances whatsoever, and agrees to indemnify the purchaser for any breach or inaccuracy of said representations and warranties. Unless otherwise agreed by the parties, all closings shall take place at the offices of the Company at 10:00 A.M. Central Time.

## ARTICLE X
## INSURANCE

A.    Each Stockholder and/or the Company shall have the right to purchase in his or its sole discretion, life insurance policies of whatever kind insuring the life of any Stockholder to this Agreement, along with the right to substitute or withdraw any life insurance policy subject to this Agreement.

B.    In the event that a Stockholder or the Company decides to purchase life insurance on any Stockholder, each Stockholder hereby agrees to cooperate fully by performing all the requirements of the life insurer which are necessary conditions precedent to the issuance of life insurance policies. The Stockholder or the Company shall be the sole owner of the policies issued to him or it, and he or it may apply any dividends toward the payment of premiums.

C.    If any Stockholder withdraws from the Company during his lifetime or if this Agreement terminates before the death of a Stockholder, then each Stockholder shall have the right to purchase any policy or policies on his life owned by the other Stockholders or the Company by paying an amount equal to the cash surrender value as of the date of transfer, less any existing indebtedness charged against the policy or policies. This right shall lapse if not exercised within sixty (60) days after such withdrawal or termination.

301243.WPD;3

IRS ADMIN-0000082

D.    Notwithstanding the provisions of this Agreement, any life insurance company which has issued a policy of life insurance subject to the provisions of this Agreement is hereby authorized to act in accordance with the terms of such policies as if the Agreement did not exist, and the payment or other performance of its contractual obligations by any such insurance company in accordance with the terms of any such policy shall completely discharge such life insurance company from all claims, suits and demands of all persons whatsoever.

## ARTICLE XI
## EXECUTION AND DELIVERY OF DOCUMENTS

An Offering Stockholder, Purported Transferor, Disability Representative or Legal Representative, as the case may be, shall execute and deliver any and all documents or legal instruments necessary or desirable to carry out the provisions of this Agreement.

## ARTICLE XII
## TERMINATION

The agreements and obligations of this Agreement shall terminate upon the occurrence of any of the following events:

A.    the bankruptcy, receivership, dissolution, assignment for the benefit of creditors or other similar event of the Company,

B.    the death of all the signatory Stockholders simultaneously, or

C.    the mutual agreement of the Stockholders owning all of the issued and outstanding Shares of the Company.

301213.WPD;3

16

IRS ADMIN-0000083

## ARTICLE XIII
## ENDORSEMENT

Upon the execution of this Agreement, the certificates of Shares subject hereto shall be endorsed as follows:

> "This certificate is transferable only upon compliance with the provisions of the Amended and Restated Stock Purchase Agreement dated _____, 2001. A copy of said Agreement is on file at the Company's principal place of business. By accepting these shares of stock evidenced by this Certificate, the holder agrees to be bound by said Agreement."

## ARTICLE XIV
## GUARANTY OF CORPORATE OBLIGATIONS TO THE COMPANY
## OR REMAINING STOCKHOLDER

In the event the Stockholder selling his Shares to the Company or Remaining Stockholders (hereinafter referred to as "Selling Stockholder") has personally guaranteed any corporate obligations, or has become a co-maker on any corporate notes, the Company and Remaining Stockholder shall take such steps as shall be or become necessary to remove said Selling Stockholder and/or his estate and spouse from liability for any of said obligations and shall secure the return of any collateral deposited in connection therewith by either renegotiation of said obligations or, failing to accomplish the foregoing after a good faith effort, shall execute a written document reasonably satisfactory to the Selling Stockholder, signed by the Company and Remaining Stockholder, holding such Selling Stockholder and/or his estate and spouse harmless and agreeing to indemnify, hold harmless and defend the Selling Stockholder and/or his estate and spouse from and against any of said obligations.

IRS ADMIN-0000084

## ARTICLE XV
### SET-OFF

In the event a Stockholder is indebted to the Company at the time of a sale of his Shares to the Company hereunder, the debt shall mature as of such sale and purchase, and the amount of such debt (including accrued interest), not in excess of the Purchase Price for the Shares, shall serve as a set-off against and decrease the amount of the Purchase Price due the Stockholder hereunder. In the event of a cross-purchase, the purchasing Stockholder shall assume such obligation of the selling Stockholder to the Company, the selling Stockholder shall be thereby released, and the amount of the Purchase Price due the selling Stockholder shall be accordingly reduced.

## ARTICLE XVI

### [ INTENTIONALLY OMITTED ]

## ARTICLE XVII
### MISCELLANEOUS

A.  Counterparts. This Agreement may be signed in any number of counterparts, each of which shall be an original for all purposes, but all of which taken together shall constitute only one agreement.

