UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| THOMAS A. CONNELLY, | ) | |
| in his Capacity as Executor of the | ) | |
| Estate of Michael P. Connelly, Sr., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No.  4:19-cv-01410-SRC |
| v. | ) | |
| | ) | |
| THE UNITED STATES OF AMERICA, | ) | |
| DEPARTMENT OF THE TREASURY, | ) | CIVIL ACTION FOR REFUND |
| INTERNAL REVENUE SERVICE | ) | |
| | ) | |
| Defendant. | ) | |

EXPERT REPORT OF

Evan K. Cohen

October 29, 2020

i



**TABLE OF CONTENTS**

I.     Introduction ................................................................................................................1

   A.   Qualifications and Background ...........................................................................1

   B.   Overview and Assignment .................................................................................2

   C.   Summary of Opinions ........................................................................................4

II.    General Background .....................................................................................................5

   A.   Introduction to Crown C Supply .......................................................................5

   B.   Life Insurance Assets ........................................................................................6

   C.   Transaction Overview .......................................................................................6

III.   Valuation Principles ....................................................................................................8

   A.   Valuation Definitions ........................................................................................9

   B.   Valuation Principle #1: Firm Value Reflects Cash Flows from All Assets .................11

   C.   Valuation Principle #2: Common Equity Captures All Residual Value After All Other Obligations Are Satisfied .....................................................................................12

   D.   Valuation Principle #3: Fair Market Transactions Do Not Make Either Party Worse Off   13

IV.   Under Generally Accepted Valuation Principles, the Fair Market Values of the Company's Equity and Connelly's Company Stock on October 1, 2013 Were $6,863,819 and $5,297,496, Respectively ..............................................................................................14

   A.   The Company's Purchase Obligation Should Not Be Deducted from Crown C Supply's Total Equity Value .........................................................................................14

   B.   Accounting for the Full Value of the Insurance Proceeds Received, 385.9 Shares of Crown C Supply Were Worth $5,297,496 on October 1, 2013 .............................................15

      1.   If Thomas A. Connelly Had Purchased Connelly's Shares on October 1, 2013, the Fair Market Value Would Have Been $5,297,496 ...........................................................16

      2.   If an Unrelated Third Party Had Purchased All of Crown C Supply's Shares, the Fair Market Value Would Have Been $6,863,819 ...........................................................19

   C.   Deducting the Value of Insurance Proceeds Leads to a Price which Fails to Capture the Full Equity Value of Crown C Supply ..............................................................21

      1.   Selling the Shares for $3,000,000 Produced a Windfall for Thomas A. Connelly ..21

      2.   Accepting a Deduction for Share Repurchase Obligations Leads to an Illogical Result when All Stock Is Repurchased .............................................................23

   D.   Deducting the Value of Insurance Proceeds Violates Equity Valuation Principles.....24

V.    Conclusion .................................................................................................................25

## EXPERT REPORT OF EVAN K. COHEN

### I.    INTRODUCTION

#### A.    QUALIFICATIONS AND BACKGROUND

1.  My name is Evan K. Cohen, and my business address is One Beacon Street, Ste. 2600, Boston, Massachusetts, 02108, United States of America. I am a Principal of The Brattle Group ("Brattle"), a global economic consulting firm headquartered in Boston, Massachusetts with additional offices in London, Rome, Madrid, Brussels, Sydney, Toronto, Chicago, Washington, D.C., New York, and San Francisco. I have an MBA from the MIT Sloan School of Management with a concentration in financial engineering. I received my Charted Financial Analyst from the CFA Institute in 2013. I was an investment banking analyst in corporate finance at Dillon, Read & Co. and UBS.

2.  I have extensive experience in corporate finance, valuation, structured finance, and tax disputes. I have assisted private businesses, the U.S. Department of Justice, and the Internal Revenue Service in developing economic and financial testimony in a variety of finance and tax litigation disputes. I have been retained by government and private counsel to provide expert and summary testimony in various venues, including federal district court, the Court of Federal Claims, and state regulatory bodies. I served as a valuation and damages expert for a class of shareholders in litigation arising from the $22 billion leveraged buyout by the Archstone-Smith REIT. I have played central roles in some of the landmark tax, economic substance, and transfer pricing cases of the past 15 years, including *Long Term Capital Holdings vs. U.S.*, *GlaxoSmithKline Holdings, Inc. vs. Commissioner*, *BB&T Corp. vs. U.S.*, *Fifth Third Bancorp & Subsidiaries vs. U.S.*, *Historic Boardwalk Hall, LLC vs. Commissioner*, *Pritired 1, LLC, et al. vs. U.S.*, *Bank of N.Y. Mellon Corp vs. Commissioner*, *Salem Financial, Inc. vs. U.S.*, *Buyuk LLC vs. Commissioner*, *U.S. vs. Ogbazion*, *U.S. vs. ITS Financial*, and *Eaton v. United States*.

3.  Prior to joining Brattle, I spent six years as a consultant at Cambridge Finance Partners, LLC, where I served as a consultant on complex business and tax litigation cases in the financial services, pharmaceutical, electric, and gas industries. I was also formerly a co-founder and Chief Financial Officer of NextCourier Networks, Inc.

1

4. I have presented at professional conferences and published articles on valuation. My detailed curriculum vitae, provided in Appendix 1, includes testimony I have provided and all of my publications for the past ten years.

5. Brattle is being compensated for my work on this case at my standard rate of $625 per hour. My compensation is not contingent upon my testimony or on the result of this proceeding.

6. Appendix 2 provides a list of documents I considered in preparing this report. I reserve the right to supplement or otherwise modify this report as new evidence is presented in this matter.

### B. OVERVIEW AND ASSIGNMENT

7. Michael P. Connelly, Sr. ("Connelly"), President and majority shareholder of Crown C Supply Company ("Crown C Supply" or the "Company"), died on October 1, 2013.[1] At the time of his death, Connelly owned 385.9 shares of stock in Crown C Supply, representing 77.18% of the Company's outstanding shares.[2] Thomas A. Connelly, Connelly's brother and the executor of Connelly's estate (collectively, Connelly and Thomas A. Connelly are the "Company Shareholders"), owned the remaining 114.1 shares or 22.82% of the Company.[3]

8. Pursuant to the Amended and Restated Stock Purchase Agreement, dated August 29, 2001, Crown C Supply was obligated to purchase the Company Shareholders' interests upon their respective deaths.[4] Crown C Supply was also the beneficiary of three life insurance policies payable upon Connelly's death.[5] Consequently, after Connelly died on

---

[1]  Exhibits A and B, Original and Amended Form, 706, United States Estate (and Generation Skipping) Tax Return of the Estate of Michael P. Connelly, Sr., line 5; Plaintiff's Response to United States Request for Admission ("U.S. RFA") Nos. 1–4, 34, 35.

[2]  Plaintiff's Response to U.S. RFA No. 52.

[3]  Plaintiff's Response to U.S. RFA No. 53; Exhibit C, Amended and Restated Stock Purchase Agreement (C000310–C000332), p. 1.

[4]  Plaintiff's Response to U.S. RFA Nos. 88 and 89; Exhibit C, Amended and Restated Stock Purchase Agreement (C000310–C000332), Article V (C0003180–C000319).

[5]  Exhibit T, $1,000,000 AXA Term Life Insurance Policy No. 109021548 (C001647-C001692) at C001655; Exhibit U, $1,000,000 AXA Term Life Insurance Policy No. 109021767 (C001827–

October 1, 2013, Crown C Supply received $3,503,894.74 from these three life insurance policies.[6] Additionally, pursuant to the Purchase and Sale Agreement dated November 13, 2013, Crown C Supply purchased Connelly's 77.18% interest in the Company, and did so for $3,000,000.[7]

9. On October 7, 2016, Anders Minkler Huber & Helm LLP ("Anders Minkler") prepared a calculation of value report[8] that concluded Connelly's Company stock was worth $2,982,000 as of October 1, 2013 (the "Anders Minkler Report").[9] When performing this analysis, Anders Minkler relied on a capitalized cash flow method, adding back "non-operating assets to arrive at [its estimate of] the fair market value of the Company's equity on a controlling, non-marketable basis."[10] These non-operating assets included, among other items, $503,915 in "Life Insurance Proceeds Retained by Company (Michael Connelly)."[11] However, these insurance proceeds were $2,999,980 less than the actual proceeds received,[12] approximating the $3,000,000 spent on the repurchase of Connelly's shares.

---

C001875) at C001830; Exhibit V, $1,500,000 AXA Universal Life Insurance Policy No. 159211555 (C001699–C001756) at C001726; Exhibit W, AXA Life Insurance Policy Documents (C002612–C002616) at C002616.

6    Plaintiff's Response to U.S. RFA Nos. 166–181.

7    Exhibit N, Sale and Purchase Agreement, dated November 13, 2013, ¶ 3 (not labeled).

8    For convenience, I occasionally refer to the Anders Minkler Report as a valuation, however it is not a valuation report. Specifically, the Anders Minkler Report was written in response to a "calculation engagement" which it describes as "[a]n engagement to estimate value wherein the valuation analyst and the client agree on the specific valuation approaches and valuation methods that the valuation analyst will use… A calculation engagement generally does not include all of the valuation procedures required for a valuation engagement. If a valuation engagement had been performed, the results might have been different." Exhibit L, Anders Minkler Report (C000613–C000640) at C000614.

9    Exhibit L, Calculation of Value Regarding 77.18% Ownership Interest in Crown C Supply, Inc., as of October 1, 2013, by Anders Minkler Huber & Helm LLP, as of October 1, 2013 (C000613–C000640) at p. 5 (C000618); Plaintiff's Response to U.S. RFA Nos. 30–32.

