

# PohlmanUSA®
## Court Reporting and Litigation Services

Evan K. Cohen

November 25, 2020

Thomas A. Connelly, et al. v. The United States of America, et al.

EXHIBIT B

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

THOMAS A. CONNELLY,                        )
in his Capacity as Executor of the         )
Estate of Michael P. Connelly, Sr.,        )
                                           )
            Plaintiff,                     )
                                           )
vs.                                        )  4:19-cv-01410-SRC
                                           )
THE UNITED STATES OF AMERICA,              )
DEPARTMENT OF THE TREASURY,                )
INTERNAL REVENUE SERVICE,                  )
                                           )
            Defendant.                     )

VIRTUAL DEPOSITION OF EVAN K. COHEN

taken on behalf of the Plaintiff

November 25, 2020

INDEX PAGE 2

REPORTER: Bo Kriegshauser
CCR MO. LICENSE NO. 735
CSR IL. LICENSE NO. 084-003924
RPR LICENSE NO. 047257



Page 2

1   INDEX OF EXAMINATIONS
2                              PAGE
3   Direct-Examination by Mr. Devereux..  5
4   Cross-Examination by Mr. Bresnahan..  74
5   Redirect-Examination by Mr. Devereux  75
6
7   INDEX OF PLAINTIFF'S EXHIBITS
8                              PAGE
9
10  Ex. 1     12
11  Ex. 2     13
12  Ex. 3     16
13  Ex. 4     38
14  Ex. 5     25
15  Ex. 6     28
16  Ex. 12    30
17  Ex. 13    50
18  Ex. 16    65
19
20
21
22  COURT REPORTER WAS EMAILED EXHIBITS
23
24  SIGNATURE PAGE FOUND ON PAGE 78
25

Page 4

REMOTE APPEARANCES

The Plaintiff was represented by Mr. Robert L. Devereux, Esq., and Ms. Jessica Gottsacker, Esq., of the Law Offices of Danna McKitrick, P.C., 7701 Forsyth Boulevard, Suite 1200, St. Louis, MO 63105.

The Defendant was represented by Mr. James Bresnahan, II, Esq., of the U.S. Department of Justice, Tax Division, 555 4th Street, NW, Room 8840, Washington, D.C., 20001.

Page 3

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

THOMAS A. CONNELLY,                    )
in his Capacity as Executor of the     )
Estate of Michael P. Connelly, Sr.,    )
                                       )
       Plaintiff,                      )
                                       )
vs.                                    ) 4:19-cv-01410-SRC
                                       )
THE UNITED STATES OF AMERICA,          )
DEPARTMENT OF THE TREASURY,            )
INTERNAL REVENUE SERVICE,              )
                                       )
       Defendant.                      )

VIRTUAL DEPOSITION OF EVAN K. COHEN, produced, sworn, and examined on behalf of the Plaintiff on November 25, 2020, between the hours of 9:30 a.m. and 1:05 p.m. of that day, via REMOTE virtual hook-up, before Bo Kriegshauser, a Registered Professional Reporter and Certified Court Reporter within and for the State of Missouri.

Page 5

IT IS HEREBY STIPULATED AND AGREED by and between Counsel for the Plaintiff and Counsel for the Defendant, that this deposition may be taken in shorthand by Bo Kriegshauser, a Registered Professional Reporter, Certified Court Reporter, and afterwards transcribed into typewriting, and the Witness read and signed the deposition.

o-O-o

COURT REPORTER: Do you swear or affirm to tell the truth, the whole truth, and nothing but the truth?
THE WITNESS: I do.
COURT REPORTER: Thank you.

o-O-o

EVAN K. COHEN, of lawful age, produced, sworn, and examined on behalf of the Plaintiff, deposes and says:

DIRECT-EXAMINATION
QUESTIONS BY MR. DEVEREUX:
   Q   Okay. Good morning everyone. Just a housekeeping matter I think we should take on the

