IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI

| | |
|---|---|
| THOMAS A. CONNELLY, IN HIS CAPACITY AS EXECUTOR OF THE ESTATE OF MICHAEL P. CONNELLY, SR., <br><br> Plaintiff, <br><br> v. <br><br> THE UNITED STATES OF AMERICA, DEPARTMENT OF THE TREASURY, INTERNAL REVENUE SERVICE, <br><br> Defendant. | Case No. 4:19-cv-01410-SRC |

**STATEMENT OF UNCONTROVERTED MATERIAL FACTS**

Procedural Posture

1. The plaintiff, Thomas A. Connelly, in his capacity as the Executor of the Estate of Michael P. Sr., Connelly, filed this action. (Compl. (ECF No. 1) ¶ 1 & Answer (ECF No. 10) ¶ 1.)

2. The defendant is the United States of America. (Answer ¶ 2.)

3. In his complaint, the plaintiff sought: (1) a federal estate tax refund pursuant to 26 U.S.C. § 7422; (2) damages for alleged unauthorized collection activities pursuant to 26 U.S.C. § 7433; and (3) attorneys' fees pursuant to 26 U.S.C. § 7430. (Compl. ¶¶ 1, 22, 24.)

4. The Court dismissed the plaintiff's 26 U.S.C. § 7433 claim for lack of subject matter jurisdiction. (Mem. & Order (ECF No. 16).)

5. The parties stipulated that the plaintiff may not recover attorneys' fees pursuant to 26 U.S.C. § 7430. (Joint Proposed Scheduling Plan (ECF No. 19) p. 2.)

6. The Court has subject matter jurisdiction over the only remaining claim, plaintiff's claim for

1

an estate tax refund under 26 U.S.C. § 7422. (Compl. ¶ 3; Answer ¶ 3.)

7. The plaintiff seeks a federal estate tax refund of $1,027,014.77, plus interest provided by law. (Compl. ¶ 5; Answer ¶ 5.)

Background

8. Connelly died on October 1, 2013. (Ex. X, Pl.'s Response to U.S. RFA 35.)

9. Prior to his death, Connelly was the President and CEO of Crown C Supply, Inc. ("Crown C Supply" or the "Company"). (*Id*. at 34.)

10. The Company, incorporated in the State of Missouri, engaged in the wholesale and retail sale of roofing and siding materials in the greater St. Louis metropolitan area.

11. Connelly owned 385.90 (77.18%) of the Company's 500 shares. (Ex. X, Pl.'s Response to U.S. RFA 52.)

12. TAC owned the remaining 114.10 (21.82%) Company shares. (*Id*. at 53.)

13. On August 29, 2001, Connelly and TAC executed the Amended and Restated Stock Purchase Agreement (the "Stock Purchase Agreement"). (Ex. C, Amended and Restated Stock Agreement.[1])

14. The Connelly Brothers entered into the Stock Purchase Agreement, in part, to ensure that their family continued to own and operate the Company, and to satisfy their respective estate planning objectives. (Ex. Y, First Stipulation ¶¶ 1-3, Ex. II, Kevin Summers December 9,

---

[1] Exhibit C, the Amended and Restated Stock Agreement, is admissible evidence and excepted from hearsay pursuant Fed. R. Evid. 803(d)(6) because it is a business record of the Company. (*See* Ex. X, Pl. Resp. to U.S. RFAs 5-7.)

2020 Discussion with Tom Connelly[2].)

15. The Stock Purchase Agreement provided that upon one Connelly Brother's death, the surviving Connelly Brother had the right to purchase the deceased Connelly Brother's Company stock, but the Company was obligated to purchase (i.e., redeem) the deceased brother's Company stock if this right was not exercised. (Ex. C, Amended and Restated Stock Agreement ¶ V.)

16. The Connelly Brothers intended that after the first brother died, the Company would redeem the deceased Connelly Brother's stock. (Ex. Y, First Stipulation ¶¶ 6, 8; Ex. II, Summers Discussion with TAC.)

The Connelly Brothers Funded the Company's Redemption Obligation with Life Insurance

17. The Connelly Brothers caused the Company to fund its redemption obligations with life insurance payable on their respective deaths. (*Id.*)

18. In aggregate, the Company acquired three life insurance policies issued on Connelly's life. (Ex. X, Pl.'s Response to U.S. RFA 167.)