B.  Binding Nature. This Agreement shall be binding upon and inure to the benefit of the Stockholders and their respective heirs, legal representatives, successors, and assigns, and the Company and its successors, and assigns.

C.  Specific Performance. Each of the parties hereto shall be entitled to specific performance of this Agreement upon compliance with all of its terms.

301243.WPD;3

18

IRS ADMIN-0000085

D.    Law Governing. This Agreement shall be deemed to have been executed and delivered in Missouri and shall be governed, construed and enforced in accordance with the laws of the State of Missouri.

E.    Amendment. This Agreement may be amended or terminated by a writing signed by the Company and all of its Stockholders.

F.    Entire Agreement. This Agreement constitutes the entire agreement by the parties relative to the subject matter hereof, and all prior agreements, by and between the parties hereto, or any of them, pertaining to the retention and ownership of their Shares in the Company, shall be deemed canceled and rescinded, void and held for naught.

G.    Severability. If for any reason any immaterial provision(s) herein are determined to be invalid and contrary to any existing or future law, such invalidity shall not impair the operation of or affect those portions of this Agreement which are valid.

H.    Authorization. The Company is authorized to enter into this Agreement by virtue of resolutions adopted at a meeting of its Directors held of even date herewith.

I.    Notice. Each notice provided for by this Agreement shall be made in writing, either (i) by actual delivery of the notice into the hands of the party thereto entitled, or (ii) by the mailing of the notices in the United States Mails, to the last known address of the party entitled thereto, certified mail, return receipt requested. This notice shall be deemed to be received in case (i) above on the date of its actual receipt by the party entitled thereto and in case (ii) above two (2) days following the date of its mailing, unless such third day after mailing falls on a holiday or weekend, in which case it shall be deemed to be received on the next business day thereafter.

J.    Exhibits. All Exhibits attached hereto shall be deemed a part hereof for all purposes.

IRS ADMIN-0000086

K.    Closing Days.  If under this Agreement the day on which a Closing, the final date for a notice or some other day falls on a weekend or legal holiday, the applicable period  shall be deemed extended so that such day falls upon the next regular business day.

L.    Titles and Captions.  All article, section and paragraph titles or captions contained in this Agreement are  for convenience only and shall not be deemed part of the context nor affect the interpretation of this Agreement.

M.    Pronouns and Plurals.  All pronouns and any variations thereof shall be deemed to refer to the masculine, feminine, neuter, singular or plural as the identity of the person or persons may require.

[Signature Pages Follow]

IRS ADMIN-0000087

IN WITNESS WHEREOF, the undersigned parties have executed this Agreement as of the

day and year first hereinabove stated.

STOCKHOLDERS:

Michael P. Connelly, Trustee U/I/T
dated 8/15/90, Michael P.
Connelly, Grantor

Thomas A. Connelly

COMPANY:

CROWN C SUPPLY COMPANY,
INC., a Missouri Corporation

By: _____
Title: President

301213.WPO;3                                  21

IRS ADMIN-0000088

IN WITNESS WHEREOF, the undersigned parties have executed this Agreement as of the day and year first hereinabove stated.

STOCKHOLDERS:

Michael P. Connelly, Trustee U/I/T
dated 8/15/90, Michael P.
Connelly, Grantor

Thomas A. Connelly

COMPANY:

CROWN C SUPPLY COMPANY,
INC., a Missouri Corporation

By: _____
Title: PRESIDENT

001213.WPD;3

21

IRS ADMIN-0000089

EXHIBIT A

CERTIFICATE OF AGREED VALUE

Pursuant to Article VII of the Amended and Restated Stock Purchase Agreement dated
19 August, [2009] [2001], by and among CROWN C SUPPLY COMPANY, INC., a
corporation organized under the laws of Missouri (hereinafter referred to as the "Company"),
MICHAEL P. CONNELLY, TRUSTEE U/I/T DATED 8/15/90, MICHAEL P. CONNELLY,
GRANTOR, AND THOMAS A. CONNELLY (collectively, the "Stockholders"); the
Stockholders hereby determine and declare that the Purchase Price Per Share of the issued and
outstanding common stock of the Company on this date is Ten Thousand Dollars ($10,000.00).

IN WITNESS WHEREOF, the Stockholders have signed this Certificate of Agreed Value
the 19th day of August, [2009] [2001].

STOCKHOLDERS:

Michael P. Connelly, Trustee U/I/T
dated 8/15/90, Michael P.
Connelly, Grantor

Thomas A. Connelly

397268.WithEh[2/mam2

IRS ADMIN-0000090