10   Exhibit L, Anders Minkler Report (C000613–C000640) at pp. 4–5 (C000617–C000618), Exhibit 6 (C000640).

11   Exhibit L, Anders Minkler Report (C000613–C000640) at Exhibit 6 (C000640).

12   Crown C Supply received $3,503,894.74 from the life insurance policies. $2,999,980 ≈ $3,503,894.74 − $503,915. Plaintiff's Response to U.S. RFA Nos. 166–181. After spending $3,000,000 purchasing shares from Connelly's estate, this leaves $503,894.74. In contrast, the Anders Minkler Report includes $503,915 in retained life insurance proceeds. Exhibit L, Anders Minkler Report (C000613–C000640) at Exhibit 6 (C000640). This appears to be an overstatement of $20.26. $20.26 = $503,915.00 − $503,894.74.

10. Counsel for the United States asked me to opine on the fair market value of a 77.18% equity interest in Crown C Supply, as of October 1, 2013 — i.e., the fair market value of Connelly's Company stock as of his date of death. Counsel for the United States instructed me to accept Anders Minkler's conclusions regarding the value of Connelly's Company ownership interest, except for Anders Minkler's treatment of the life insurance proceeds that Crown C Supply used to purchase Connelly's Company stock.[13] For simplicity, I ignore the $20.26 overstatement and assume that the Anders Minkler Report excluded exactly $3,000,000 of insurance proceeds from its analysis.

### C.    SUMMARY OF OPINIONS

11. Crown C Supply's purchase of Connelly's 385.9 Company shares was a purchase of equity, and valuation of those shares should have been consistent with general equity valuation principles. In a fair market equity valuation, the insurance proceeds would be included in the value of Crown C Supply as a non-operating asset, distributable to the shareholders based on their respective equity interests in the Company. Accordingly, Connelly's 77.18% interest in Crown C Supply was worth $5,297,496, as of October 1, 2013.[14]

12. The alternative of allowing the repurchase obligation to offset $3,000,000 of insurance proceeds undervalues Crown C Supply's equity, undervalues Connelly's equity interest in Crown C Supply (*i.e.*, his stock), and violates well-established equity valuation principles because the resultant share price creates a windfall for a potential buyer that a willing seller would not accept. Indeed, by purchasing Connelly's shares at a $3,000,000 price, Crown C Supply created a windfall for Thomas A. Connelly at Connelly's expense.

---

[13]    Functionally, that means I have not been asked to opine on the Anders Minkler Report's conclusion that the Company's equity value without $3,000,000 in insurance proceeds was $3,863,819.

[14]    Note that, if I assumed that the Anders Minkler Report did not exclude exactly $3,000,000 of insurance proceeds, but rather $2,999,980, this value would fall to $5,297,480. $5,297,480 = 77.18% x ($3,863,819 + $2,999,980).

## II.   GENERAL BACKGROUND

### A.   INTRODUCTION TO CROWN C SUPPLY

13. Founded in 1980,[15] Crown C Supply is a roofing and siding materials supply company operating primarily in the St. Louis, Missouri area.[16] As of October 1, 2013, Crown C Supply relied on a variety of facilities in its operations, including a corporate headquarters, a showroom for displaying products samples, and a 75,000 square foot warehouse.[17] The Company leased these facilities from two related parties, 5200 Manchester, LLC and Connelly, LLC.[18]

14. Prior to October 1, 2013, Connelly was the president of Crown C Supply.[19] On a standalone basis, Crown C Supply's annual gross and net incomes were somewhat variable. Between 2009 and 2013, Crown C Supply generated between $22,000,000 and $38,000,000 in annual revenue, leading to net annual income ranging from a loss of −$168,787 in 2010 to a profit of $1,181,064 in 2012.[20]

---

[15]   Exhibit L, Anders Minkler Report (C000613–C000640) at C000615; *see also* Exhibit D, Crown C Supply Company, Inc. and Subsidiary, Consolidated Financial Statements, for the years ended September 30, 2012 and 2013 (C0000397–C000413), Item 2 (C000408).

[16]   Exhibit L, Anders Minkler Report (C000613–C000640) at pp. 2–3 (C000615–C000616).

[17]   *Id.*, p. 3 (C000616).

[18]   *Id.* The annual financial statements for Crown C Supply and 5200 Manchester, LLC were produced on a consolidated basis, since these companies were jointly owned by Connelly and Thomas A. Connelly. Exhibit D, Crown C Supply Company, Inc. and Subsidiary, Consolidated Financial Statements, for the years ended September 30, 2012 and 2013, Item 1 (C000406).

[19]   Plaintiff's Response to U.S. RFA No. 34.

[20]   Exhibit L, Anders Minkler Report (C000613–C000640) at Exhibit 2 (C000629–C000631). *See also* Exhibit P, Crown C Supply Company, Inc. and Subsidiary, Consolidated Financial Statements, for the years ended September 30, 2009 and 2010 (Anders 388–Anders 407) at (Anders 393); Exhibit Q Crown C Supply Company, Inc. and Subsidiary, Consolidated Financial Statements, for the years ended September 30, 2010 and 2011 (Anders 408–Anders 421) at (Anders 412); Exhibit R, Crown C Supply Company, Inc. and Subsidiary, Consolidated Financial Statements, for the years ended September 30, 2011 and 2012 (Anders 422–Anders 435) at (Anders 426); Exhibit D, Crown C Supply Company, Inc. and Subsidiary, Consolidated Financial Statements, for the years ended September 30, 2012 and 2013 (C000403).

**B.  LIFE INSURANCE ASSETS**

15. Crown C Supply acquired life insurance policies for both Connelly and Thomas A.
Connelly.[21] From 2009 to 2013, the Company's annual consolidated financial statements
show that Crown C Supply: (1) spent between $125,550 and $186,070 annually on life
insurance premiums,[22] and (2) included the cash surrender value of these life insurance
policies as an asset, reporting $851,870 as of September 30, 2013.[23] In total, Crown C
Supply received $3,503,894.74 from the three life insurance policies it owned with
respect to Connelly after his death.[24]

**C.  TRANSACTION OVERVIEW**

16. In August of 2001, the Company Shareholders entered into an Amended and Restated
Stock Purchase Agreement (the "2001 Agreement").[25] This agreement gave the Company
Shareholders — i.e., the Connelly brothers — the right of first refusal for the other's
shares. If one Company Shareholder received a bona fide offer for all of his shares from a
third party and planned to sell those shares, the other Connelly brother had the option to
purchase all the shares in lieu of the third party.[26] The 2001 Agreement also gave the
Company Shareholders similar rights in the event of one brother's death, adding that,
"[i]n the event that all of the Deceased Stockholder's Shares are not purchased by the
other Stockholders, then the Company shall and must purchase from the Legal
Representative and the Legal Representative must sell to the Company all of the
Deceased Stockholder's Shares that are not purchased by the Remaining Stockholders."[27]

---

[21]  *See* footnote 5 above; *see also* Plaintiff's Response to U.S. RFA Nos. 57 and 62.

[22]  Exhibit L, Anders Minkler Report (C000613–C000640) at Exhibit 2 (C000636).

[23]  Exhibit D, Crown C Supply Company, Inc. and Subsidiary, Consolidated Financial Statements, for the
years ended September 30, 2012 and 2013, Item 4, (C000409). Note that, on an unconsolidated basis, the
Anders Minkler Report also includes $851,870 of "Cash Value of Life Insurance" as an asset.
Exhibit L Anders Minkler Report, Exhibit 1 at C0000627.

[24]  Plaintiff's Response to U.S. RFA Nos. 166–181; C001647–C001692; C001827–C001875; C001699–
C001776; C002613–C002616.

[25]  Exhibit C, Amended and Restated Stock Purchase Agreement (C000310–C000332).

[26]  *Id.*, Article II (C000313–C000315).

[27]  *Id.*, Article V (C000318–C000319).

That is, if any of the deceased Company shareholder's shares were not purchased by other stockholders, the 2001 Agreement *required* the Company to purchase them.

17. In the event that Crown C Supply was required to purchase the shares of a deceased stockholder, the 2001 Agreement specified that "the purchase price per Share . . . shall be the amount per Share set forth in the Certificate of Agreed Value," where "'Certificate of Agreed Value' means a certificate . . . signed by all of the Stockholders and filed with the records of the Company, which establishes the agreed per Share value of the Shares or a method of ascertaining the same."[28]

18. Further, the 2001 Agreement stated that "in the event the Stockholders fail or refuse to execute a new Certificate of Agreed Value within eighteen (18) months following the date of the last executed Certificate of Agreed Value . . . the Purchase Price Per Share shall be the 'Appraised Value Per Share.'"[29] The 2001 Agreement set forth the process for retaining an appraiser(s) to determine the "Appraised Value Per Share."[30]

19. When Connelly died on October 1, 2013, the Company was then obligated to purchase his shares according to the 2001 Agreement. However, the Company Shareholders (i.e., the Connelly brothers) had not executed a Certificate of Agreed Value within the last 18 months.[31] Further, an appraiser was not retained at the time of death to determine the "Appraised Value Per Share."[32]

20. On November 13, 2013, Connelly's son, Michael P. Connelly Jr. ("Connelly, Jr."), and Thomas A. Connelly entered into "the 2013 Purchase Agreement" "for the sale and purchase of the stock formerly held by Michael P. Connelly, Sr."[33] In this document, the parties "agreed that the value of the stock in Crown C Supply Co., Inc. is Three Million Dollars ($3,000,000) and that life insurance is available for payment of the same," and

---

[28] Exhibit C, Amended and Restated Stock Purchase Agreement (C000310–C000332), Article VII (C000319–C000321).

[29] *Id.*

[30] *Id.*

[31] Plaintiff's Response to U.S. RFA No. 91.

[32] Plaintiff's Response to U.S. RFA No. 92.