EXAMINATION BY MR. DEVEREUX

Page 14

1. this document as part of what you reviewed in order to
2. render your report?
3.    A   I believe some part of this document is
4. included in Exhibit A, which is on my documents
5. considered list, but I didn't -- I don't recall
6. reading it or paying any particular attention to it.
7.    Q   Okay. Are you familiar with -- I'm on the
8. third page. Are you familiar with Form 843 the Claim
9. for Refund and Request for Abatement?
10.    A   No.
11.    Q   You're not familiar with that?
12.    A   No.
13.    Q   Okay. And so I'm now on Bates No. 271 of
14. Plaintiff's Exhibit No. 2. Do you recall reviewing
15. this page in preparation for your report?
16.    A   No.
17.    Q   Okay. I'm now on Bates No. 273, which is
18. page 3 of the Request for Refund. Did anybody call to
19. your attention the ruling that took place in the
20. estate of George C. Blount versus the Commission at
21. 428 F 3rd 1328?
22.    A   It may have been discussed at some point. I
23. didn't pay any particular attention to it in preparing
24. my report.
25.    Q   Did you ever read the case?

Page 15

1.    A   Did I read the opinion in the case?
2.    Q   Yes, sir.
3.    A   I may have skimmed it, you know, around when
4. we were being retained for this.
5.    Q   Did the holding in the estate of Blount
6. versus the commissioner, did that play any part in the
7. opinion that you've rendered and placed in your expert
8. report?
9.    A   No.
10.    Q   Okay. Did you understand that the Blount
11. case dealt with how the insurance proceeds from a
12. buy/sell agreement are to be treated for estate
13. purposes?
14.    A   No.
15.    Q   Okay. And when you reviewed the Blount
16. case, did you understand that that ruling took place
17. in 2005?
18.    A   I understand that now. I don't know if I
19. understood that at the time.
20.    Q   Okay. And as a result of the ruling in
21. Blount, did you ever investigate whether or not the
22. Internal Revenue Service issued any nonacquisition
23. statements regarding the Blount case?
24.    A   No.
25.    Q   Okay. And so as you sit here today, you

Page 16

1. don't know whether or not the Internal Revenue Service
2. ever issued a nonacquisition statement regarding the
3. ruling in the Blount case?
4.    A   I don't even know what a nonacquisition
5. statement is.
6.    Q   Okay. All right. Give me just a second
7. here.
8.        [Plaintiff's Exhibit 3.]
9.
10.    Q   Okay. Mr. Cohen, could I direct your
11. attention to Plaintiff's Exhibit No. 3? And would you
12. be kind enough to identify it for the record?
13.    A   It looks like it's the Amended and Restated
14. Stock Purchase Agreement dated August 29th, 2001 for
15. Crown C Supply Company.
16.    Q   Okay. And is this a document that you
17. reviewed as part of your assignment to render an
18. expert report in this matter?
19.    A   Yes.
20.    Q   Okay. And who were the parties to this
21. agreement?
22.    A   It looks like the company, and Michael P.
23. Connelly and his brother Thomas A. Connelly.
24.    Q   Okay. And did you understand that in
25. reviewing this that they were the two and only

Page 17

1. shareholders of Crown C Supply?
2.    A   Yeah.
3.    Q   All right. And did you understand the
4. purpose of this agreement?
5.    A   I'm sorry, did you say did you understand
6. that's the purpose of this agreement, or did I
7. understand the purpose of this agreement?
8.    Q   The latter. Did you understand the purpose
9. of this agreement?
10.    A   I think so.
11.    Q   All right. Mr. Cohen, with respect to
12. Plaintiff's Exhibit No. 3, have you formulated any
13. opinions as to the enforceability of this agreement?
14.    A   No.
15.    Q   Okay. And in reviewing this agreement, did
16. you understand that the company, Crown C, was going to
17. satisfy its obligations under the contract by
18. purchasing life insurance on the lives of the two
19. shareholders?
20.    A   I don't know that I understood from this
21. document that the company was going to satisfy that
22. obligation with life insurance, no.
23.    Q   Well, as part of your assignment, did you --
24. did you learn that, in fact, the company did purchase
25. life insurance in order to satisfy the obligations