19. Connelly obtained a $1 million life insurance policy on his own life (AXA Life Insurance Policy No. 109021548) and then assigned this policy to the Company. (Ex. T, AXA Life

---

[2]Exhibit II, Kevin Summers December 9, 2020 Discussion with Tom Connelly, admissible evidence and not hearsay pursuant to Fed. R. Evid. 801(d)(2) because it is a statement by a party opponent. (*See* Ex. Z, Summers Dep. 95:3-24.)

Insurance Policy No. 109021548 Application;[3] Ex. W, Policy Assignment Documents[4]).

20. Connelly obtained a second $1 million life insurance policy on his own life (AXA Life Insurance Policy No. 109021767) and then assigned this policy to the Company. (Ex. U, AXA Life Insurance Policy No. 109021767 Application;[5] Ex. W, Policy Assignment Documents).

21. Connelly obtained a $1.5 million life insurance on his own life in the Company's name. (Ex. V, AXA Life Insurance Policy No. 159211555 Application.[6])

22. The Company also acquired $3.5 million of life insurance on TAC's Life. (Ex. II, Summers Discussion with TAC; Ex. AA, Pl.'s Resp. to U.S. Interrog. 6.)

The Connelly Brothers Did Not Comply with the Stock Purchase Agreement's Valuation Requirements

23.  The Stock Purchase Agreement provided two mechanisms for determining the price at which the Company would redeem a deceased Connelly brother's stock. (Ex. C, Amended and Restated Stock Purchase Agreement, Article VII; Ex. Z, Summers Dep. 66:19-67:9.)

---

[3] Exhibit T, AXA Life Insurance Policy No. 109021548 Application, is admissible evidence and excepted from hearsay pursuant Fed. R. Evid. 803(d)(6) because it is a business record of the Company. (*See* Ex. X, Pl. Resp. to U.S. RFAs 182-184.)

[4] Exhibit W, Policy Assignment Documents, is admissible evidence and excepted from hearsay pursuant Fed. R. Evid. 803(d)(6) because it is a business record of the Company. (*See* Ex. X, Pl. Resp. to U.S. RFAs 202-204.)

[5] Exhibit U, AXA Life Insurance Policy No. 109021767 Application, is admissible evidence and excepted from hearsay pursuant Fed. R. Evid. 803(d)(6) because it is a business record of the Company. (*See* Ex. X, Pl. Resp. to U.S. RFAs 186-188.)

[6] Exhibit V, AXA Life Insurance Policy No. 159211555 Application, is admissible evidence and excepted from hearsay pursuant Fed. R. Evid. 803(d)(6) because it is a business record of the Company. (*See* Ex. X, Pl. Resp. to U.S. RFAs 190-192.)

24. The Stock Purchase Agreement required the Connelly Brothers to execute a "Certificate of Agreed Value" annually to determine the agreed value of their Company stock. (*Id*. ¶ B; Ex. X, Pl.'s Response to U.S. RFAs 69 – 75.)

25. The Connelly Brothers did not execute of a Certificate of Agreed Value in 2001. (Ex. X, Pl.'s Response to U.S. RFA 76.)

26. The Connelly Brothers did not execute of a Certificate of Agreed Value in 2002. (*Id*. at 77.)

27. The Connelly Brothers did not execute of a Certificate of Agreed Value in 2003. (*Id*. at 78.)

28. The Connelly Brothers did not execute of a Certificate of Agreed Value in 2004. (*Id*. at 79.)

29. The Connelly Brothers did not execute of a Certificate of Agreed Value in 2005. (*Id*. at 80.)

30. The Connelly Brothers did not execute of a Certificate of Agreed Value in 2006. (*Id*. at 81.)

31. The Connelly Brothers did not execute of a Certificate of Agreed Value in 2007. (*Id*. at 82.)

32. The Connelly Brothers did not execute of a Certificate of Agreed Value in 2008. (*Id*. at 83.)

33. The Connelly Brothers did not execute of a Certificate of Agreed Value in 2009. (*Id*. at 84.)

34. The Connelly Brothers did not execute of a Certificate of Agreed Value in 2010. (*Id*. at 85)

35. The Connelly Brothers did not execute of a Certificate of Agreed Value in 2011. (*Id*. at 86.)

36. The Connelly Brothers did not execute of a Certificate of Agreed Value in 2012. (*Id*. at 87.)

37. After Connelly died on October 1, 2013, the Stock Purchase Agreement provided that, if the Connelly Brothers did not comply with the Certificate of Agreed Value requirements, TAC and the Estate of Michael P. Connelly, Sr. (the "Connelly Estate") were required to obtain appraisals to value the Connelly's Company stock. (Ex C, Amended and Restated Stock Purchase Agreement, Article VII ¶ C; Ex. X, Pl.'s Response to U.S. RFAs 89-92.)