[33] Exhibit N, Sale and Purchase Agreement Dated November 13, 2013, p. 1.

further agreed that payment for the shares would be made upon receipt of the life insurance proceeds.[34] Additionally, the parties agreed that Connelly, Jr. had the right to purchase all of Thomas A. Connelly's shares "either 1) upon the death of Thomas A. Connelly; or 2) upon the determination by Thomas A. Connelly . . . that Michael, Jr. has achieved the experience and ability to capably manage the company effectively."[35] Based on this agreement, Crown C Supply purchased Connelly's 385.9 shares for $3,000,000.[36]

21. According to the Anders Minkler Report, Connelly's 385.9 Company shares were worth $2,982,000 on October 1, 2013.[37] The Anders Minkler Report included $503,915 in "Life Insurance Proceeds Retained by Company (Michael Connelly),"[38] or approximately $3,000,000 less than the amount of life insurance proceeds received by Crown C Supply.

22. In the following sections I evaluate whether this exclusion prevented the Anders Minkler Report from arriving at a fair market value for the 385.9 shares. First, I review some basic principles of valuation and discuss how these guide the appropriate treatment of life insurance proceeds owned by the Company. Second, I affirmatively show that the fair market value of the equity of the Company, as of October 1, 2013, was $6,863,819, making Connelly's shares worth $5,297,496. Finally, I show that excluding the insurance proceeds when valuing the Company leads to outcomes that would not arise in an arm's length transaction because it creates a windfall to a potential buyer that no willing seller would accept.

## III.  VALUATION PRINCIPLES

23. Valuation of companies, property, intangibles, and other assets is a common form of analysis used throughout the finance and investment industry.[39] Subsequently, there are

---

[34]  *Id.*, pp. 1–2.

[35]  *Id.*, pp. 4–5.

[36]  *Id.*, p. 1.

[37]  Exhibit L, Anders Minkler Report (C000613–C000640) at C000618.

[38]  Exhibit L, Anders Minkler Report (C000613–C000640) at Exhibit 6 (C000640).

[39]  As Holthausen and Zmijewski write, "[m]anagers and investors decide whether or not to make an investment by comparing their assessment of the value—or valuation—of the future cash flows they expect to earn from an investment to the amount they must invest." Robert W. Holthausen and Mark E.

"well-accepted methods or valuation models that managers and investors commonly use to measure value,"[40] as well as extensive discussion of these methods and models in financial textbooks and other academic literature. I consider these methods in the context of the Anders Minkler Report's exclusion of the $3,000,000 in insurance proceeds from their valuation of the Company. I conclude that the Anders Minkler Report violates three standard "valuation principles" that are central to all arm's length equity valuations. Violation of these principles is an indication that the valuation did not result in a market-driven price (or fair market value, see definition below). In this section, after discussing some basic valuation definitions, I lay out these three valuation principles which any arm's length equity valuation should follow. Later in my report, I refer back to these principles to ascertain if the valuation of Connelly's shares conformed to fair market valuation principles.

### A.  VALUATION DEFINITIONS

24. **Fair Market Value:** The fair market value of an asset is the price at which it would be sold in the market between two willing, well-informed unrelated parties, neither being under compulsion to participate.[41] While there are many different approaches to estimating fair market value, several common approaches start by examining the asset's expected cash flow. As Aswath Damodaran writes, "the price we pay for any asset should reflect the cash flows it is expected to generate."[42] A profit-maximizing buyer is not

---

Zmijewski, *Corporate Valuation: Theory Evidence & Practice*, First Edition, (Cambridge Business Publishers, 2014), p. 4.

[40] Robert W. Holthausen and Mark E. Zmijewski, *Corporate Valuation: Theory Evidence & Practice*, First Edition, (Cambridge Business Publishers, 2014), p. 4.

[41] *See, e.g.*, the OECD's definition for fair value, "[t]he price at which an asset would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts." Available online at https://stats.oecd.org/glossary/detail.asp?ID=5332, accessed October 29, 2020. This is consistent with the definition provided in IRS Revenue Ruling 59-60 which references regulations defining fair market value as "the price at which the property would change hands between a willing buyer and a willing seller when the former is not under any compulsion to buy and the latter is not under any compulsion to sell, both parties having reasonable knowledge of relevant facts." IRS Revenue Ruling 59-60, § 2, available online at https://www.pvfllc.com/files/IRS_Revenue_Ruling_59-60.pdf. *See* also U.S. Treasury Regulation § 20.2031-1(b).

[42] Aswath Damodaran, *Damodaran on Valuation: Security Analysis for Investment and Corporate Finance*, Second Edition, (Hoboken, New Jersey: John Wiley & Sons, 2006), p. 1. Similarly, Holthausen and Zmijewski write, "[t]he value of an asset depends on the magnitude, timing, and risk of the cash

9

willing to pay more for an asset than its cash flows are worth, while a profit-maximizing
seller is not willing to accept a price below what the cash flows are worth.[43] Therefore,
willing, well-informed unrelated parties will generally accept a price which is consistent
with an asset's expected cash flows.

25. **Firm Value:** When estimating the fair market value of a company, an analyst can either
value the whole company — its firm value — or the value that equity holders can expect
to recover — its equity value (discussed below). Firm value reflects the fair market value
of the company's assets without deducting its liabilities, and encompasses all of the
firm's assets, including non-operating assets.[44]

26. **Equity Value:** Equity value (or common equity value) is the fair market value of a
company's equity (or common equity). Equity investors provide a primary source of
funding for a firm and, in return, receive an interest in all cash flows and assets available
after other non-equity interests have been paid. As Fuhrmann and Lamba write, "[w]hen
the company issues equity securities, it is not contractually obligated to repay the amount
it receives from shareholders, nor is it contractually obligated to make periodic payments
to shareholders for the use of their funds. Instead, shareholders have a claim on the
company's assets after all liabilities have been paid. Because of this residual claim,
equity shareholders are considered to be owners of the company."[45]

---

flows the investor expects it to generate." Robert W. Holthausen and Mark E. Zmijewski, *Corporate
Valuation: Theory Evidence & Practice*, First Edition, (Cambridge Business Publishers, 2014), p. 9.

[43] Note that "worth" here is as measured by the buyer and seller, respectively. It is possible that a buyer
and seller will disagree slightly on the value of an asset and, indeed, "transactions are more likely to
occur when the buyer believes a company is worth more than the seller believes it is." However
"valuation models should approximate the observed market value of the company so long as the inputs
used reflect both a specific valuation context and the information and expectations of the buyers and
sellers engaged in market transactions." Robert W. Holthausen and Mark E. Zmijewski, *Corporate
Valuation: Theory Evidence & Practice*, First Edition, (Cambridge Business Publishers, 2014), p. 5.

[44] As Aswath Damodaran writes, "[t]here are two ways in which we can approach DCF valuation. The
first is to value the entire business, with both assets in place and growth assets; this is often termed firm
or enterprise valuation. . . . The second way is to just value the equity stake in the business, and this is
called equity valuation." Aswath Damodaran, *Damodaran on Valuation: Security Analysis for
Investment and Corporate Finance*, Second Edition, (Hoboken, New Jersey: John Wiley & Sons, 2006),
pp. 11–12.

[45] Ryan C. Fuhrmann and Asjeet S. Lamba, "Overview of Equity Securities," *Equity Asset Valuation*
Fourth Edition, Jerald E. Pinto, et al. Ed., (Hoboken, New Jersey: Wiley, 2020), p. 8.

27. Consistent with equity's status as a residual claim on value, analysts often start an equity valuation by estimating firm value and then deducting all non-equity obligations. As Damodaran writes, "we can always get from the former (firm value) to the latter (equity value) by netting out the value of all nonequity claims from firm value. Done right, the value of equity should be the same whether it is valued directly (by discounting cash flows to equity at the cost of equity) or indirectly (by valuing the firm and subtracting out the value of all nonequity claims)."[46] Figure 1 below depicts the transformation from firm value to equity value.

**Figure 1: Starting from Equity Value or Firm Value to Derive the Other**



28. Note also that an analyst can go in the opposite direction and use valuation techniques or markets to find the equity value, then follow Figure 1 to find firm value. For public companies, for example, analysts might start with an observation of the equity as valued by the stock market, then add back non-common equity claims and liabilities to get to firm value.

### B. VALUATION PRINCIPLE #1: FIRM VALUE REFLECTS CASH FLOWS FROM ALL ASSETS

29. Total firm valuation should account for all cash flows associated with the firm's assets. For companies, this includes both the cash generated by regular business operations as

---

[46] Aswath Damodaran, *Damodaran on Valuation: Security Analysis for Investment and Corporate Finance*, Second Edition, (Hoboken, New Jersey: John Wiley & Sons, 2006), p. 12.

well as any cash available from non-operating assets. Explaining this, Wessels, Goedhart, and Koller write, "[m]any companies own assets that have value but whose cash flows are not part of the operations of the business and are not included in accounting revenue or operating profit. As a result, the cash generated by these assets is not part of free cash flow and must be valued separately."[47]

30. Life insurance proceeds, such as the proceeds at issue here, provide a lump-sum cash payment to a company and represent such a non-operating asset that must be added to firm's operating value in any firm valuation.[48]

### C. VALUATION PRINCIPLE #2: COMMON EQUITY CAPTURES ALL RESIDUAL VALUE AFTER ALL OTHER OBLIGATIONS ARE SATISFIED

31. Because common equity is the residual claim on a company's assets, all other obligations need to be satisfied before equity holders can begin to recoup their investment. This means that in order to estimate the fair market value of common equity starting from firm value, an analyst must deduct all of the other obligations as described in Figure 1.

---

[47] David Wessels, Marc H. Goedhart, and Tim Koller, *Valuation: Measuring and Managing the Value of Companies*, University Edition, Sixth Edition, (Hoboken, NJ: Wiley Finance, 2015), p. 149. Similarly, when discussing the capitalized cash flow method, the National Association of Certified Valuators and Analysts writes, "[i]t is important that any income or expense items generated from non-operating assets and liabilities be removed from estimated future benefits prior to applying this method. The fair market value of net non-operating assets and liabilities is then added to the value of the business derived from the capitalization of earnings." National Association of Certified Valuators and Analysts, BVTC Course 1: Fundamentals, Techniques, and Theories, "Chapter 6: Commonly Used Methods of Valuation," 2012, p. 6.