EXAMINATION BY MR. DEVEREUX

Page 18

1  contained in this agreement?
2      A   No. I know the company purchased life
3  insurance.
4      Q   Okay. And what was your understanding of
5  why the life insurance was purchased?
6      A   I have no understanding of why the life
7  insurance was purchased.
8      Q   Okay. Did you understand that Crown C
9  Supply was the purchaser of the life insurance?
10     A   I did.
11     Q   Okay. Now, there has been some confusion,
12 so I want to go to -- give me just a second here.
13         I want to direct your attention to Article
14 VII of Plaintiff's Exhibit No. 3 on page 12.
15         MR. BRESNAHAN: That would be Article VIII.
16         MR. DEVEREUX: Oh, I'm sorry. Thank you.
17     Q   (By Mr. Devereux) And I want to direct your
18 attention to section Article VIII B. Does this
19 article provide that in the event of a sale and
20 purchase under Article V (death) and the proceeds
21 collected from any life insurance owed by the
22 surviving Stockholders or the Company on which the
23 Decedent Stockholder was the insured was sufficient to
24 pay the Purchase Price in full, the full amount of
25 said Purchase Price shall be paid on the closing date

Page 19

1  to the legal representative of the decedent
2  stockholder, and any remaining proceeds may be
3  retained by the beneficiary thereof. Do you see that?
4      A   I do.
5      Q   And did you construe that that in the event
6  the Crown C received life insurance proceeds, Crown C
7  was required to pay the decedent the estate of the
8  decedent?
9      A   I'm sorry, can you repeat that question?
10     Q   In the event that one of the stockholders
11 died and the company received life insurance proceeds
12 or death benefits from that death, did you understand
13 that the company was required to pay that to the
14 estate of the decedent?
15     A   I don't understand that from this clause,
16 no. I mean this clause --
17     Q   Well -- go ahead. What is your
18 understanding of how this clause becomes operative in
19 the event of the death of one of the stockholders.
20     A   If there is this death and Article V is --
21 remember, Article V says in the event of death, we
22 need to have a fair market valuation of the equity in
23 order to figure out how much is paid. So this says if
24 there is a death and the proceeds from any life
25 insurance are sufficient to pay the purchase price in

Page 20

1  full, the full amount of said purchase price shall be
2  paid on the closing date to the legal representative
3  of the decedent stockholder, and any remaining
4  proceeds may be retained by the beneficiaries thereof.
5  So to me it doesn't say anything that is useful, in my
6  opinion, because it doesn't say assume that the life
7  insurance proceeds are sufficient. It just says in
8  the event they are sufficient, which still leaves us
9  with Article V where the fair market value needs to be
10 determined for what those shares are worth, and then
11 sort of a separate calculation whether or not there
12 are insurance proceeds that are sufficient to satisfy
13 that Article V obligation.
14     Q   So my question to you is: If Crown C
15 received death benefits as a result of the death of
16 Michael Connelly, were they required -- was the
17 company required to pay those proceeds to the estate
18 of Michael Connelly pursuant to the clause contained
19 in this agreement?
20     A   I don't know if they were required. I'm not
21 a lawyer. And, you know, this clause has no bearing
22 on my opinion.
23     Q   Okay. This clause does say -- and I'm at
24 the top of page 13. The full amount of said purchase
25 price shall be paid on the closing date to the legal