38. TAC and the Connelly Estate did not obtain the appraisals required under the Stock Purchase Agreement. (Ex. X, Pl.'s Response to U.S. RFAs at 93-96.)

39. After Connelly died on October 1, 2013, the Company received approximately $3.5 million of death benefits from the life insurance policies Connelly procured for the Company. (*Id.* at 170, 175, & 180.)

40. At issue in this matter are $3 million of the life insurance policy proceeds that the Company received upon Connelly's death and then used to redeem Connelly's Company stock (the "Proceeds").

Valuation Principles

41. The United States retained Evan K. Cohen to opine on the fair market value of Connelly's Company stock, as of October 1, 2013.[7] (Ex. BB, Decl. of Evan K. Cohen ¶¶ 10.)

42. The fair market value of an asset is the price at which it would be sold in the market between two willing, well-informed unrelated parties, neither being under compulsion to participate. (*Id.* ¶ 24.)

43. To arrive at the fair market value of the Crown C Supply and Connelly's Crown C Supply stock, the Proceeds should be included in the value of Crown C Supply as a non-operating asset, distributable to the shareholders based on their respective equity interests in the Company. Accordingly, the fair market values of Crown C. Supply and Connelly's 77.18% interest were worth $6,863,819 and $5,297,496, as of October 1, 2013. (*Id.* ¶¶ 9, 11).

44. The alternative of allowing Crown C Supply's repurchase obligation to offset the Proceeds undervalues Crown C Supply's equity, undervalues Connelly's equity interest in Crown C

---

[7] Counsel for the United States instructed Cohen to opine on whether the Proceeds should be included in the fair market value of the Company and Connelly's Company stock, as of October 1, 2013. In doing so, Cohen accepted the plaintiff's position that the Company and Connelly's Company stock, exclusive of the Proceeds, were worth $$3,863,819 and $3,000,000, respectively, as of October 1, 2013.

Supply (i.e., his stock), and violates well-established equity valuation principles because the resultant share price creates a windfall for a potential buyer that a willing seller would not accept. Indeed, by purchasing Connelly's shares at a $3,000,000 price, Crown C Supply created a windfall for TAC at Connelly's expense. (*Id*. at ¶ 12.)

45. Three "standard" valuation principles support this conclusion. (*Id*. at ¶ 23.)

46. The first principle states that a company's valuation should account for all cash flows associated with the firm's assets, including cash generated by regular business operations and any cash available from non-operating assets. (*Id*. at ¶¶ 29-30.)

47.  The second principle states common equity captures all residual value after all other obligations are satisfied. As part of this principle, once the residual value is determined, it belongs to all common equity holders based upon the number shares held. Each share is entitled to its proportional claim on that residual value; no individual common equity share is worth more than another. This makes common equity shares fully interchangeable. (*Id*. at ¶¶ 31-33.)

48. The third principle states fair market value transactions do not make either party worse off. For example, if a person buys a baseball card trading at $100, then when the buyer exchanges $100 of cash with the seller/card owner, the seller has merely converted the value of the card into a different asset. On the seller's personal balance sheet, that asset has been transformed from a $100 baseball card into $100 in cash. On buyer's personal balance sheet, the $100 in cash has been transformed into a $100 baseball card. The parties' economic positions are unchanged.  (*Id*. at 34-35.)

49. Three examples illustrate these principles and show that the fair market values of Crown C Supply and Connelly's 77.18% interest were worth $6,863,819 and $5,297,496, as of October 1, 2013. (*Id.* ¶¶ 36-42).

Example 1: TAC buys Connelly's stock

50. The Stock Purchase Agreement provided that TAC had the option of purchasing Connelly's stock after Connelly's death. Assuming TAC did, only a price of $5,297,496 reflects the fair market value of Connelly's stock and satisfies the three valuation principles listed above. (*Id.* ¶ 43)

51. Immediately before the purchase, TAC's Company stock would have been worth $1,566,323 ($6,863,819 fair market value * 22.82%) and Connelly's Company stock would have been worth $5,297,496 ($6,863,819 fair market value * 77.18%). After the purchase, TAC would have acquired a company worth $6,863,819 [the assumed $3,863,819 operational value plus the $3 million of Proceeds]. The transaction is illustrated below.