[48] Life insurance proceeds are received as cash, where any cash exceeding what is needed for day-to-day operations is considered a non-operating asset. For example, Wessels, Goedhart, and Koller write, "companies often hold more cash and marketable securities than they need to run the business on a daily basis. You need to make an estimate of how much the business needs for operations. The remaining cash and marketable securities are treated as nonoperating." David Wessels, Marc H. Goedhart, and Tim Koller, *Valuation: Measuring and Managing the Value of Companies*, University Edition, Sixth Edition, (Hoboken, NJ: Wiley Finance, 2015), p. 319. Similarly, Damodaran writes "[n]onoperating assets include all assets whose earnings are not counted as part of the operating income. The most common of the nonoperating assets is cash and marketable securities, . . . and the value of these assets should be added to the value of the operating assets." Aswath Damodaran, *Damodaran on Valuation: Security Analysis for Investment and Corporate Finance*, Second Edition, (Hoboken, New Jersey: John Wiley & Sons, 2006), p. 197.

32. Indeed, the Anders Minkler Report took this approach, valuing first the ongoing operations of the Crown C Supply and then deducting the fair market value of its debt.[49] This approach is appropriate as long as all assets are included and the debt deducted includes all non-equity claims, and no equity claims.

33. As part of this principle, once the residual value is determined, it belongs to all common equity holders based upon the number shares held. Each share is entitled to its proportional claim on that residual value; no individual common equity share is worth more than another. This makes common equity shares fully interchangeable.

    **D.    VALUATION PRINCIPLE #3: FAIR MARKET TRANSACTIONS DO NOT MAKE EITHER PARTY WORSE OFF**

34. As noted above, the fair market value reflects the value that would be accepted in a market transaction between two willing, well-informed unrelated parties. In order for both parties to be willing, this means that an asset must be priced so that neither party in an exchange is made worse off by transacting. For example, if I buy a baseball card trading at $100, then when I exchange $100 of cash with the card owner, she has merely converted the value of the card into a different asset. On her personal balance sheet, that asset has been transformed from a $100 baseball card into $100 in cash. On my personal balance sheet, the $100 in cash has been transformed into a $100 baseball card. In other words, our economic positions are unchanged.

35. In an exchange like the purchase of the baseball card, where the asset is not worth more because of a change in ownership, the principle that neither party is worse off means that there is no transfer of wealth between the parties and neither party is made better or worse off. Acquiring a company worth $10,000,000 by paying $10,000,000 in cash leaves neither the buyer nor the seller with new wealth; their portfolio compositions have merely shifted. In general, fair market transactions do not change the wealth of participating parties unless the asset is worth more when owned by one of the participating parties.

---

[49]    Exhibit L, Anders Minkler Report (C000613–C000640) at Exhibit 6 (C000640).

36. Having established these principles, I next move to evaluating the fair market value of Crown C Supply as of October 1, 2013.

## IV.  UNDER GENERALLY ACCEPTED VALUATION PRINCIPLES, THE FAIR MARKET VALUES OF THE COMPANY'S EQUITY AND CONNELLY'S COMPANY STOCK ON OCTOBER 1, 2013 WERE $6,863,819 AND $5,297,496, RESPECTIVELY

### A.  THE COMPANY'S PURCHASE OBLIGATION SHOULD NOT BE DEDUCTED FROM CROWN C SUPPLY'S TOTAL EQUITY VALUE

37. Crown C Supply paid Connelly's estate $3,000,000 for 385.9 Company shares.[50] This purchase was necessitated by the 2001 Agreement, which states, "[i]n the event that all of the Deceased Stockholder's Shares are not purchased by the other Stockholders, then the Company shall and must purchase from the Legal Representative and the Legal Representative must sell to the Company all of the Deceased Stockholder's Shares that are not purchased by the Remaining Stockholders."[51]

38. The payment from Crown C Supply to Connelly's estate was compensation for a transfer of Company shares, an equity asset. As such, this payment represents a payment to equity rather than a non-equity claim, and the price should have reflected the fair market valuation principles for equity valuation described above.

39. Importantly, a proper valuation should include all the assets before calculating the residual value held by the equity holders. The Anders Minkler Report excludes an asset, approximately $3 million of the insurance proceeds, before estimating the total equity value of Crown C Supply, leading to an undervaluation of Connelly's Company shares. In the next section I correct the Anders Minkler Report's estimate of value to arrive at a fair market value of Connelly's Company shares.

---

[50]  Exhibit N, Sale and Purchase Agreement Dated November 13, 2013, p. 1 Plaintiff's Response to U.S. RFA No. 52.

[51]  Exhibit C, Amended and Restated Stock Purchase Agreement (C000310-C000332), Article V, (C000319).

14

**B.**    **ACCOUNTING FOR THE FULL VALUE OF THE INSURANCE PROCEEDS RECEIVED, 385.9 SHARES OF CROWN C SUPPLY WERE WORTH $5,297,496 ON OCTOBER 1, 2013**

40. The Anders Minkler Report concludes that Crown C Supply's equity — i.e., 100% of the Company shares — was worth $3,863,819 as of October 1, 2013.[52] This value includes $503,915 in life insurance proceeds the Company received upon Connelly's death, but excludes an approximate $3,000,000 of these same life insurance proceeds.[53] As discussed above, the purchase of Connelly's shares was payment on an equity claim, and thus should not be subtracted from the estimate of its equity value.

41. The proper valuation of the Company's equity should include the full $3,503,894.74 of life insurance proceeds the Company received upon Connelly's death — both the $503,915 included in the Anders Minkler report and the roughly $3,000,000 excluded amount. Thus, beginning with the value of the Company's shares estimated by the Anders Minkler Report (the "Anders Minkler Estimated Company Equity Value") and adding in the excluded insurance proceeds increases Crown C Supply's total equity value from $3,863,819 to $6,863,819 on October 1, 2013.[54] Accounting for this correction, Connelly's 77.18% equity ownership in Crown C Supply was worth $5,297,496 as of October 1, 2013.[55]

42. One way to confirm whether Connelly's shares were worth $5,297,496 is to test whether parties other than Crown C Supply would have paid this price. I examine this question by determining: (1) how much Thomas A. Connelly would have paid for his brother's

---

[52]    Exhibit L, Anders Minkler Report (C000613–C000640) at Exhibit 6 (C000640). See the line item "Fair Market Value of Equity On A Controlling, Non-Marketable Basis As Of October 1, 2013." I have not evaluated the value conclusion of this report aside from its treatment of the life insurance proceeds received tied to Connelly's death. At the direction of counsel, I accept all other considerations as fair estimations throughout this report.

[53]    The Company received $3,503,894.74 in life insurance proceeds as a consequence of Connelly's death (*see* footnote 5 above) and approximately $500,000 in proceeds were included and labeled as "Retained by Company." The difference, implicitly, is the amount which was spent repurchasing stock from Connelly's estate. Exhibit N, Sale and Purchase Agreement Dated November 13, 2013, p. 1; Exhibit D, Crown C Supply Company, Inc. and Subsidiary, Consolidated Financial Statements, for the years ended September 30, 2012 and 2013 (C000413).

[54]    $6,863,819 = $3,863,819 + $3,000,000.

[55]    $5,297,496 = $6,863,819 x 0.7718.

Company shares; and (2) the price an unrelated third-party buyer would have been willing to pay for all of Crown C Supply's shares.

> **1.    If Thomas A. Connelly Had Purchased Connelly's Shares on October 1, 2013, the Fair Market Value Would Have Been $5,297,496**

43. Under the 2001 Agreement, Thomas A. Connelly held the right of first refusal to purchase Connelly's shares.[56] If Thomas A. Connelly had elected to purchase Connelly's 77.18% equity interest in the Company, this would have eliminated the Company's obligation to purchase Connelly's shares.[57] In this hypothetical scenario, it is readily apparent that Crown C Supply's equity value was $6,863,819. Crown C Supply would have still received the entire $3,503,894.74 of life insurance proceeds — this insurance payment was not contingent on Thomas A. Connelly's share purchase decisions — but the Company would not have been obligated to purchase any of Connelly's shares. Based on the Anders Minkler Report, the Company's equity value was $6,863,819 in this scenario.[58] Therefore, if Thomas A. Connelly had elected to directly purchase his brother's 385.9 shares, a fair price for those shares would have been $5,297,496.[59]

44. Figure 2 illustrates this hypothetical transaction. The depiction in Section "A" of Figure 2 captures the ownership interest of Crown C Supply after Connelly's death, but before any sale of Connelly's Company shares. Connelly owned 77.18% of the Company, and Thomas A. Connelly owns the remaining 22.82%. Without any repurchase obligation, the Anders Minkler Report's Company equity value would be $6,863,819, making Thomas

---

[56]  Exhibit C, Amended and Restated Stock Purchase Agreement (C000310–C000332), Article V (C000318–C000319).

[57]  The person owning all of the Company shares (regardless of the actual number of shares), whether Thomas A. Connelly or a hypothetical third-party purchaser, had complete control over the $3,000,000 of insurance proceeds at issue. That 100% owner could have either: (1) left the 2001 Agreement in place, whereby the Company would have purchased the 385.9 shares for $3,000,000; or (2) terminated the Company's repurchase obligation under Article XII of Exhibit C, Amended and Restated Stock Purchase Agreement (C000325) and caused the Company to distribute the $3,000,000 of insurance proceeds. In either situation, the 100% owner would have owned $6,863,819 of assets—$3,000,000 cash and 100% of the Company that Anders Minkler valued at $3,863,819. A similar situation is discussed in Section IV.B.2.