Page 21

1  representative of the decedent stockholder. Correct?
2      A   Yeah. But you're ignoring the rest of the
3  sentence, which is and the proceeds collected from any
4  life insurance owned by the surviving stockholders or
5  the company on which the decedent stockholder was
6  insured are sufficient to pay the purchase price in
7  full. Then I would agree that there seems to be a
8  requirement.
9      Q   Okay. And in what situation would there not
10 be a requirement of Crown C Supply to pay to the
11 decedent stockholder the life insurance proceeds?
12     A   I just want to be clear that whether or not
13 this clause says they have to pay the life insurance
14 proceeds -- you know, if the proceeds are not
15 sufficient to satisfy the purchase price, then this
16 clause is insufficient, you know, to satisfy the
17 Article V obligation.
18     Q   Okay. Well, let me ask it this way: In
19 reviewing the file, is it your understanding that
20 Michael Connelly died on October 1st, 2013?
21     A   I don't recall if he died on September 30th
22 or October 1st.
23     Q   Okay. So -- and just so -- you know, I've
24 reviewed your report, and I'll get to that, but is it
25 my understanding that your client has accepted the

EXAMINATION BY MR. DEVEREUX

Page 34

1  insurance policies as an asset, reporting $851,870 as
2  of September 30th, 2013."
3     A  I see that.
4     Q  And can you explain why the cash surrender
5  value of these policies was contained as an asset on
6  Crown C's consolidated financial statements?
7     A  I'm sorry, do you want me to tell what you
8  cash surrender value of life insurance is?
9     Q  Well, I asked it more in the form of why it
10 is included as an asset on Crown C's consolidated
11 financial statements.
12    A  I mean, are you asking me what prepares as a
13 financial statement toward thinking and including it
14 on their balance sheet?
15    MR. BRESNAHAN: Objection. He can't --
16 there is no foundation here, Bo. He can't testify as
17 to why -- why the company did something. He can --
18 the objection is to the foundation.
19    MR. DEVEREUX: I'll restate it.
20    Q  (By Mr. Devereux) So, Mr. Cohen, do you have
21 an understanding as to what the cash surrender value
22 of a life insurance policy is?
23    A  Yes.
24    Q  So is it accurate -- and I don't want to put
25 words in your mouth. But if the cash surrender value

Page 35

1  as listed here in the amount of $851,870, does that
2  mean the company could contact the insurance company
3  and receive the cash surrender value of the policy at
4  any given point in time?
5     A  Yes. So on September 30th, 2013 my
6  understanding of cash surrender value of life
7  insurance is if the company calls the life insurance
8  company and cancels the policies, they would be
9  entitled to a total of $851,870 in cash.
10    Q  Okay. And do you have an understanding as
11 to whether or not there is a difference between the
12 cash surrender value of a life insurance policy as
13 opposed to the death benefits of a life insurance
14 policy?
15    A  Yes, I have an understanding of the
16 difference.
17    Q  And what is your understanding?
18    A  Cash surrender value is what the policy is
19 worth on any given day if the policy was canceled.
20 So, you know, it would be the accumulated cash value.
21 Whereas, the death benefit is how much the life
22 insurance company has contracted to pay the
23 beneficiary or beneficiaries upon the death of, you
24 know, the covered person.
25    Q  Okay. And is it accurate once the death

Page 36

1  benefits paid under a life insurance policy are paid,
2  does that cancel the cash value of the policy?
3     A  Yeah.
4     Q  Now, directing your attention to -- I'm on
5  paragraph No. 16. Did you indicate in this
6  paragraph -- I'm at the bottom four lines -- in the
7  event that all of the deceased stockholder's shares
8  are not purchased by other stockholders, then the
9  company shall and must purchase from the legal
10 representative, and the legal representative must sell
11 to the company all of the deceased stockholder's
12 shares that are not purchased by the remaining
13 stockholders.
14    A  Yes.
15    Q  Okay. And I think we talked earlier about
16 Article VIII; is that correct? On Plaintiff's Exhibit
17 No. 3.
18    A  Yes, I think it was Article VIII. Now I'm
19 getting confused whether it was Article VIII or
20 Article VII.
21    Q  Well, I'll put it back up on the screen. I
22 don't want -- I'm not trying to trick you or confuse
23 you, so let's just take it one step at a time. Here
24 it is. Paragraph B; is that correct?
25    A  Yeah, I remember talking about that.