(*Id.* ¶¶ 43-44.)

52. This hypothetical transaction satisfies all of the principles of equity valuation described above. It takes into account the fair market value of all of the Company's assets. The residual

8

value subtracts out all non-equity claims and is distributed to all common equity holders. Thus, no shares are worth more than any other.[8] Finally, it shows that TAC's economic wealth is unchanged by the purchase. Before the purchase, he had a $1,566,323 interest in the company and presumably $5,297,496 in cash, totaling $6,863,819. After the purchase, he has a 100% interest in $6,863,819 of Company equity, but no longer holds the $5,297,496 in cash. That is, at a price of $5,297,496 the transaction would not have increased or decreased the value of TAC's economic position. Similarly, the $5,297,496 price would not create nor destroy wealth for Connelly's estate; a $5,297,496 interest in the Company would be exchanged for $5,297,496 in cash. Because this exchange would not transfer wealth between the Company Shareholders, it is consistent with the third equity valuation principle and thus a fair market value exchange. (*Id.* ¶ 45.)

53. Finally, once TAC owns 100% of the Company's stock, he can either redeem what used to be Connelly's shares or cancel the redemption (Exhibit C, Amended and Restated Stock Purchase Agreement, Article XII.) Regardless of which action he takes, TAC still has $6,863,819 of assets because he **either** has $3 million of cash and owns a company worth $3,863,819 **or** owns a company worth $6,863,819. (*Id.* ¶ 43 n. 57.)

54. In contrast, a $3,000,000 purchase price (instead of a $5,297,496 purchase price) would have shifted $2,297,496 in wealth from Connelly's Estate to TAC [$2,297,496 = $5,297,496 − $3,000,000]. In other words, TAC's economic position would have increased—at his brother's expense—by $2,297,496 because he would have started with $1,566,323 worth Company shares and $3,000,000 in cash, totaling $4,566,323, but ended with a 100% interest

---

[8] In this transaction, all shares are worth $13,727.64 each: $13,727.64 ≈ $1,566,323 / 114.10; $13,727.64 ≈ $5,297,496 / 385.90; and $13,727.64 ≈ $6,863,819 / 500.

in the Company worth $6,863,819. A willing seller would not agree to this $3 million price because it would result in windfall for the buyer at the seller's expense. (*Id.* ¶¶ 53-55.)

Example 2: An unrelated third-party purchases the all of Crown C Supply's stock

55. This example analyzes what a third-party buyer would have willingly paid for all of the Company shareholders' equity interests. This example assumes: (1) the buyer purchases all 500 equity shares; (2) after Connelly's death but before the Company redeemed his shares; (3) the Connelly Brothers transfer their Company interests without any modification; and (4) the Company subsequently redeems Connelly's former shares for $3,000,000. (*Id.* ¶ 47.)

56. In this example, the third-party would have transferred $6,863,819 in cash in exchange for the 500 Company shares. Assuming the third party did not modify the Stock Purchase Agreement, and the Company (which at this point is fully owned by the third party) redeemed the 385.9 shares that Connelly previously owned, the third-party would have received $3,000,000 from the Company. At that point, the third-party would still own a company with operational value of $3,863,819, but also have $3,000,000 in cash. That is, the Company Shareholders' equity interests in the Company would produce $6,863,819 in value for a third party. This is illustrated below. (*Id.* ¶ 48.)



10

57. In this example, the third-party, as the Connelly Brothers did in real life, extracted $6,863,819 of value from the Company. Any price greater or less than $6,863,819 would be incorrect because it would violate equity valuation principles by making one party worse off. Therefore, this demonstrates that a willing buyer would pay $6,863,819 for the Company but a willing seller would not accept less. (*Id*. ¶¶ 49, 51-55.)

58. Despite this, the plaintiff suggests that the Connelly Brothers' combined equity in the Company was only $3,863,819. The difference between the hypothetical $3,863,819 valuation and the actual $6,863,819 valuation does not reflect an underlying change in the Company's fair market value; it reflects the fact that the plaintiff excludes the Proceeds—$3,000,000 in non-operating asset that belonged to the Connelly brothers as equity owners of the Company. Because this value does not reflect residual value that the Connelly Brothers were entitled to receive as the Company's equity owners, it does not reflect the fair market value of their equity interests—i.e., their Company stock. In fact, it results in a windfall for the third-party. (*Id*. ¶¶ 50, 53.)