[58]  *See* footnote 54 above.

[59]  $5,297,496 = $6,863,819 x 77.18%.

A. Connelly's initial interest worth $1,566,323.[60] The illustration in Section "B" of Figure 2 captures the transfer of shares and the resulting ownership, whereby Thomas A. Connelly would have paid $5,297,496 for Connelly's 385.9 Company shares, giving Thomas A. Connelly full equity ownership of Crown C Supply, which was worth $3,863,819 without the excluded insurance proceeds, and control of the $3,000,000 of insurance proceeds that the Anders Minkler Report excluded.

**Figure 2: Thomas A. Connelly's Potential Purchase of 385.9 Shares**



45. Note that this hypothetical transaction satisfies all of the principles of equity valuation described above. It takes into account the fair market value of all of the Company's assets. The residual value subtracts out all non-equity claims from firm value and is distributed to all common equity holders. Thus, no shares are worth more than any other.[61] Finally, we can also see that Thomas A. Connelly's economic wealth is unchanged by the purchase. Before the purchase, he had a $1,566,323 interest in the company and $5,297,496 in cash,[62] totaling $6,863,819.[63] After the purchase, he has a 100% interest in $6,863,819 of Company equity, but no longer holds the $5,297,496 in cash. That is, at a price of $5,297,496 the transaction would not have increased or decreased the value of Thomas A. Connelly's economic position, consistent with the

---

[60]  $1,566,323 = $6,863,819 x 0.2282.

[61]  In this transaction, all shares are worth $13,727.64 each: $13,727.64 ≈ $1,566,323 / 114.10; $13,727.64 ≈ $5,297,496 / 385.90; and $13,727.64 ≈ $6,863,819 / 500.

[62]  Here I use cash as a simplification for assets available to purchase Crown C Supply; in reality Thomas A. Connelly could have used cash, sold assets, or borrowed money to finance the purchase of Crown C Supply.

[63]  Note that this only includes Thomas A. Connelly's personal holdings related to the Company.

baseball card example above. Similarly, the $5,297,496 price would not create nor destroy wealth for Connelly's estate; a $5,297,496 interest in the Company would be exchanged for $5,297,496 in cash. Because this exchange would not transfer wealth between the Company Shareholders, it is consistent with the third equity valuation principle and thus a fair market value exchange. In contrast, a $3,000,000 purchase price (instead of a $5,297,496 purchase price) would have shifted $2,297,496 in wealth from Connelly's estate to Thomas A. Connelly.[64] In other words, Thomas A. Connelly's economic position would have increased by $2,297,496 because he would have started with $1,566,323 of Company shares and $3,000,000 in cash,[65] totaling $4,566,323, but ended with a 100% interest in the Company worth $6,863,819.[66]

46. In both this hypothetical scenario and the actual transaction, Connelly's estate transfers all of its equity interest for cash and Thomas A. Connelly becomes the sole equity holder of the Company. However, in the actual transaction, Connelly's estate transferred its stock to the Company for $3,000,000, leaving Thomas A. Connelly with the only remaining outstanding shares and, as a consequence, 100% equity ownership of Crown C Supply.[67] In principle, since these two scenarios transfer the same equity interest, the fair market value of the transfer should be the same. That is, the share price should not depend upon which Thomas A. Connelly-controlled entity pays for the shares — the Company, which at the close of the transaction he fully owned, or Thomas A. Connelly himself from his personal wealth. Only a price of $5,297,496 for Connelly's stake reconciles both transactions. Therefore, the fair market value for the 77.18% equity interest in Crown C Supply was $5,297,496 on October 1, 2013.

---

[64] $2,297,496 = $5,297,496 − $3,000,000.

[65] Again, I use cash as a simplification for assets available to purchase Crown C Supply; in reality Thomas A. Connelly could have used cash, sold assets, or borrowed money to finance the purchase of Crown C Supply.

[66] $2,297,496 = $6,863,819 − $4,566,323.

[67] Of course, in this scenario Thomas A. Connelly owns 114.1 shares of Crown C Supply which in turn owns the remaining 385.9 shares.

2.    **If an Unrelated Third Party Had Purchased All of Crown C Supply's Shares, the Fair Market Value Would Have Been $6,863,819**

47. Another way to confirm that the fair market value of Crown C Supply's equity should include the full value of the insurance proceeds is to consider the perspective of a third-party buyer and what the buyer would have willingly paid for all of the Company Shareholders' equity interests. To examine this, I consider a third-party buyer's perspective in purchasing all of the Company Shareholders' interests in Crown C Supply, without affecting any repurchase obligations (i.e., after Connelly's death but before the Company purchased his shares). For simplicity, this scenario assumes that Company Shareholders' interests are transferred without any modification, the third-party receives all 500 outstanding shares, and the Company subsequently purchases the Connelly shares for $3,000,000.

48. Using the corrected equity value, the third party would have transferred $6,863,819 in cash in exchange for the 500 Company shares (i.e., all equity interests in the Company), including the shares held by Connelly's estate that the Company was required to purchase. Assuming the third party did not modify the 2001 Agreement,[68] and the Company (which at this point is fully owned by the third party) purchased the 385.9 shares that Connelly previously owned, the third party would have received $3,000,000 from the Company. After selling those shares back to the Company, the third party would still own a company worth $3,863,819 according to the Anders Minkler Report, but also have $3,000,000 in cash. That is, based on the Anders Minkler Report, the Company Shareholders' equity interests in the Company would produce $6,863,819 in value for a third party. *See* Figure 3. Consequently, if a third party had purchased all equity interests in the Company for only $3,863,819, it would have received a $3,000,000 windfall from the sale at the expense of the Connelly brothers.[69]

---

[68]  Exhibit C, Amended and Restated Stock Purchase Agreement (C000310–C000332), Article XII (C000325). The owner of all Company stock can terminate the agreement.

[69]  $3,000,000 = $6,863,819 − $3,863,819.

**Figure 3: Outcome of a Hypothetical Third-Party Sale**



49. Like this hypothetical third party, the Company Shareholders (i.e., the Connelly brothers) extracted $6,863,819 of total value from Crown C Supply. In the observed transaction, Connelly's estate received $3,000,000 in cash as payment for its shares and Thomas A. Connelly received full equity control of a company which, after deducting the cost of the $3,000,000 payment, was worth an estimated $3,863,819. In combination, these recoveries total $6,863,819. Consequently, at the correct price, this hypothetical third-party transaction does not make any party worse off. Any price greater or less than $6,863,819 would be incorrect because it would violate equity valuation principles by making one party worse off.

50. Despite this, the Anders Minkler Report suggests that the Company Shareholders' combined equity in the Company was only $3,863,819. The difference between the hypothetical $3,863,819 valuation and the actual $6,863,819 valuation does not reflect an underlying change in the Company's fair market value; it reflects the fact that the Anders Minkler Report excluded approximately $3,000,000 in non-operating assets which belonged to the Connelly brothers as equity owners of the Company. Since the Anders Minkler Company Equity Value does not reflect all of the cash flows and residual value the Company Shareholders had the right to receive as a consequence of their equity ownership, it does not reflect the fair market value of their equity.

20

C. **DEDUCTING THE VALUE OF INSURANCE PROCEEDS LEADS TO A PRICE WHICH FAILS TO CAPTURE THE FULL EQUITY VALUE OF CROWN C SUPPLY**

51. The analyses above demonstrate that, following standard valuation principles, the at-issue shares were worth $5,297,496 and that the corresponding share price would have been the only acceptable fair market value in both of the alternative transactions: direct purchase by Thomas A. Connelly and direct purchase by an unrelated third party. In both of the hypothetical scenarios, a price of $3,000,000 for 385.9 shares does not reflect the fair market value of the shares being transferred.

52. Indeed, the methodology for arriving at a $3,000,000 purchase price for the 385.9 shares is flawed and in violation of equity valuation principles. First, the actual transaction transferred significant wealth from Connelly's estate to Thomas A. Connelly, an outcome which is not consistent with the equity valuation principles and which demonstrates that it did not occur at a fair market value. Second, applying the same logic in a hypothetical where both Company Shareholders die simultaneously shows that allowing the estates to deduct share repurchase expense from a company's equity value leads to an impossible scenario of a company with residual value but no shares or shareholders.

1. **Selling the Shares for $3,000,000 Produced a Windfall for Thomas A. Connelly**

53. The $3,000,000 price that the Company paid to purchase Connelly's shares is problematic because it created a windfall for Thomas A. Connelly, even based on the Anders Minkler Estimated Company Equity Value. That is, accepting an estimated Company equity value of $3,863,819 leads to a stock repurchase agreement which creates a substantial transfer of wealth from one brother to another. Based on the Anders Minkler Estimated Company Equity Value, Connelly's estate and Thomas A. Connelly owned shares worth $2,982,095 and $881,723, respectively. However, after the Company purchased Connelly's 385.9 shares, Thomas A. Connelly, without any personal investment, became the sole equity owner of a company with an estimated equity value

of $3,863,819.[70] Based on these numbers, the Company's stock repurchase increased the value of Thomas A. Connelly's portfolio by $2,982,095 *under the assumptions of Anders Minkler Report*.[71] There is no reasonable explanation for this increase to Thomas A. Connelly's portfolio because the Company's repurchase of Connelly's shares should have reduced the total value of the Company equity and left the value of Thomas A. Connelly's shares unchanged, assuming the Company's shares were correctly priced. This increase, however, to Thomas A. Connelly's portfolio is a consequence of Anders Minkler excluding $3,000,000 of Company assets in its equity valuation.