Page 37

1     Q  So, I just read to you Article V about the
2  other stockholders having the right to purchase the
3  shares. But when you look at paragraph 8B, does it
4  not require the company, in the event the company
5  receives life insurance proceeds, to pay to the estate
6  of the decedent the proceeds available in order to pay
7  the value of the decedent's share?
8     A  Yeah. I thought we talked about this
9  before, and I don't think that's what Article VIII
10 says.
11    Q  Well, what do you think Article VIII says?
12    A  I mean, like we talked about, Article VIII
13 says if one of the stockholders were to die, you know,
14 and implicit there is the other stockholders take
15 their right of first refusal and purchase the shares,
16 then the company is obligated, like you said in
17 Article V, to purchase all of those shares. And
18 Article V goes on to say and does so at a fair market
19 value price. And here it says if they died and the
20 life insurance proceeds are sufficient to pay the full
21 purchase price, and purchase price there defined has a
22 fair market value implication, you know, then the life
23 insurance obligation would satisfy the purchase
24 obligation.
25    Q  So this is something I want to address with

10 (Pages 34 to 37)

Page 58

1  and which affected the expert report you prepared in
2  Plaintiff's Exhibit No. 12?
3      A   Yes.
4      Q   And what was that? What were those factors?
5      A   That they all -- I think the only thing that
6  is relevant is that they agreed -- if they agreed to
7  sell and the company agreed to buy the shares for
8  $3 million from the estate.
9      Q   Okay. Let me direct your attention to page
10 4, paragraph 12 of your expert report.
11     A   All right.
12     Q   In this report you indicate that the
13 redemption of the shares creates a windfall for Thomas
14 Connelly. Is that accurate?
15     A   Yeah.
16     Q   Okay. And I'll ask it again. Did you
17 understand that the parties were funding the
18 obligation of the amended and restated stock purchase
19 agreement by the purchase of life insurance policies
20 that would be available to redeem the stock as
21 required --
22     A   No, those are --
23     Q   -- under the amended and restated stock
24 purchase agreement?
25     A   No, those are two separate things.

Page 59

1      Q   What do you mean by they're separate things?
2      A   Well, the amount of the insurance proceeds
3  is what was bought on the insurance coverage. Whereas
4  the obligation is to purchase the shares of the estate
5  at their fair market value. Those two things don't
6  have to be tied at all.
7      Q   All right. But my question -- my question
8  is: Is did you understand that the purchase of the
9  life insurance policies was the funding vehicle to
10 allow the company to comply with the terms of the
11 amended and restated stock purchase agreement?
12     A   No.
13     Q   No what?
14     A   No, that's not my understanding.
15     Q   What was your understanding then?
16     A   My understanding is the company had an
17 obligation on the death of Michael or Thomas, but
18 Michael unfortunately is the one that passed away.
19 The company had an obligation to purchase his shares
20 at their fair market value. You know, the fact that
21 there was life insurance available to pay some of it
22 is, you know, nice, but I don't see the connection.
23 And it's not my understanding that there needs to be a
24 connection.
25     Q   In one of your examples did you indicate

Page 60

1  that a willing buyer would be willing to pay
2  6.8 million, approximately, and then come in and
3  redeem Michael Connelly's shares for $3 million?
4      A   I believe so. It might have been 6.9.
5      Q   Okay. My question to you, is that kind of a
6  distinction without a difference? Because isn't the
7  net price that you're paying for the company $3.8
8  million? Because you're coming in, you're paying 6.8,
9  and you're immediately paying out the $3 million
10 obligation?
11     A   Yeah. I think the reason that I set up that
12 hypothetical like that is to mimic what really
13 happened. That there was, you know, the redemption of
14 shares that was paid out, so that there is not, you
15 know, there is not as much difference. And when a
16 third party comes in, if the shares haven't been
17 redeemed, if the company's obligations to redeem those
18 shares remains, and if the $3 million is still, you
19 know, available and not paid out yet, then they're
20 purchasing the company and the $3 million, and then
21 they are redeeming the shares for, you know, whatever
22 that's worth.
23     Q   So don't we arrive at the valuation that
24 Anders calculated that --
25     A   No.