<u>Example 3: The Connelly Brothers die simultaneously</u>

59. This examples assumes: (1) the Connelly Brothers die simultaneously; and (2) Crown C Supply receives $3,863,819 in insurance proceeds (i.e., the assumed operational value); and (3) use just this amount to repurchase both brothers' shares in the Company. (*Id*. ¶¶ 56-67.)

60. As depicted in Section "A" in the picture below, including the insurance proceeds in the valuation suggests the Company is worth $7,727,638. (*Id.* ¶ 58.)



61. If equity prices were based on a valuation that deducts any repurchase obligations from the Company's equity value, in line with the plaintiff's position, Crown C Supply would use only $3,863,819 to repurchase the Company Shareholders' shares—i.e., $2,982,095.50 for Connelly's 77.18% Company interest and $881,723.50 for TAC's 22.82% Company interest. (*Id.*)

62. In this scenario, all outstanding equity in the Crown C Supply would be repurchased, leaving the Company with no owners. However, as depicted in Section "B" above, Crown C Supply, without any shareholders, would still have an ongoing equity value of $3,863,819, since insurance proceeds alone were sufficient to cover any cash required by the repurchases that occurred at prices that did not reflect the fair market value of the shares. (*Id.*)

63. This outcome violates the second principle of equity valuation discussed above — the equity owners do not recover all residual value after all non-equity claims have been paid. This reflects the fundamental problem that arises if funds earmarked for share repurchase obligations are excluded from equity values. (*Id.*)

12

The Redemption

64. On November 13, 2013, TAC and Michael P. Connelly, Jr. ("Michael, Jr.") executed a Sale and Purchase Agreement through which the Company redeemed Connelly's stock for the Proceeds: $3 million. (Ex. N, Sale and Purchase Agreement.[9])

65. As a result of this intra-family agreement: (1) TAC improved his economic position because he went from owning 22.18% of the Company to owning 100%; (2) the Connelly Estate received $3 million; (3) Michael, Jr. obtained the right to immediately purchase the Company from TAC—his uncle and now the 100% owner of the Company—for $4,166,666; and (4) in the event TAC sold the Company within 10 years, TAC and Michael Jr., agreed to split evenly any gains from the future sale. (*Id.*; Ex X, Pl.'s Response to U.S. RFAs 100-108.)

66. Eventually TAC sold the Company.  He and Michael Jr. split the gains as required by the Sale and Purchase Agreement. (Ex. LL, Correspondence Estimating Michael Jr.'s Gains.[10])

Estate Administration

67. On December 31, 2014, TAC, in his capacity as the Executor of the Connelly Estate, filed with the IRS a Form 706, United States Estate (and Generation-Skipping Transfer) Tax Return on behalf of the Connelly Estate, and then amended that return on January 12, 2015 (collectively, the "Form 706"). (Ex. A, The Connelly Estate's Original Form 706; Ex. B, The

---

[9] Exhibit N, the November 13, 2013 Sale and Purchase Agreement, is admissible evidence and not hearsay pursuant to Fed. R. Evid. 801(d)(2) because it is a statement by a party opponent. (*See* Ex. X, Pl. Resp. to U.S. RFAs 97-100.)

[10] Exhibit LL is admissible evidence and not hearsay pursuant to Fed. R. Evid. 801(d)(2) because it is a statement by a party opponent.

Connelly Estate's Amended Form 706; [11] Ex X, Pl.'s Response to U.S. RFAs 37-38.)

68. The Connelly Estate's Form 706 reported a gross estate worth $6,721,596, as of October 1, 2013. (Ex. B, The Connelly Estate's Amended Form 706, Line 1.)

69. The Connelly Estate's Form 706 reported a taxable estate of $6,013,564. (*Id*., Line 3c.)

70. The Connelly Estate's Form 706 reported that Connelly's Company stock was worth $3 million, as of October 1, 2013, and included that amount in the Connelly Estate's gross estate and taxable estate. (*Id*. Part 5, Schedule G; Ex. X, Pl.'s Response to U.S. RFA 54.)