54. Analyzing Thomas A. Connelly's position using a corrected equity value of $6,863,819 similarly demonstrates that the $3,000,000 purchase price created a windfall for Thomas A. Connelly. Applying the corrected Company equity value of $6,863,819, Thomas A. Connelly's shares were initially worth $1,566,323.[72] After the Company purchased Connelly's shares for the below market price, Thomas A. Connelly held shares worth $3,863,819, for an increase of $2,297,496.[73] That is, regardless of whether an analyst relies on the Anders Minkler Estimated Company Equity Value or the corrected Company equity value of $6,863,819, a $3,000,000 purchase price for Connelly's shares creates a windfall for Thomas A. Connelly.

55. Thomas A. Connelly received a windfall because the Company underpaid for Connelly's shares, causing a decline in value of the Connelly estate's portfolio of at least $2,297,496.[74] This violates the third principle of equity valuation, since the transfer makes Thomas A. Connelly better off and Connelly's estate worse off. An unrelated, well-informed party would not willingly agree to this decrease in portfolio value, suggesting $3,000,000 cannot be the fair market value for Connelly's shares.

---

[70]  According to the Anders Minkler Report, Crown C Supply's ongoing operations and non-operating assets, excluding approximately $3,000,000 in insurance proceeds, were worth a collective $3,863,819 on October 1, 2013.

[71]  $2,982,095.50 = $3,863,819 − $881,723.50.

[72]  $1,566,323 = $6,863,819 x 0.2282.

[73]  $2,297,496 = $3,863,819 − $1,566,323.

[74]  At a corrected Company equity value of $6,863,819, Connelly's estate sells shares worth $5,297,496 for $3,000,000.

2.    **Accepting a Deduction for Share Repurchase Obligations Leads to an Illogical Result when All Stock Is Repurchased**

56. In the observed transaction, approximately $3,000,000 in insurance proceeds were excluded from the equity valuation in connection with a stock repurchase. This type of exclusion, when applied to all equity repurchases as in the hypothetical transaction described below, leads to an outcome which violates the principles of equity valuation.

57. To demonstrate the problem caused by allowing the exclusion, I consider a scenario in which (1) the Company has a $3,863,819 equity value (i.e., the Anders Minkler Estimated Equity Value) prior to receiving any insurance proceeds; and (2) the Company owns life insurance policies which will pay out proceeds equal to each brother's pro rata interest in the Company's pre-insurance equity.[75] Further, this scenario assumes that Crown C Supply plans to repurchase the Company Shareholders shares using these insurance proceeds upon their death, much the way the Company purchased Connelly's shares in the actual transaction. Figure 4 depicts this scenario.

**Figure 4: Hypothetical Scenario with Simultaneous Repurchase**



58. In this scenario, if both Company Shareholders were to die simultaneously, Crown C Supply would receive $3,863,819 in insurance proceeds and use just this amount to repurchase *both* brothers' shares in the Company. As depicted in Section "A" of Figure 4,

---

[75]   The actual Anders Minkler Report $3,863,819 valuation includes $458,083 which may represent the cash value of life insurance for Thomas A. Connelly. For simplicity and ease of illustration, I assume in the hypothetical scenario that the $3,863,819 excludes life insurance proceeds and that the proceeds paid exactly equal the calculated equity value.

23

including the insurance proceeds in the valuation suggests the Company is worth $7,727,638.[76] If equity prices were based on a valuation which deducts any repurchase obligations from the Company's equity value, in line with the Anders Minkler Report, Crown C Supply would use only $3,863,819 to repurchase the Company Shareholders' shares. Connelly's 385.9 shares would be repurchased for $2,982,095.50, and Thomas A. Connelly's 114.1 shares would be repurchased for $881,723.50.[77] In this scenario, all outstanding equity in the Crown C Supply would be repurchased, leaving the Company with no owners. However, as depicted in Section "B" of Figure 4, Crown C Supply, without any shareholders, would still have an ongoing equity value of $3,863,819, since insurance proceeds alone were sufficient to cover any cash required by the repurchases that occurred at prices that did not reflect the fair market value of the shares.

59. This outcome violates the second principle of equity valuation discussed above — the equity owners do not recover all residual value after all non-equity claims have been paid. This reflects the fundamental problem that arises if funds earmarked for share repurchase obligations are excluded from equity values. Share repurchases are one method through which common equity owners recover their investment in a company; excluding share repurchases reliably undervalues a company's equity because it ignores a portion of the equity value owners should recover.

**D.    DEDUCTING THE VALUE OF INSURANCE PROCEEDS VIOLATES EQUITY VALUATION PRINCIPLES**

60. Accepting the Anders Minkler Estimated Company Equity Value violates all three valuation principles laid out in Section III above. The first principle is that valuation of the firm needs to take into account all assets. The $3,863,819 Anders Minkler Estimated Company Equity Value violates this principle by excluding approximately $3,000,000 of life insurance proceeds. Specifically, the Anders Minkler Report adds $503,915 to its equity value for Crown C Supply, noting these funds as "Life Insurance Proceeds

---

[76]    $7,727,638 = $3,863,819 + $2,982,095.50 + $881,723.50. These values represent the assumed equity value excluding any insurance proceeds, the insurance proceeds from Connelly's life insurance policy, and the insurance proceeds from Thomas A. Connelly's life insurance policy, respectively.

[77]    $2,982,095.50 = $3,863,819 x 0.7718. $881,723.50 = $3,863,819 x 0.2282.

Retained by Company (Michael Connelly)."[78] Including life insurance proceeds in valuing a firm is consistent with the principle that non-operating assets are added to estimates of operating value to calculate the fair market value of a firm or its equity. However, including only a portion of Crown C Supply's life insurance proceeds is not consistent with fair market valuation.

61. The second principle is that common equity is the residual claim after all other obligations have been satisfied, where the fair market value of each owner's claim is proportional to the number of shares held. The $3,000,000 in insurance proceeds is a company asset excluded by the Anders Minkler Report in connection with a common equity purchase. The insurance payment is a new asset owned by the equity holders, who should divide it based on their ownership shares. The purchase of the 385.9 shares for $3,000,000 equals a per share price of $7,774.[79] Thomas A. Connelly's 114.1 shares retained the remaining $3,863,819 of Company equity, which comes out to $33,863 per share.[80] This result — excluding assets from calculated equity values and having some Company shares allegedly worth 336% more than the price of identical shares — violates this second principle.

62. Finally, the third principle is that transactions that occur at fair market value do not make any of the participants worse off. Because the 385.9 shares were undervalued relative to the full equity value of the company, under the Anders Minkler Report approach, Connelly's estate was made worse off as a result of this transaction. Indeed, Thomas A. Connelly's boon described in Section IV.C.1 came fully at the expense of Connelly's estate. Because one party was made worse off in this transaction, it did not occur at fair market value and thus violated the third principle described above.

## V.    CONCLUSION

63. The Anders Minkler Report valued Crown C Supply's equity at $3,863,819 on October 1, 2013, excluding approximately $3,000,000 in insurance proceeds held by the Company

---

[78]    Exhibit L, Anders Minkler Report (C000613–C000640) at Exhibit 6 (C000640).

[79]    $7,774 ≈ $3,000,000 / 385.9.

[80]    $33,863 ≈ $3,863,819 / 114.1.

from the Company's equity value. Excluding these proceeds is inconsistent with equity valuation principles and undervalues Crown C Supply's equity by the same $3,000,000, since these insurance proceeds represented an asset which is recoverable by the Company's equity owners. Correcting this omission leads to a $6,863,819 equity value for Crown C Supply, implying the 77.18% interest owned by Connelly's estate was worth $5,297,496 on October 1, 2013. I can confirm this corrected equity value is the fair market value because unlike the $3,863,819 original valuation, this valuation does not violate the rules of equity valuation. It takes into account all the assets of the Company, it takes into account the full residual value and values all common shares equally, and transactions based on this value do not cause a transacting party to suffer a wealth loss.

26

### Appendix 1: Curriculum Vitae of Evan K. Cohen

**Mr. Evan Cohen** specializes in financial analysis and valuation, with a focus on complex business litigation. He has experience supporting highly regarded expert witnesses, including a Nobel Laureate, and assisting attorneys for the US Department of Justice (DOJ), the Internal Revenue Service (IRS), and corporations on all phases of case management and strategy. He has been retained by government and corporations to provide expert testimony on economic substance, structured finance and valuation.

Mr. Cohen has worked on a variety of finance and tax litigation matters, including cases involving Long-Term Capital Management, GlaxoSmithKline, Altria, BB&T, Fifth Third, Historic Boardwalk Hall, Pritired, Bank of New York, Salem, Buyuk, and Instant Tax Service. He has been involved in several high-profile public health investigations for the federal government, involving New York City Housing Authority's maintenance of public housing, landlords' disclosure and mitigation of lead violations, and damages arising from an auto manufacturer's lack of disclosure of Environmental Protection Agency (EPA) emissions requirements.

Prior to joining The Brattle Group, Mr. Cohen worked for six years as a consultant at Cambridge Finance Partners, where he focused on litigation involving tax shelters, leasing transactions, transfer pricing, and valuation matters. He has also worked as an investment banking analyst in corporate finance at Dillon Read and UBS.

#### EDUCATION

MBA, concentration in financial engineering, MIT Sloan School of Management

BA, Economics *magna cum laude*, Cornell University

Chartered Financial Analyst since 2013

Member of the CFA Institute and Boston Securities Analyst Society

#### AREAS OF EXPERTISE

- Tax Controversy
- Structured Finance and Valuation
- Transfer Pricing
- State Tax
- Capital Structure
- Damages
- Investigations

#### TESTIMONY AND REPORTS

- *Robert J. Nagy v. United States of America*, for the United States, July 2010, US District Court for the District of South Carolina; summary witness testimony.

- *Steven A. Stender, Harold Silver and Infinity Clark Street Operating, L.L.C, et al. v. Archstone-Smith Operating Trust, et al.*, on behalf of plaintiffs, June 2015, US District Court for the District of Colorado; expert report, rebuttal report, and deposition testimony.

- *Jeffrey W. Herrmann and Mina Gerowin Herrmann v. United States*, for Mr. and Mrs. Herrmann, January 2017, US Court of Federal Claims; summary witness testimony.