Page 61

1      Q   -- is contained in Plaintiff's Exhibit 5?
2      A   No, because at that point it would only be
3  115 shares left. It wouldn't be the 500 shares.
4      Q   But the point is, if you take 6.8 and you
5  came in and you paid off the 3 million, then you would
6  be at 3.8 million, right?
7      A   Yeah. But why are you only paying the
8  3 million?
9      Q   I don't know. You came up with this -- with
10 this -- what I consider to be, you know, this
11 convoluted explanation as to what a willing buyer
12 would do when, you know, the entire situation is such
13 that whoever buys it is going to have to satisfy the
14 obligation that Crown C had as a result of the amended
15 and restated purchase agreement. And would a buyer
16 not take that into consideration in arriving at the
17 price that willing buyer would pay for the company?
18     A   Is there a particular place you want me to
19 look in the report? Would figure 3 be a good place?
20 It seems like that's the hypothetical that you're
21 calling convoluted.
22     Q   I would just request that you answer the
23 question.
24     A   If a third-party were purchasing the company
25 and the cash proceeds from the life insurance, they

16 (Pages 58 to 61)

EXAMINATION BY MR. DEVEREUX

Page 66

1  or becomes incompetent or revokes or disputes the
2  validity or liability under, any guarantee of the
3  indebtedness evident by this note. I see that.
4     Q   So my question is, did you understand that
5  when Michael Connelly died, that was a delineated item
6  of default in the promissory note that's contained in
7  Plaintiff's Exhibit 16?
8     A   I see that language here, but I didn't -- it
9  wasn't part of my opinion or scope.
10    Q   So did you give any credence to the fact
11 that when Michael Connelly died on October 1st, 2013,
12 that Crown C Supply was in default of its loan
13 covenants with Commerce Bank?
14    A   No, because in accepting the Anders Minkler
15 valuation I've been told to accept everything, you
16 know, above the treatment of the obligation and the
17 insurance proceeds. And this included that. So I
18 didn't consider a valuation of the debt could be part
19 of my scope.
20        MR. DEVEREUX:  Okay. I'm just about done.
21 Could we take about a ten-minute break? Let me just
22 get a little organized here and see if I have any
23 additional questions? I think it will be about
24 another five or ten minutes. Would that be okay with
25 everybody?

Page 67

1         MR. BRESNAHAN:  Yes.
2         MR. DEVEREUX:  All right. It's 12:34.
3  Let's come back about 12:45. Or in your case, the
4  east coast guys, 1:45.
5         (A break was held.)
6
7         MR. DEVEREUX:  Back on.
8     Q   (By Mr. Devereux) Mr. Cohen, did you perform
9  any analysis to determine the value of Crown C Supply
10 by comparing any other similarly situated business?
11    A   I'm sorry, I was on mute. No.
12    Q   Okay. And I think I asked you this, but I
13 want the record to be clear, did anybody during your
14 assignment that culminated in your expert report ever
15 inform you of the case of the estate of Blount versus
16 The Commissioner of Internal Revenue?
17    A   Yeah, I thought we discussed that at the
18 beginning that I might have reviewed the case a year
19 ago, but it had no impact on my analysis and opinion.
20    Q   Did you ignore the holding in Blount in
21 rendering your opinion?
22    A   I didn't even consider the holding of Blount
23 in rendering my opinion.
24    Q   Well, when you -- when you reviewed the
25 Blount case, what understanding did you gain as it