71. After TAC filed the Connelly Estate's Form 706, the IRS audited the Connelly Estate's Form 706 and challenged, among other positions not at issue in this litigation, whether Connelly's Company stock was worth $3 million, as of October 1, 2013. (Ex. X, Pl.'s Response to U.S. RFA 165; Compl. ¶¶ 14-18.)

72. Because the Connelly Estate had nothing to support its claim that Connelly's Company Stock was worth $3 million value— i.e., no Certificate of Agreed Value and no appraisal—counsel for the Connelly Estate procured an after-the-fact calculation of value report from Anders Minkler Huber Helm LLP ("Anders Minkler") to substantiate the $3 million value reported on the Form 706. (Compl. ¶ 15; Ex. L Anders Minkler Calculation of Value Report, dated October 16, 2016[12]; Ex. X, Pl.'s Response to U.S. RFA 55; Ex. Z, Summers Dep. 25:18-

---

[11] Exhibit A, The Connelly Estate's Original Form 706, and Exhibit B, The Connelly Estate's Amended Form 706, are admissible evidence and not hearsay pursuant to Fed. R. Evid. 801(d)(2) because each is a statement by a party opponent. (*See* Ex. X, Pl. Resp. to U.S. RFAs 1-4.)

[12] The Anders Minkler Calculation of Value Report is inadmissible hearsay, but illustrates the plaintiff's position in this case. (Compl. ¶ 15; Ex. AA, Pl.'s Resp. to U.S. Interrogs. 1, 4.) The United States identifies and references the report solely to show deficiencies and inconsistencies in the plaintiff's position.

26:20; 31:3-22[13].)

73. When Anders Minkler calculated the Company's value, Anders Minkler excluded the Proceeds: the $3 million of life insurance policy proceeds that the Company received upon Connelly's death and then used to redeem Connelly's Company stock. (Ex AA, Pl.'s Resp. to U.S. Interrogs. 1, 2; Compl. ¶¶ 15- 16.)

74. Anders Minkler excluded the Proceeds from its calculation of the Company's value because that is what Anders Minkler and the client—i.e., the plaintiff—agreed to do. (Ex. Z, Summers Dep. 35:6-37:3.)

75. Anders Minkler calculated the value of Connelly's Company stock by first determining the fair market value of the Company's operating business. (Ex. L, Anders Minkler Calculation of Value Report, Ex. 6 (C00640).)

76. Anders Minkler concluded that the value of the Company's operating business, exclusive of non-operating assets, was $2,901,821. (*Id.*)

77. Anders Minkler added the value of two non-operating assets to this $2,901,821 value. First, Anders Minkler added $458,083, the cash surrender value of the life insurance policies the Company owned with respect to TAC. (*Id.*)

78. Second, Anders Minkler added $503,915 for the life insurance that the Company received after Connelly's death, but did not use to redeem his stock (the "Retained Proceeds"). (*Id.*)

79. After including these non-operating assets, Anders Minkler calculated the value of the Company's operating business and non-operating assets to be $3,863,810. (*Id.*)

80. Anders Minkler multiplied this $3,863,810 by 77.18% to calculate the value of Connelly's

---

[13] The plaintiff retained Kevin Summers, a partner with Anders Minkler, to provide expert testimony in this case.

Company stock because Connelly owned 77.18% of the Company. That equaled $2,982,089 or approximately $3,000,000. (*Id*.)

81. According to Anders Minkler, the value of the Company is the same both before and after it redeemed Connelly's stock. (Ex. Z, Summers Dep. 101:8-17.)

82. The IRS assessed a federal estate tax deficiency against the Connelly Estate in accordance with its determination that the Proceeds should be included in the fair market value of the Company. (Compl. ¶¶ 8, 9, 16; Compl. Ex. A, ECF No. 1-1.)

Financial Statement Treatment

83. The Company prepared financial statements on annual basis. (Ex. X, Pl.'s Response to US RFA 123.)

84. The Company's management relied on the information contained in the Company's annual financial statements to manage business operations. (*Id*. at 126.)

85. The Company's management relied on the information contained in the Company's annual financial statements to monitor the Company's financial performance. (*Id*. at 127.)

86. The Company had access to a line of credit. (*Id*. at 128.)

87. The Company provided its annual financial statements when it applied to renew its line of credit. (*Id*. at 134.)

88. The Company's available line of credit varied over time, increasing from $3,500,000 as of September 30, 2010, to $5,500,000 as of September 30, 2013. (*Id*. at 129-131.)