- On behalf of Uber Technologies, submitted affidavit to Georgia House Ways and Means Committee on the fiscal impact of a proposed sales tax on for-hire and ride-share trips, March, 2017.

- For a private client, submitted joint declaration with Michael Cragg to arbitration panel addressing damages due to lost profits and inability to access financial markets from a breach of contract, June 2017.

- For a private client, submitted an affidavit on valuation of corporate bonds and certain intracompany indebtedness, January 2013.

## EXPERIENCE

### Tax Controversy

- For taxpayer in a case involving the clean coal tax credit in U.S. Tax Court, provided consulting support for attorneys and trial team, and expert support for testimony of Dr. Michael Cragg. Dr. Cragg's testimony included analysis of the transactions involving clean coal. Led a team implementing a Monte Carlo approach to assessing the risk of the transaction. The judge issued a bench ruling after trial in 2019 in which he found for the taxpayer, relying in part on the risks the taxpayer was exposed to in the transactions.

- For the DOJ in a case in the Southern District of New York, supported analysis for Dr. Michael Cragg in examining the non-tax economics of several financing transactions undertaken by a major international insurance company. Supported Dr. Cragg's Declarations from 2010, which concluded that there was no pre-tax subjective business purpose, nor a meaningful chance of pre-tax economic profit. Supported the filing of Dr. Cragg's 2016 expert report and several 2017 rebuttal reports examining the economic analysis of four taxpayer witnesses. Worked directly with the client on the discovery process and on the exposition of Dr. Cragg's report. Settled favorably for the government in 2018.

- On behalf of a Fortune 500 consumer products company, examined the economics of a partnership transaction involving the creation of a joint venture involving several hundred thousand acres of timberlands, which the IRS alleged was a disguised sale. Examined the risks undertaken and the economics of the partners,

including the financing arrangements of the partnership. Settled favorably for the company in 2018.

- On behalf of an individual taxpayer, examined the cash flows from a foreign partnership and the flow of funds to each partner to conclude how much the taxpayer received from the partnership in the tax year at issue. Provided summary testimony in the Court of Federal Claims, including cross examination by attorneys from the Tax Division of the DOJ attorneys. In a written opinion from June 2017, Judge Lettow found in favor of the taxpayer. Mr. Cohen's testimony survived a Motion in Limine to exclude filed by the DOJ.

- Retained by the IRS as an expert witness on economic substance involving the historic rehabilitation tax credit. Analyzed transaction and structure of partnership transaction, which the IRS claimed lacked economic substance and non-tax business purpose. Provided consulting support to attorneys, which resulted in a settlement on favorable terms for the government.

- Supported attorneys from the IRS and one of their experts, Dr. Michael Cragg, in the Buyuk transaction. Led a case team that provided analytical and documentary support for the expert's analysis of economic substance and incentives of the parties. In ruling for our client, the US Tax Court judge relied heavily on the testimony of Dr. Cragg.

- For the IRS in an appeals hearing, supported four experts, including a Nobel Laureate and a Stanford Business School professor, in the preparation of two reports regarding a hedge's funds claim of long-term capital gains through options underwritten by two investment banks on billions of dollars in earnings. Examined the risks taken on by the investment banks or retained by the hedge fund, and critiqued the analysis of the hedge fund's experts in assessing the probability of a loss event and the magnitude of potential losses if such an event were to occur.

- Supported Brattle Chairman Dr. Michael Cragg in his testimony in US Tax Court regarding the valuation of residual interests in long-running dispute with the IRS. The analysis turned on assessing the different risks of near-term and long-term cash flows and how to properly apportion value. The matter was decided favorably for the IRS with heavy reliance on Dr. Cragg's opinions.

- Provided support to MIT Professor Stewart Myers in his testimony for Exelon in its recent tax dispute regarding Section 1031 like-kind exchanges and Exelon's purchase of coal-fired electrical plants. Analysis involved extensive financial analysis of leases, options, and assets.

- On behalf of a Fortune 500 client, supported the work of Professor Cliff Holderness from Boston College examining the manufacturing relationship between the company's domestic and international units. Specifically, the expert was asked to examine the contracts and opine on whether or not the parties transacted with each other on an arm's length basis involving the termination of their manufacturing relationship. Researched the range of potential relationships from joint ventures to

29

joint ownership and examined the specificity of assets within the contractual relationships. Supported the finalization of Dr. Holderness's report, which helped the client settle favorably with the IRS.

- On behalf of the DOJ, provided consulting support to trial team and supported the expert work of Dr. Michael Cragg and Roger Knauf, the former President and Executive Director of the Debt Buyers' Association International, in examining Distressed Asset Debt and Distressed Asset Trust structures, which were alleged to be abusive tax shelters. Supported Dr. Cragg in examining the economic substance of the structures and Mr. Knauf in examining industry norms in the consumer receivable secondary market. Case settled favorably for the government.

- For the DOJ, provided analytical and project team management support for the preparation of expert opining on the effectiveness of the hedging program and the implications of improper hedging techniques, including the determination of sale versus loan and its impact on tax reporting of various parties. Also supported documentary and case team management for the expert opining on the standards of care of accountants on such complex transactions.

- For Wells Fargo in a dispute with the IRS and DOJ, supported several internal rebuttal experts related to an economic substance dispute over several leveraged lease transactions and the expert report of Dr. Thomas Lys on behalf of the taxpayer. Rebuttal analysis revealed material flaws in Dr. Lys's assessment of risk and computation of the present value of cash flows related to the transactions. Led team on the production of two rebuttal reports, and helped prepare expert and attorneys for trial.

- For the IRS, provided analytical evaluation of economic substance of a partnership designed to transfer historic tax credits in the case against Historic Boardwalk Hall. Led team reviewing underlying documents and developing the cash flow model necessary for the evaluation of risk transfer and economic substance. Aided in preparation of report and ancillary materials, as well as trial strategy and preparation of expert testimony.

- For the DOJ on three cases involving LILO transactions, encountered the underlying legal issues of economic substance, substance over form and pre-tax business purpose. Provided expert support, including document review, cash flow creation and scenario testing, as well consulting on strategy and case preparation. Examined option exercise scenarios and their sensitivity to various parameters, including interest rates and the value of the underlying assets, as well as potential default scenarios.

- For a taxpayer involved in litigation over leasing transactions, examined analysis of government expert on conclusions concerning cash flows, ownership and discount rates for different phases of long-term leveraged leases.

30

- For the DOJ in a dispute involving the tax consequences of a contingent liability, examined underlying contracts, and produced econometric models to measure the likelihood of the various contract contingencies arising.

- For the IRS in a tax dispute involving transfer pricing, evaluated the valuation of intangible assets and its impact on the pricing of inter-company transactions.

- For the DOJ and IRS in cases involving the STARS transactions, analyzed the economic substance of the transaction from the perspective of the US taxpayers. Had resulted in favorable outcomes for our clients in the Bank of New York, Wells Fargo, and Salem cases.

- Consulted for the investment division of a major insurance company involved in a tax matter over foreign currency options. Examined underlying documents to develop a cash model, which provided insight into the sources of pre-tax returns to meet economic substance and form over substance standards. Documented and presented the results to the client and legal team and consulted over negotiation and settlement strategy.

- For the DOJ in the Pritired case, analyzed the economic substance of international structured finance transaction involving investment by Principal Life Insurance and Citibank. This resulted in a favorable ruling for our client.

- For the DOJ in a case involving a basis pump fueled by cross-border leasing transactions, looked at issues involving the step transaction doctrine, economic substance, substance over form, and pre-tax business purpose.

**Structured Finance and Valuation**

- For the Class A-1 Shareholders of the Archstone-Smith Trust UPREIT, provided testimony as a valuation and damages expert in class-action litigation by the A-1 Shareholders against the REIT managers and the banks who helped them in a $22 billion LBO in 2007. The A-1 Shareholders needed to ascertain if a common damages methodology could be applied to all shareholders for the purpose of certifying the class. The A-1 Shareholders alleged that they were forced to exchange for either cash, which would trigger a significant tax liability, or shares in the new REIT, which were inferior economic instruments to the shares they owned. Provided an expert report and deposition testimony for federal district court in Colorado.

- For a private Fortune 500 client, provided affidavit analyzing value of company's bonds and other internal, intracompany indebtedness. Analyzed market rates, comparable indebtedness, and modeled cash flows from specific tranches of debt

- For a private client, supported an outside expert in the development of an opinion on the creditworthiness of several corporate subsidiaries, providing analysis and opinion as to the implied credit rating of each as independent entities.

31

- Evaluated the accuracy of valuation models used by investment banks and other firms in the Chicago Tribune LBO and bankruptcy. Reverse engineered an LBO valuation model and performed scenario analysis.

- For a private creditor in a bankruptcy, provided economic scenario analysis and advice on various settlement offers. Advised client to reject $840 million payout to other creditors, eventually saving them $25 million in the final negotiation.

- Built real options models for the drug development process for 19 distinct drugs in various stages of clinical progress in support of expert testimony on the relative economic value of marketing, development, and patented technology. The end result was to model the profit split on the potential returns of these drugs between small biotech firms and the large pharmaceutical firms with whom they entered into business alliances. This involved separate research projects for analyzing the terms of the development contracts between biotech and big pharma firms, and for the assumptions on revenues, manufacturing costs, clinical trial expenses, phase times and transitional probability success, cost of capital, and itemized income statement expenses. Performed extensive sensitivity testing on all assumptions.

- For the DOJ, built integrated financial models for nine underlying transactions involved in complex cross-border lease-stripping tax shelter dispute. This involved review of case records and analysis of all pertinent transaction documents. Modeled underlying cash flows from the leasing of thousands of different types of computer equipment including mainframes and telecommunication systems.