Page 68

1  relates to life insurance proceeds that are received
2  by a company pursuant to a buy/sell agreement?
3     A   I don't recall having any understanding.
4  And I didn't need to come up with an understanding
5  because my assignment was, you know, to opine on the
6  fair market value of the -- of Michael Connelly's
7  shares, and that's not a question where I need legal
8  precedent to consider it. You know, it's a question
9  of valuation.
10    Q   But don't we as taxpayers and as Internal
11 Revenue Service, don't we rely on court cases to
12 provide guidance as to how we treat particular
13 transactions?
14    A   I mean, let's take my baseball card example.
15 You don't need a court decision to figure out that
16 $100 baseball card its worth $100. So, I mean I don't
17 know what courts have to do with -- with, you know,
18 what my scope was.
19    Q   Well, let's use your example of the baseball
20 card. And let's say that you do sell a baseball card
21 for $100, and the internal revenue code provides that
22 when anybody sells a baseball card you're taxed at
23 95 percent of the sale price. Would that require the
24 seller of that baseball card to then pay $95 into the
25 registry of the federal government as a result of that

Page 69

1  sale due to the fact that there was an internal
2  revenue code that required it?
3     A   It would seem that way.
4     Q   So, why -- why was it that you didn't follow
5  the case law that annunciated how insurance proceeds
6  are to be treated pursuant to a buy/sell agreement?
7         MR. BRESNAHAN:  Objection. That's calling
8  for a legal conclusion.
9     Q   (By Mr. Devereux) Subject to that, sir, you
10 may answer.
11    A   Yeah, if the question is what's the fair
12 market value of the baseball card and you know, do an
13 analysis and it's $100, that has nothing to do with
14 what the proceeds are used for. You know, my question
15 is what's the value of the company or what's the value
16 of the percentage share of the company? Then if there
17 is some legal precedent that has some impact -- you
18 know, it doesn't affect what a willing buyer and a
19 willing seller are going to exchange that for. That's
20 a market determination. Not a legal determination.
21    Q   Is it not a legal determination when the
22 court declares that -- in Blount, the Ninth Circuit
23 approved deducting the insurance proceeds from the
24 value of the organization when they are offset by an
25 obligation to pay those proceeds to the estate in a

Page 78

```
 1               SIGNATURE PAGE
 2    STATE OF_____)
 3    COUNTY OF_____)
 4         I,_____, do
 5    hereby affirm that I have read the foregoing
 6    deposition and agree that said deposition is a true
 7    and correct representation of my testimony in this
 8    matter, with any changes I have made on the correction
 9    page.
10
11         _____
12                    EVAN K. COHEN
13
14         Subscribed to before me this _____ day
15    of _____, 2020.
16
17         _____
18                   NOTARY PUBLIC
19
20         My commission expires:_____
21
      STYLE OF CASE:  Thomas A. Connelly, in his Capacity as
22    Executor of the Estate of Michael P. Connelly, Sr.,
      VS. The United States of America, Department of the
23    Treasury, Internal Revenue Service
24    TAKEN ON:  November 25, 2020
25    REPORTER:  Bo Kriegshauser, RPR, CCR, CSR-IL, CLVS
```

Page 79

```
 1                    CERTIFICATE
 2         I, Bo Kriegshauser, a Registered
      Professional Reporter and duly Certified Court
 3    Reporter within and for the State of Missouri, do
      hereby certify that there came before me via REMOTE
 4    virtual hook-up,
                    EVAN K. COHEN,
 5
 6    was by me first duly sworn to testify to the truth and
      nothing but the truth of all knowledge touching and
 7    concerning the matters in controversy in this cause;
      that the witness was thereupon carefully examined
 8    under oath and said examination was reduced to writing
      by me; and that the signature of the witness was NOT
 9    waived by agreement of witness and all parties, and
      that this deposition is a true and correct record of
10    the testimony given by the witness.
11         I further certify that I am neither attorney
      nor counsel for nor related nor employed by any of the
12    parties to the action in which this deposition is
      taken; further, that I am not a relative or employee
13    of any attorney or counsel employed by the parties
      hereto or financially interested in this action.
14
15
16
17
18
19
20              Bo Kriegshauser
21
22
23
24
25
```