89. The Company recorded the cash surrender value of its life insurance policies—i.e., the policies the Company used to fund its redemption obligations under the Stock Purchase Agreement—as assets on its balance sheet. (*Id*. at 138, 144, 150, and 156; Ex. P (Anders 388-Anders 407 at 392, 399), the Company's financial statements for the years ended September

30, 2009 and 2010; Ex. Q (Anders 408-Anders 421 at 411, 418), the Company's financial statements for the years ended September 30, 2010 and 2011; Ex. R (Anders 422-Anders 435 at 425, 431), the Company's financial statements for years ended September 30, 2012 and 2011; Ex. S (Anders 436-Anders 451 at 440, 447), the Company's financial statements for the years ended September 30, 2012 and 2013.)[14]

90. The Company recorded increases to the cash surrender value of its life insurance policies as income on its income statements. (Ex. X, Pl.'s Response to US RFAs 139, 145, 151, 157; Ex. P (Anders 395); Ex. Q (Anders 414); Ex. R (Anders 426, 434); Ex. S (Anders 441,449).)

91. The Company's financial statements did not record the Company's redemption obligations or discuss the Company's redemption obligations as a liability in the Notes to Consolidated Financial Statements. (Ex. X, Pl.'s Response to US RFAs 140, 141, 146, 147, 152, 153, 158, 159; Ex. P (Anders 391-395, 396-402); Ex. Q (Anders 411-414, 415-421); Ex. R (Anders 425-428, 429-435); Ex. S (Anders 440-443, 444-451).)

---

[14] Exhibit P, the Company's financial statements for the years ended September 30, 2009 and 2010, Exhibit Q, the Company's financial statements for the years ended September 30, 2010 and 2011, Exhibit R, the Company's financial statements for years ended September 30, 2012 and 2011, and Exhibit S the Company's financial statements for the years ended September 30, 2012 and 2013, are admissible evidence and excepted from hearsay pursuant Fed. R. Evid. 803(d)(6) because each is a business record of the Company. (*See* Ex. X, Pl. Resp. to U.S. RFAs 111-122.)

Dated: December 22, 2020　　　　　　　　Respectfully submitted,

　　　　　　　　　　　　　　　　　　　　JEFFREY B. JENSEN
　　　　　　　　　　　　　　　　　　　　United States Attorney

　　　　　　　　　　　　　　　　　　　　RICHARD E. ZUCKERMAN
　　　　　　　　　　　　　　　　　　　　Principal Deputy Assistant Attorney General

　　　　　　　　　　　　　　　　　　　　*/s/ James F. Bresnahan II*
　　　　　　　　　　　　　　　　　　　　JAMES F. BRESNAHAN II
　　　　　　　　　　　　　　　　　　　　Trial Attorney, Tax Division
　　　　　　　　　　　　　　　　　　　　U.S. Department of Justice
　　　　　　　　　　　　　　　　　　　　P.O. Box 7238
　　　　　　　　　　　　　　　　　　　　Washington, D.C.  20044
　　　　　　　　　　　　　　　　　　　　Phone: 202-616-9067
　　　　　　　　　　　　　　　　　　　　Fax: 202-514-6770
　　　　　　　　　　　　　　　　　　　　Email: James.F.Bresnahan@usdoj.gov

　　　　　　　　　　　　　　　　　　　　Attorneys for Defendant United States

**CERTIFICATE OF SERVICE**

　　　　I hereby certify that on this 22nd day of December, 2020, I electronically filed the foregoing Statement of Uncontroverted Material Facts, the accompanying exhibit index, and the exhibits listed in the exhibit index with the Clerk of Court using the CM/ECF system, which will send notification of such filing to the following:

Robert L. Devereux
Danna McKitrick, P.C.
7701 Forsyth Blvd.
Suite 1200
St. Louis, MO 63105
Phone: (314) 889-7119
Email: rdevereux@DMFIRM.com

Attorney for the Plaintiff

　　　　　　　　　　　　　　　　　　　　*/s/ James F. Bresnahan II*
　　　　　　　　　　　　　　　　　　　　JAMES F. BRESNAHAN II
　　　　　　　　　　　　　　　　　　　　Trial Attorney
　　　　　　　　　　　　　　　　　　　　United States Department of Justice, Tax Division