- For a private client, led a team providing the valuation of various subsidiaries of a Fortune 500 company. Created financial statements for each legal entity, and performed discounted cash flow and comparable company valuation analyses.

- For a private client, created thirty years' worth of earnings and expenditure cash flows in support of testimony on the creation of earning capacity and analysis of enhanced earning claim.

**Transfer Pricing**

- Developed rebuttal testimony to IRS experts in a major transfer pricing dispute regarding the manufacture of medical devices. Analysis required novel valuation techniques for in-process R&D and a detailed functional analysis of the business.

- For a taxpayer in the manufacturing sector involved in a transfer pricing dispute with the IRS, lead a case team of over a dozen Brattle personnel in supporting multiple expert witnesses analyzing the cancellation of an Advanced Pricing Agreement with the IRS and assessing the proper transfer pricing methodology by examining the sources of value along the company's supply chain. Primary responsibility for the main transfer pricing economist's report, testimony, and trial preparation. Collaborated closely with trial team before and at trial to craft effective direct testimony presentation and provide real-time support for redirect testimony

32

and cross-examination topics for opposing experts. In a novel ruling, the Tax Court agreed with our analyses and ruled in favor of Eaton.

- For the IRS in a transfer pricing dispute with a major pharmaceutical company where the IRS alleged the company was overpaying its R&D arm at the expense of its domestic marketing and distribution operations, supported the testimony of Dr. Josh Lerner from Harvard Business school in examining the sources of value in the pharmaceutical industry using a novel analytical approach developed by Dr. Lerner. Examined milestones between funding rounds for biotech companies, and performed rigorous economic and econometric analyses, which helped Dr. Lerner conclude that advances made by these companies that brought the product closer to market, rather than just technical advances, were the real sources of value in the industry. Supplemented with model of the entire drug development process, including costs, timing, and probabilities for success at each level, and performed analysis of over 20 drugs involved in strategic alliances between major pharmaceutical companies and biotechs, to show that the lion's share of the profits accrued to the pharmaceutical company that helped distribute the drugs. Resulted in a favorable settlement for the government after the filing of opening reports.

**State Tax**

- On behalf of Uber Technologies, filed an affidavit to Georgia House Ways and Means Committee on the fiscal impact of a proposed sales tax on for-hire and ride-share trips. Examined the impact of the proposal, which would have removed the sales tax on such trips and replaced it with a specific per ride tax. Concluded that eliminating the sales tax and imposing the proposed tax would raise almost $4 million in revenue for the state of Georgia.

- On behalf a Fortune 500 consumer products company, examined the state tax apportionment scheme of the state of South Carolina on the company. Specifically, looked at the value of in-state business activities in South Carolina, and analyzed the potential distortion between the state's sales-only apportionment approach and the actual economic activity generated by the company, who's manufacturing and headquarter operations were domiciled outside the state. Company settled its case before reports were filed.

- On behalf of Comcast, supported the expert work of Dr. Cragg in examining certain intercompany financing arrangements and the Company's request from Massachusetts that it be allowed an exception to deduct interest for state tax purposes on this debt. Supported Dr. Cragg's expert report and eventual testimony before the Massachusetts Appellate Tax Board, where Dr. Cragg testified as to why the debt is legitimate, and its interest should be respected as it would if it were a third party lending arrangement. The Appellate Tax Board ruled in favor of the state.

### Capital Structure

- On behalf of the DOJ, provided consulting support to the government attorneys, and analytical and case team leadership for an outside expert in examining the debt and equity attributes of Qualified Written Notices of Allocation, and later Patronage Notes. Case settled.

- For a private consumer products company, examined their capital structure through acquisitions and reorganizations before, during, and after the Financial Crisis to assess the debt and/or equity characteristics of their balance sheet. The US government is alleging that the company's debt should be treated like equity at some stages during the company's operating history.

### Damages

- For a private client, retained as an expert to analyze damages due to lost profits and inability to access financial markets from a breach of contract. Filed joint affidavit with Dr. Cragg, resulting in favorable settlement for our client in arbitration.

- For an investment bank involved in class action securities litigation related to Enron, prepared damages estimate based on stock price analysis utilizing contemporaneous equity analyst reports.

- For a private client, evaluated malpractice damages in celebrity divorce representation. This included modeling of eschewed settlement offers and effects of potential legal advice errors using several different damage theories.

- Analyzed the pricing and market response to a client's bonds, including general obligation bonds, those secured by credit card receivables, and those involving a provision that allowed the client to call the bonds in the event of a large decline in receivables. Helped to formulate methodology for estimating damages from the analysis.

### Investigations

- For the DOJ and Department of Housing and Urban Development, lead a case team examining the effectiveness of the New York City Housing Authority (NYCHA), the largest provider of public housing in the country with over 175,000 units, in complying with federal law and mandate to provide decent, safe, sanitary housing that is in good repair. Case team investigated responsiveness and effectiveness of NYCHA in addressing issues related to lead paint, mold, heat, elevators, and pests. Provided recommendation for ongoing responsiveness levels and providing metrics to assess the effectiveness of NYCHA in dealing with these issues and satisfying federal law.

- For the DOJ, provided support into the investigation into more than a dozen landlords accused of violations with lead disclosures and abatement. Worked with attorneys to examine thousands of documents and provide actionable information for attorneys to enforce lead laws and provide tenants with lead-free housing.

- For the EPA and DOJ, analyzed disclosures of emissions violations by a major car company in order to assess propriety and effectiveness of company's emissions recalls. Formulated methodology and calculated damages for manufacturer's history of non-compliance with federal emissions laws.

- On behalf of the DOJ and in support of the expert reports and trial testimony of Dr. Michael Cragg and industry expert Marc West, examined the practices of Instant Tax Services (ITS). Dr. Cragg examined their relationship with their customers, including fees charged and the underlying interest rate of their loans of tax filing fees or cash advances in anticipation of tax refunds. Mr. West examined the back-office practices of ITS and their inability to follow industry standard practices to properly monitor franchises from filing false or misleading taxes on behalf of individuals. Federal District Court ruled in favor of the government in granting an injunction against ITS barring them from filing others' taxes, which eventually lead to the criminal conviction of their owner and the shutdown of the business.

## PUBLICATIONS AND PRESENTATIONS

With Richard McGowan and Jehan deFonseka, "Caloric Sweetened Beverage Taxes: A Toothless Solution," *The Economists' Voice*, Vol. 14, June 2017.

"Public Disclosure versus Confidentiality in Liquid Fuel Markets," The Brattle Group, January 2015, with Evan Cohen, Michael Cragg, and Bin Zhou.

With Michael Cragg, Jehan deFonseka, Adele Hite, Melanie Rosenberg, and Bin Zhou, "Statistical review of US macronutrient consumption data, 1965-2011: Americans have been following dietary guidelines, coincident with the rise in obesity," Nutrition (2015).

With Michael Cragg, David Hutchings and Bin Zhou, "Public Disclosure versus Confidentiality in Liquid Fuel Markets," whitepaper, January 23, 2015.

Panelist, ABA 2014 Joint Fall CLE Meeting, "Experts in the Trenches: Risk, Fair Rewards, Economic Substance, and Shams," Denver, Colorado, September 19, 2014.

With Yvette Austin Smith, "Asset Value Trumps Discounted Cash Flow in Another Bankruptcy Valuation Dispute," Brattle Client Alert, July 29, 2014.

Bankruptcy definition for the *Wiley Encyclopedia of Management*, 3rd Edition, 2013.

With Richard McGowan, "Grass is Always Greener When It's Legal: Policies for State Regulated Marijuana," *The Economists' Voice*, Vol. 9, Issue 1, October 2012.

"Tax Policies for Legalized Marijuana in California," SSRN abstract 1626985, August 2010.

With Metin Celebi, Michael Cragg, David Hutchings, and Minal Shankar, "Can the U.S. Congressional Ethanol Mandate be Met?," Brattle Discussion *Paper*, May 2010.

**Appendix 2: Documents Considered**

**Lettered Exhibits**
Exhibit A
Exhibit B
Exhibit C
Exhibit D
Exhibit E
Exhibit F
Exhibit G
Exhibit H
Exhibit I
Exhibit J
Exhibit K
Exhibit L
Exhibit M
Exhibit N
Exhibit P
Exhibit Q
Exhibit R
Exhibit S
Exhibit T
Exhibit U
Exhibit V
Exhibit W


**Request for Admissions and Other Case Documents**
Complaint
Answer to Complaint
Plaintiff's Response to U.S. First Set of RFA
Plaintiff's Response to U.S. Second Set of RFA
Plaintiff's Response to U.S. Third Set of RFA
Plaintiff's Response to U.S. Fourth Set of RFA


**Academic Literature**
Aswath Damodaran, *Damodaran on Valuation: Security Analysis for Investment and Corporate Finance*, Second Edition, (Hoboken, New Jersey: John Wiley & Sons, 2006)
Ryan C. Fuhrmann and Asjeet S. Lamba, "Overview of Equity Securities," *Equity Asset Valuation*, Fourth Edition, Jerald E. Pinto, et al. Ed., (Hoboken, New Jersey: Wiley, 2020)
Robert W. Holthausen and Mark E. Zmijewski, *Corporate Valuation: Theory Evidence & Practice*, First Edition, (Cambridge Business Publishers, 2014)
David Wessels, Marc H. Goedhart, and Tim Koller, *Valuation: Measuring and Managing the Value of Companies*, University Edition, Sixth Edition, (Hoboken, NJ: Wiley Finance, 2015)

37

**Additional Documents Procured by Brattle**

Organisation for Economic Co-operation and Development, Glossary of Statistical Terms

IRS Revenue Ruling 59-60

U.S. Treasury Regulation § 20.2031-1(b)

National Association of Certified Valuators and Analysts, *BVTC Course 1: Fundamentals, Techniques, and Theories*, "Chapter 6: Commonly Used Methods of Valuation," 2012