**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

THOMAS A. CONNELLY, IN HIS          )
CAPACITY AS EXECUTOR OF THE         )
ESTATE OF MICHAEL P.                )
CONNELLY, SR.,                      )
                                    )
    Plaintiff(s),                 )
                                    )
v.                                  )          Case No. 4:19-cv-01410-SRC
                                    )
THE UNITED STATES OF                )
AMERICA, DEPARTMENT OF THE          )
TREASURY, INTERNAL REVENUE          )
SERVICE,                            )
                                    )
    Defendant(s).                 )

**Memorandum and Order**

Brothers Michael and Thomas Connelly were the only shareholders in Crown C Supply, Inc., a closely-held family business that sold roofing and siding materials.  As is typical in family businesses, the brothers entered into a stock purchase agreement that required the company to buy back the shares of the first brother to die, and the company bought life insurance to ensure it had enough cash to make good on the agreement.  When Michael died in October 2013, Crown C repurchased his shares for $3 million, and Michael's Estate paid estate taxes on his shares in Crown C.  But the IRS assessed additional estate taxes of over $1 million.  Thomas, as executor of Michael's Estate, paid the deficiency and filed this suit seeking a refund.  At the core of the dispute lies the question of the proper valuation of Crown C on the date of Michael's death.

Aside from the life-insurance proceeds, Crown C was worth roughly $3.3 million on the date of Michael's death.  On that date, Crown C had an obligation to repurchase Michael's shares from his Estate.  Also on that date, Crown C received (or was about to receive) a cash infusion of

$3.5 million from the life-insurance proceeds; without these proceeds, Crown C would have had to deplete its assets or borrow money (or both) to buy Michael's shares.

The parties dispute whether the portion of the life-insurance proceeds used to buy Michael's shares must be included in the value of the company for estate-tax purposes. Both parties moved for summary judgment on this issue and moved to exclude each other's expert witnesses. Because on the date of death, Crown C was entitled to receive the life-insurance proceeds to fund the purchase of Michael's shares, the Court holds that Crown C was worth roughly $3.5 million more than it was worth the day before Michael's death.

## I. Facts and background

### A. Undisputed material facts

Crown C sells roofing and siding materials in the St. Louis area. Doc. 58 at ¶ 10. Before his death, Michael[1] was the President, CEO, and majority shareholder. *Id.* at ¶ 9. The Connelly brothers together owned all of Crown C's 500 shares, with Michael owning 385.90 shares (77.18%) and Thomas owning 114.10 shares (22.82%). *Id.* at ¶ 11–12.

The Connelly brothers and Crown C signed a Stock Purchase Agreement (the "Stock Agreement") in 2001, to maintain family ownership and control over the company and to satisfy their estate-planning objectives. *Id.* at ¶¶ 13–14. The Stock Agreement provided that upon one brother's death, the surviving brother had the right to buy the decedent's shares, but the Stock Agreement required Crown C itself to buy (i.e., redeem) the deceased brother's shares if the surviving brother chose not to buy them. *Id.* at ¶ 15. When the brothers signed the Stock Agreement, they always intended that Crown C, not the surviving brother, would redeem the deceased brother's shares. *Id.* at ¶ 16.

---

[1] The Court refers to the Connelly brothers by their first names to differentiate between them, not to imply familiarity.

To fund its redemption obligation, Crown C bought $3.5 million in life-insurance policies on both Connelly brothers. *Id.* at ¶¶ 17–22. Article VII of the Stock Agreement provided two mechanisms for determining the price at which Crown C would redeem the shares. *Id.* at ¶ 23. Article VII specified that the brothers "shall, by mutual agreement, determine the agreed value per share by executing a new Certificate of Agreed Value" at the end of every tax year. *Id.* at ¶ 24; Doc. 53-4, Art. VII., Sec. A–B. If the brothers failed to execute a "Certificate of Agreed Value[,]" the brothers would determine the "Appraised Value Per Share" by securing two or more appraisals.[2] Doc. 53-4, Art. VII., Sec. A, C. The Connelly brothers never signed a single Certificate of Agreed Value under the Stock Agreement. Doc. 58 at ¶¶ 25–36.

Upon Michael's death on October 1, 2013, Crown C received about $3.5 million in life-insurance proceeds. *Id.* at ¶ 39. Thomas chose not to buy Michael's shares, so Crown C used a

---

[2] Article VII, Section C of the Agreement sets forth a comprehensive appraisal process:

> For the purposes hereof, the "Appraised Value Per Share" of the Company shall be determined as follows: If the Certificate of Agreed Value is more than eighteen (18) months old, within ten (10) days after the date an option is exercised or a mandatory purchase is required ("Appraisal Date"), the transferring Stockholder or his successor in interest shall appoint an appraiser and the Company or purchasing Stockholder(s), as the case may be, shall appoint an appraiser. Both appraisers shall have at least five (5) years of experience in appraising businesses similar to the Company. If either party fails to name such an appraiser within the specified time, the other party may upon five (5) days written notice to the failing party, select the second appraiser. Each appraiser shall independently determine and submit to the parties, in writing, with reasons therefor, an appraisal of the fair market value of the Company. The appraisers shall take into consideration the goodwill of the Company in determining the fair market value of the Company. The appraisers shall not take into consideration premiums or minority discounts in determining their respective appraisal values. Upon receipt by the parties of both appraisals, if the fair market value of the Company is determined to be the same or if the difference between the appraisals is less than ten percent (10%) of the lower of the appraised values, then the fair market value of the Company shall be the average of the two appraisals. If the appraisals so submitted differ by more than ten percent (10%) of the lower of the appraised values, the accounts then servicing the Company shall appoint a third appraiser. The third appraiser so appointed shall, as promptly as possible, determine the value of the Company on the same basis as set forth, and that prior appraisal which is closer in value to such third appraisal shall, thereupon, be the appraisal which is binding on all parties in interest hereunder. The "Appraised Value Per Share" shall equal the amount determined by dividing the binding appraisal by the total number of Shares of the Company issued and outstanding as of the Appraisal Date. Each party shall pay the fee and expenses of the appraiser selected by such party and the fee of the third appraiser shall be borne equally by the parties appointing the two appraisers.

Doc. 53-4.

portion of the life-insurance proceeds to buy Michael's shares from Michael's Estate.  *Id.* at ¶ 16, 39–40.  Crown C and the Estate did not obtain appraisals for the value of Michael's shares under the Stock Agreement, instead entering a Sale and Purchase Agreement (the "Sale Agreement") for the price of $3 million.  *Id.* at ¶¶ 37–38, 64.  Through the Sale Agreement, (1) the Estate received $3 million in cash; (2) Michael P. Connelly, Jr., Michael's son, secured a three-year option to purchase Crown C from Thomas for $4,166,666; and (3) in the event Thomas sold Crown C within 10 years, Thomas and Michael Jr. agreed to split evenly any gains from the future sale.[3]  *Id.* at ¶¶ 64–66.

Thomas, as executor of Michael's Estate, filed an estate-tax return valuing Michael's Crown C shares at $3 million as of October 1, 2013 and included that amount in the taxable estate.  *Id.* at ¶ 70.  The IRS audited the Estate, challenging the $3 million value of Michael's Crown C shares.  *Id.* at ¶ 71.  The IRS determined that as of October 1, 2013, the fair market value of Crown C should have included the $3 million in life-insurance proceeds used to redeem the shares, resulting in a higher value for Michael's Crown C shares than reported on the Estate's return.  *Id.* at ¶ 40, 82.  The IRS issued a Notice of Deficiency, assessing over $1 million in additional estate taxes.  *Id.* at ¶ 82; Doc. 1 at ¶¶ 8–9, 16.  During the IRS audit, the Estate obtained a calculation of value report on Crown C's fair market value from Anders Minkler Huber & Helm, LLP.  Doc. 1 at ¶ 15.  And in May 2019, Thomas filed this suit on behalf of the Estate, seeking a refund of over $1 million.  *See id.* at ¶ 5.

The parties stipulated that, if the Estate is due a federal-estate-tax refund, for the purpose of determining the amount of such refund, the fair market value of Michael's Crown C shares was $3.1 million as of October 1, 2013.  Doc. 48.  The stipulation expressly leaves aside the

---

[3] For purposes of distinguishing father and son, the Court refers to the decedent/father as "Michael" and son as "Michael P. Connelly, Jr." or "Michael Jr."

dispute over how to account for the life-insurance proceeds used to redeem Michael's shares, so the stipulation only controls the value of Crown C exclusive of those life-insurance proceeds. *Id.*; Doc. 71 at 31–33.

### B.    Experts

#### 1.    The Estate's expert, Kevin P. Summers

Kevin P. Summers is a CPA and a partner at accounting firm Anders Minkler Huber & Helm, LLP.  Doc. 55-1 at p. 1.  Summers offered an opinion on the proper fair market value of Crown C as of the date of Michael's death.  *See id.*  He stated that the Stock Agreement created "an enforceable contractual obligation to use the life-insurance proceeds to purchase [Michael] Connelly's stock in Crown C Supply" upon Michael's death.  *Id.* at p. 11.  Relying on the Eleventh Circuit's holding in *Estate of Blount*, Summers opined that the life-insurance proceeds used to redeem Michael's shares should be excluded from the fair market value of Crown C.  *See id.* at pp. 11–12 (citing *Estate of Blount v. Comm'r*, 428 F.3d 1338, 1342–43 (11th Cir. 2005)).  Summers advised that the IRS improperly disregarded Crown C's obligation to redeem Michael's shares under *Estate of Blount* and that the IRS's decision was inconsistent with "common business sense."  Doc. 55-1 at p. 14.  Summers concluded that inclusion of the insurance proceeds in Crown C's fair market value resulted in an overstated value for Crown C by $3 million, as well as an inflated estate-tax bill for Michael's estate.  *Id.*

#### 2.    The IRS's expert, Evan K. Cohen

Evan K. Cohen is a Charted Financial Analyst and a principal at an economic consulting firm, Brattle Group.  Doc. 53-19 at ¶ 1.  Cohen offered an opinion on the fair market value of Crown C and Michael's shares as of the date of Michael's death.  *Id.* at ¶ 10.  Cohen stated that "[i]n a fair market equity valuation, the insurance proceeds would be included in the value of

Crown C Supply as a non-operating asset." *Id.* at ¶ 11.  He opined that allowing the redemption

obligation to offset the insurance proceeds "undervalues Crown C Supply's equity, undervalues

[Michael's] equity interest in Crown C Supply (i.e., his shares), and violates well-established

equity valuation principles because the resultant share price creates a windfall for a potential

buyer that a willing seller would not accept." *Id.* at ¶ 12.  Cohen concluded that the fair market

value of Crown C was $6.86 million, rather than $3.86 million, a $3 million difference.  *Id.* at ¶

63.

## II.    Standard

Summary judgment is proper if the evidence, viewed in the light most favorable to the

nonmoving party, demonstrates no genuine issue of material fact exists and the moving party is

entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); *Cordry v. Vanderbilt Mortg. &*

*Fin., Inc.*, 445 F.3d 1106, 1109 (8th Cir. 2006) (citing *Bockelman v. MCI Worldcom, Inc.*, 403

F.3d 528, 531 (8th Cir. 2005)).

Here, the parties agree that no disputed material facts exist and that the Court should

decide the case on the cross motions without a trial.  Docs. 45, 51, and 66.  The Court may

decide a case as a matter of law when there are no disputed issues of fact.  *See* Fed. R. Civ. P.

56(a); *see also Sprint Communications Company v. Bernsten*, 152 F.Supp.3d 1144, 1150 (S.D.

Iowa Dec. 30, 2015) ("Because there is no genuine dispute of fact in this case, the Court must

determine which movant is entitled to judgment as a matter of law."); *Essick Air Products, Inc. v.*

*Crane USA Inc.*, 2018 WL 9963828, at *1 (E.D. Ark. July 12, 2018) (granting summary

judgment where the parties agreed that there were no material factual disputes).  The Court held

argument on April 8, 2021.  Doc. 70.

In a tax refund action under 28 U.S.C. § 1346(a)(1), the district court must determine the plaintiff's tax liability. *Lewis v. Reynolds*, 284 U.S. 281, 283, *modified*, 284 U.S. 599 (1932). The district court must make a *de novo* determination as to whether the plaintiff is entitled to a federal-estate-tax refund. *See, e.g., Blansett v. United States*, 283 F.2d 474, 478 (8th Cir. 1960). The notice of tax deficiency carries a presumption of correctness, requiring the taxpayer to demonstrate that the deficiency is incorrect. *See Lesser v. United States*, 368 F.2d 306, 310 (2d Cir. 1966) (en banc). The taxpayer bears the burden of persuading the trier of fact that the assessment is incorrect. *Pizzarello v. United States*, 408 F.2d 579, 583 (2d. Cir.), *cert. denied*, 396 U.S. 986 (1969).

## III.   Discussion

Congress imposes a federal estate tax on a decedent's taxable estate. *See* 26 U.S.C. § 2001. The estate tax is a property tax levied on the taxable estate a decedent transfers at death. *See* 26 U.S.C. §§ 2001(a), 2033; *see also Estate of McClatchy v. Comm'r*, 147 F.3d 1089, 1091 (9th Cir. 1998). A decedent's taxable estate is the value of a decedent's gross estate, minus all authorized deductions. *See* 26 U.S.C. § 2051. The decedent's gross estate includes the decedent's "property, real or personal, tangible or intangible," as of the decedent's date of death, as defined by statutes and regulations. *See* 26 U.S.C. §§ 2031(a), 2033; 26 C.F.R. § 20.2031-1(b). The value of the gross estate "shall be determined by including . . . the value at the time of his death of all property, real or personal, tangible or intangible, wherever situated[,]" as further fleshed out in the Internal Revenue Code. 26 U.S.C. § 2031(a). Treasury regulations provide that the "value of stocks . . . is the fair market value per share . . . on the applicable valuation date." 26 C.F.R. § 20.2031-2(a).

The parties dispute the value of Crown C, and of Michael's shares, as of the date of Michael's death.  The Estate argues that the Stock Agreement determines the value of Crown C for estate-tax purposes, so the Court need not determine Crown C's fair market value.  Doc. 46 at 7.  The Estate also argues, alternatively, that Crown C's fair market value does not include $3 million of the life-insurance proceeds, because the Stock Agreement created an offsetting $3 million obligation for Crown C to redeem Michael's shares.  *Id.* at 4.

The IRS disagrees, arguing that the Stock Agreement fails to meet the requirements under the Code, Treasury regulations, and applicable caselaw to control the valuation of Crown C, and that under applicable law and customary valuation principles, the life-insurance proceeds used to redeem Michael's shares increased Crown C's fair market value by $3 million.  Doc. 52 at 5; Doc. 61 at 4.

### A.      Stock Agreement

The value of the taxable estate is the fair market value of the decedent's property at the date of death.  26 U.S.C. §§ 2031(a), 2033; 26 C.F.R. § 20.2031-1(b); *see also United States v. Cartwright*, 411 U.S. 546, 550–51 (1973).  Under 26 U.S.C. § 2703(a), the IRS generally determines the fair market value of any property without regard to a buy-sell agreement, but certain kinds of buy-sell agreements fall under an exception to this general rule.  *See* 26 U.S.C. § 2703(b); *St. Louis County Bank v. United States*, 674 F.2d 1207, 1210 (8th Cir. 1982); *Estate of True v. Comm'r*, 390 F.3d 1210, 1218 (10th Cir. 2004).

To control the value of a decedent's property for estate-tax purposes, a buy-sell agreement must meet the three statutory requirements of 26 U.S.C. § 2703(b):  "(1) [i]t is a bona fide business arrangement[;] (2) [i]t is not a device to transfer such property to members of the decedent's family for less than full and adequate consideration in money or money's worth[; and]

8

(3) [i]ts terms are comparable to similar arrangements entered into by persons in an arms' length transaction." 26 U.S.C. § 2703(b); *see also* 26 C.F.R. § 25.2703-1(b). As developed in caselaw and embodied in Treasury Regulation 26 C.F.R. § 20.2031-2(h), a buy-sell agreement must also meet several additional requirements: (1) the offering price must be fixed and determinable under the agreement; (2) the agreement must be legally binding on the parties both during life and after death; and (3) the restrictive agreement must have been entered into for a bona fide business reason and must not be a substitute for a testamentary disposition for less than full-and-adequate consideration. *Estate of True*, 390 F.3d at 1218 (citing 26 C.F.R. § 20.2031-2(h)); *see also St. Louis County Bank,* 674 F.2d at 1210. The effect of a buy-sell agreement's offering price "in determining the value of the securities for estate-tax purposes depends upon the circumstances of the particular case." 26 C.F.R. § 20.2031-2(h).

The parties dispute whether the Stock Agreement meets all of the requirements necessary to determine the valuation of Crown C's shares for purposes of estate-tax valuation. If it doesn't meet all of the requirements, then the fair market value of the shares will determine the valuation. *See* 26 C.F.R. §§ 25.2703-1(b)(2); 20.2031-2(h). The Estate urges that the Stock Agreement meets all of the requirements, Doc. 46 at p. 7, while the IRS argues that "(1) the price of [Michael's] Company stock is not determinable from the Stock Purchase Agreement; (2) the Stock Purchase Agreement's terms were not binding throughout [Michael's] life and after his death; (3) the Stock Purchase Agreement is not a bona fide business arrangement and its terms are not comparable to similar arrangements that have been negotiated at arms' length; and (4) the Stock Purchase Agreement is an impermissible substitute for a testamentary disposition [that] transferred . . . wealth to [Michael's] family[.]" Doc. 64 at p. 6.

The Court begins by observing that the Estate's arguments all turn on the same premise. The Estate argues that the company sold Michael's shares at fair market value, Doc. 65 at p. 7, which in turn relies on the assumption that the Estate's valuation expert correctly valued Michael's shares. The Estate's valuation expert, Kevin P. Summers, excluded $3 million in life-insurance proceeds from the valuation, presuming that the Eleventh Circuit's decision in *Estate of Blount* controls. Doc. 55-1 at pp. 11–12. And, even though the parties to the Sale Agreement did not value Michael's shares using the valuation mechanisms set forth in Article VII of the Stock Agreement, the Estate nonetheless argues that the very existence of the Stock Agreement—the parties' failure to adhere to it notwithstanding—provides sufficient basis for the Court to accept Thomas and the Estate's *ad hoc* valuation as the proper estate-tax value of Michael's shares. Doc. 46 at pp. 8–9. For the reasons explained below, the Court rejects this premise but nonetheless first analyzes whether the Stock Agreement fits into the buy-sell-agreement exception to the fair-market-valuation rule. The Court begins by analyzing the statutory requirements in 26 U.S.C. § 2703(b), and then the additional requirements from 26 C.F.R. § 20.2031-2(h) and applicable caselaw. *See Estate of True*, 390 F.3d at 1218.

### 1.     Statutory requirements in 26 U.S.C. § 2703(b)

#### a.     Bona fide business arrangement

The IRS argues that the Stock Agreement is not a bona fide business arrangement, so it should not control the value of Michael's stock. Doc. 61 at pp. 10–11. The IRS admits that the Connelly brothers entered into the Stock Agreement to ensure their family continued to own Crown C and to satisfy certain estate-planning objectives but argues that these purposes do not, by themselves, make the Stock Agreement a bona fide business arrangement. *Id.* at p. 10. The IRS explains that the Connelly brothers did not genuinely follow the Stock Agreement in good

faith.  *Id.*  Specifically, the IRS points to the Connelly brothers' disregard for the pricing

mechanisms set out in Article VII of the Stock Agreement as well as Michael Jr.'s retained

interest in Crown C's future sale under the Sale Agreement.  *Id.* at pp. 10–11.

"The ultimate question of whether there was a bona fide business arrangement is a

question of fact[.]"  *See Holman v. Comm'r*, 601 F.3d 763, 769 (8th Cir. 2010) (citing *Estate of*

*True*, 390 F.3d at 1218–19).  Courts have recognized the validity of agreements to maintain

family ownership and control over closely-held businesses.  *St. Louis Cty. Bank*, 674 F.2d at

1210.  To establish that the Stock Agreement was a bona fide business *arrangement*, the Estate

needed only to show that the Connelly brothers entered the Stock Agreement for a bona fide

business *purpose*.  *See id.* ("We have no problem with the District Court's findings that the

stock-purchase agreement . . . had a bona fide business purpose—the maintenance of family

ownership and control of the business."); *Estate of Lauder v. Comm'r*, 1992 WL 386276, *21

(T.C. 1992) (buy-sell agreements had a bona fide business purpose because the "agreements, on

their face, serve the legitimate business purpose of preserving family ownership and control of

the various Lauder enterprises. We are persuaded that these concerns were a motivating factor in

the Lauders' decision to enter into the agreements."); *Estate of Gloeckner v. Comm'r*, 152 F.3d

208, 214 (2d Cir. 1998) ("[W]e agree with the tax court that the Gloeckner agreement represents

a bona fide business arrangement. This test is sufficiently satisfied when the purpose of a

restrictive agreement is to maintain current managerial control—whether by family or

outsiders.").

The parties here have stipulated that the Connelly brothers entered the Stock Agreement

for the purpose of ensuring continued family ownership over Crown C.  Doc. 47 at ¶¶ 1–3.  The

IRS does not provide any support for its contention that the Estate's actions taken after Michael's

death alter the purpose of the Stock Agreement, making it no longer a bona fide business arrangement. Doc. 61 at p. 12. Based on the parties' stipulation, the Court deems the Stock Agreement a bona fide business arrangement for purposes of summary judgment.

Assuming that the IRS could explain its position in light of its stipulation to the business purpose of the Stock Agreement, the "bona fide business arrangement" issue would otherwise have to be resolved by the factfinder at trial. *See Holman*, 601 F.3d at 769. Even so, resolution of this issue is ultimately unnecessary because the Stock Agreement fails to meet the other requirements under 26 U.S.C. § 2703(b).

> **b. Device to transfer property to family for less than full-and-adequate consideration**

The IRS argues that the Stock Agreement is a device to transfer wealth to Michael's family members for less than full-and-adequate consideration. Doc. 61 at pp. 7–9. The IRS states that the $3 million redemption price is not full-and-adequate consideration because the price did not account for all of the insurance proceeds, allowing Thomas to obtain a financial windfall at the expense of Michael's Estate. *Id.*

For a buy-sell agreement to control the value of property for estate-tax purposes, it must not be a substitute for a testamentary disposition, ensuring that transactions between family members reflect full-and-adequate consideration. *See* 26 C.F.R. § 25.2703-1(b)(4) (price must be comparable to what an unrelated third party would pay, taking into account fair market value); *Estate of Lauder*, 1992 WL 386276, *21 (plaintiff must demonstrate full-and-adequate consideration in money or money's worth). The existence of a bona fide business purpose does not exclude the possibility that a buy-sell agreement is a testamentary device. 26 C.F.R. § 25.2703-1(b)(2); *see also St. Louis County Bank*, 674 F.2d at 1210. Further, "intrafamily agreements restricting the transfer of stock in a closely held corporation must be subjected to

greater scrutiny than that afforded similar agreements between unrelated parties." *Estate of Lauder*, 1992 WL 386276, *20 (citing *Dorn v. United States*, 828 F.2d 177, 182 (3d Cir. 1987)); *see also Hoffman v. Comm'r*, 2 T.C. 1160, 1178–1179 (T.C. 1943), *affd. sub nom. Giannini v. Comm'r*, 148 F.2d 285 (9th Cir. 1945) ("[T]he fact that the option is given to one who is the natural object of the bounty of the [decedent] requires substantial proof to show that it rested upon full-and-adequate consideration.").

Despite the legitimate business purpose of the Stock Agreement, the Estate bears the burden of proving that the Stock Agreement was not also a device to pass Crown C shares to members of the Connelly family for less than full-and-adequate consideration. *See Estate of Lauder*, 1992 WL 386276, *21. The Estate asserts that the Stock Agreement was not a testamentary device because (1) Crown C redeemed Michael's shares for fair market value, as established by the parties' stipulation to the value of Michael's shares, (2) the Stock Agreement was binding, because Crown C redeemed Michael's shares, and (3) the Connelly brothers were in good health when they executed the Stock Agreement. Doc. 65 at p. 7.

The Estate failed to show that the Stock Agreement was not a device to transfer wealth to Michael's family members for less than full-and-adequate consideration. First, the $3 million redemption price was not full-and-adequate consideration. The parties' stipulation explicitly left aside the life-insurance issue when it otherwise agreed to the $3.1 million fair market value of Michael's Crown C shares. Doc. 48. Therefore, the stipulation only aids the Estate if the Court finds that the fair market value excludes the $3 million in life-insurance proceeds used to redeem Michael's shares. In other words, the $3 million redemption price is only equivalent to the fair market value of the shares *if* the Court were to find that the $3 million in life-insurance proceeds are not included in Crown C's value. As discussed in section III.B.1 below, the Court follows

the reasoning from the Tax Court in *Estate of Blount*, so the life-insurance proceeds are included in Crown C's fair market value. *Estate of Blount v. Comm'r*, 2004 WL 1059517, at *26 (T.C. 2004), a*ff'd in part, rev'd in part on other grounds*, 428 F.3d 1338 (11th Cir. 2005).

Second, even though Crown C fulfilled the purpose of the agreement by redeeming Michael's shares, Thomas and the Estate's process in selecting the redemption price indicates that the Stock Agreement was a testamentary device. *See Estate of Gloeckner*, 152 F.3d at 216 ("[C]ourts scrutinize the processes employed in reaching the share price contained within the redemption agreement to shed light on the nature of the relationship between the decedent and the person to whom the stock was conveyed.") (citing *Estate of Lauder*, 1992 WL 386276, *21–22 and *Cameron W. Bommer Revocable Trust v. C.I.R.*, 1997 WL 473161, at *13 (T.C. 1997)). Thomas and the Estate excluded a significant asset (the life-insurance proceeds) from the valuation of Crown C, failed to obtain an outside appraisal or professional advice on setting the redemption price, Doc. 58 at ¶¶ 23–38; Doc. 51 at p. 4, and as discussed further below, disregarded the appraisal requirement in Article VII of the Stock Agreement, *see* Section III.A.2.a–b, *infra*. *See also Estate of Lauder*, 1992 WL 386276, *21–22 (exclusion of major intangible assets, absence of a formal appraisal, and failure to obtain professional advice may mean the agreement is a testamentary device); *St. Louis County Bank*, 674 F.2d at 1211 (lack of regular enforcement of the buy-sell agreement's terms may mean the agreement is a testamentary device); *Estate of True*, 390 F.3d at 1222 ("[W]here the price term in a buy-sell agreement is reached in an arbitrary manner, is not based on an appraisal of the subject interest, or is done without professional guidance or consultation, courts draw an inference that the buy-sell agreement is a testamentary substitute.").

14

Additionally, the Stock Agreement's lack of a minority discount for Thomas's shares and corresponding lack of a control premium for Michael's shares substantially overvalues Thomas's shares and undervalues Michael's shares.  The Stock Agreement required that in determining the appraised value of the shareholders' shares in Crown C, "[t]he appraisers shall not take into consideration premiums or minority discounts[.]"  Doc. 53-4, Art. VII., Sec. C.  The Stock Agreement's lack of a control premium for Michael's majority interest indicates that the price was not full-and-adequate consideration.  *See* 26 C.F.R. § 20.2031–2(f)(2) (fair market value for a corporation's stock is determined by "the company's net worth, prospective earning power and dividend-paying capacity, and other relevant factors" including "the degree of control of the business represented by the block of stock to be valued . . ."); *Bright's Estate v. U.S.*, 658 F.2d 999, 1006–7 (5th Cir. 1981) (a willing buyer would account for a controlling interest or a minority interest in a closely-held corporation); *Estate of True v. Comm'r*, 2001 WL 761280, at *100 (T.C. 2001) ("[Plaintiff's] 58.16–percent interest represented a majority of the shares entitled to vote; therefore, [Plaintiff] owned a controlling interest in Black Hills Trucking at his death.  Accordingly, [the expert] should have added a control premium to compute entity value . . ."); *see also Zaiger's Estate v. Comm'r*, 64 T.C. 927, 945–46 (T.C. 1975) ("Petitioner's experts applied discounts to their valuations to reflect the minority interest involved and to compensate for the fact that voting control would not be in the hands of the purchaser. Such considerations were proper and discounts were appropriate.").

While the Connelly brothers' good health when they executed the Stock Agreement weighs in favor of the Estate's argument, the parties' abject disregard of the Stock Agreement so as to undervalue the company and underpay estate taxes, as well as the Stock Agreement's lack of a control premium or minority discount, demonstrates that the Stock Agreement was a

testamentary device to transfer wealth to Michael's family members for less than full-and-adequate consideration.  *See* Section III.A.2.a–b, *infra*.[4]

### c.   Comparability to similar arrangements

The IRS argues that the Stock Agreement is not comparable to similar arrangements negotiated at arms' length because Thomas and the Estate did not account for the insurance proceeds in the valuation of Michael's Crown C shares and because the Stock Agreement itself undervalued Michael's 77.18% majority interest.  Doc. 61 at pp. 11–12.  The IRS claims that an unrelated majority shareholder operating at arms' length would not have allowed Crown C to create a windfall for a minority shareholder at the expense of the majority shareholder's estate. *Id.*

The Estate does not show that the Stock Agreement is comparable to similar agreements negotiated at arms' length.  Courts treat a contractual restriction as comparable to similar agreements if it "could have been obtained in a fair bargain among unrelated parties in the same business dealing with each other at arm's length."  26 C.F.R. § 25.2703-1(b)(4) (this determination considers factors such as "the expected term of the agreement, the current fair market value of the property, anticipated changes in value during the term of the arrangement, and the adequacy of any consideration given in exchange for the rights granted.").  The question is whether, "[a]t the time the right or restriction is created, the terms of the right or restriction are comparable to similar arrangements entered into by persons in an arm's length transaction."  26 C.F.R. § 25.2703-1(b)(1)(iii); *Holman v. Comm'r*, 130 T.C. 170, 197 (T.C. 2008), *aff'd*, 601 F.3d 763 (8th Cir. 2010) ("Comparability is determined at the time the restriction is created.").

---

[4] Were the Court to consider that the parties seemingly paved the way for Michael Jr. to purchase the company at a below-market price, it would reinforce this conclusion.  But as noted in Section III.A.2.b.ii, the parties did not fully develop this point and the Court does not consider it.

In *Blount*, the Tax Court held that to show comparability, the estate had to produce evidence "that the terms of an agreement providing for the acquisition or sale of property for less than fair market value are similar to those found in similar agreements entered into by unrelated parties at arm's length in similar businesses." *Estate of Blount*, 2004 WL 1059517, at *17 (T.C. 2004), *aff'd in part, rev'd in part on other grounds*, 428 F.3d 1338 (11th Cir. 2005); *see also Holman*, 130 T.C. at 198–99.  The Tax Court relied on the text of 26 U.S.C. § 2703(b)(3), legislative history, and the text of the applicable regulations, 26 C.F.R. § 25.2703–1(b)(4).

The Court agrees with this analysis.  The statutory text of 26 U.S.C. § 2703(b)(3) uses terms that require a comparison of the agreement at issue to others ("comparable to similar arrangements") and that those other agreements must be the product of "arm's length transaction(s)."  In the face of this plain text, legislative history need not be consulted, but even so, the Senate committee report supports this textual analysis.  *See* 136 Cong. Rec. 15683 (Oct. 18, 1990) (discussing consideration of various factors, including "the demonstration of general practice(s) of unrelated parties," and expert testimony).  The regulations also track the "general practice(s) of unrelated parties" language of the Senate committee report, and further require the showing of comparables from similar businesses.  26 C.F.R. 25.2703-(1)(b)(4).

The Estate claims that the Stock Agreement was comparable to similar arrangements negotiated at arms' length simply because the $3 million redemption price here was equal to what the Estate claims is the fair market value of Michael's shares, and because closely-held family corporations often use life-insurance proceeds to redeem a shareholder's stock.  Doc. 46 at pp. 12–13.  In support of its position on the fair market valuation, the Estate presents the calculation-of-value report from Anders Minkler, as well as the expert report and testimony of Kevin P. Summers.  *Id.*

17

Even assuming that the Anders Minkler valuation and Summers's testimony were admissible in their present form, the Court does not find them persuasive.  The Anders Minkler calculation of value and Summers's opinions both rely on the reasoning of the 11th Circuit opinion in *Estate of Blount*, which held that life-insurance proceeds used to redeem a stockholder's shares do not count towards the fair market value of the company when valuing those same shares.  Doc. 58 at ¶¶ 73–74; Doc. 55-1 at p. 14; *see also Estate of Blount*, 428 F.3d at 1344.   Thus neither valuation answers the question of whether the $3 million price was below fair market value, and both valuations ignore the detailed valuation mechanism in the Stock Agreement.  The Estate does not explain how these contra-agreement valuations have any bearing on whether the Stock Agreement or its valuation mechanism was comparable to similar arm's-length agreements.

As discussed further in section III.B.1 below, the Court includes the life-insurance proceeds in the fair market value of Crown C and of Michael's shares.  Other than the Anders Minkler report and Summer's testimony, the Estate failed to provide any evidence of similar arrangements negotiated at arms' length.  That closely-held family corporations generally use life-insurance proceeds to fund redemption obligations does not establish that this particular Stock Agreement was comparable to an arm's-length bargain, particularly when the $3 million valuation was so far below fair market value.  Doc. 53-19 at ¶¶ 12, 45; *see also Estate of Blount*, 2004 WL 1059517, at *19 (T.C. 2004) ("[W]e assign no weight to [the expert's] testimony that the $4 million purchase price set forth in the [agreement] was a fair market price value.  Accordingly, his conclusion that the [agreement] established a price comparable to those of similar arrangements entered into at arm's length by people in similar businesses is flawed.").

The Court also observes that here the Stock Agreement's prohibition of control premiums or minority discounts results in an undervalued majority interest for Michael's shares. *See* 26 C.F.R. § 20.2031–2(f)(2); Section III.A.1.b, *supra*. Thus, the Stock Agreement is not comparable to similar arrangements negotiated at arms' length.

### 2.      Additional requirements under regulations and caselaw

### a.      Fixed and determinable offering price

The IRS contends that the price of Michael's Crown C shares was not fixed and determinable under the Stock Agreement because Thomas and the Estate ignored the agreement's pricing mechanisms and came up with a valuation of their own. Doc. 52 at p. 7; Doc. 61 at p. 5. The Stock Agreement required shareholders Michael and Thomas to agree on and sign "Certificates of Agreed Value" every year to establish the price-per-share; but in the 12 years the agreement was in place before Michael's death, they never agreed on the value, or created or signed such certificates. Doc. 61 at p. 5; Doc. 53-4, Art. VII., Sec. A–B. Under the Stock Agreement, the failure of the shareholders to do so triggered the obligation to obtain the Appraised Value Per Share through a very specific process involving multiple professional appraisers. Doc. 53-4, Art. VII., Sec. C. But Thomas and the Estate never followed that specific process and never determined the Appraised Value Per Share; instead, they chose to come up with their own *ad hoc* valuation of $3 million. Doc. 58 at ¶¶ 23–38; Doc. 51 at p. 4.

The Court finds that Crown C's share price was not "fixed and determinable" from the 2001 Stock Agreement. *See Estate of Lauder*, 1992 WL 386276, *18 ("Several requirements have evolved for testing whether the *formula price set forth in such restrictive agreements* is binding for purposes of the Federal estate tax. It is axiomatic that *the offering price* must be fixed and determinable under the agreement." (emphasis added)); *see also* 26 C.F.R. § 20.2031-

19

2(h) ("The effect, if any, that is given to the option or contract price in determining the value of the securities for estate-tax purposes depends upon the circumstances of the particular case.").

The $3 million redemption price that Thomas and the Estate set forth in the Sale Agreement did not come from any formula or other provisions in the Stock Agreement, rendering the Estate's proposed share price, for estate-tax-valuation purposes, neither fixed nor determinable from the Stock Agreement. Doc. 58 at ¶¶ 23–38. The parties did not rely on a Certificate of Agreed Value or follow the detailed appraisal mechanism of the Stock Agreement to determine the price-per-share; instead, they completely disregarded the Stock Agreement and negotiated their own value, which not surprisingly was less than the value of the life-insurance proceeds. *Id.* at ¶¶ 23–38, 64–65; *see also* 26 C.F.R. § 20.2031-2(h).

The Estate argues that the mere existence of a pricing formula in the Stock Agreement satisfies the requirement that the offering price be "fixed and determinable" by the preexisting agreement. Doc. 46 at pp. 8–9 (citing *Estate of Gloeckner*, 152 F.3d at 213). But the Estate does not ask the Court to apply one of the price-setting mechanisms set out in the Stock Agreement; it wants the $3 million price to control estate-tax valuation, even though that price has no mooring in the Stock Agreement. *Id.* Further, the Estate's citation to *Estate of Gloeckner* is unpersuasive, as in *Estate of Gloeckner,* the Commissioner conceded that the buy-sell agreement at issue had a "fixed and determinable" offering price. 152 F.3d at 213 ("The Commissioner does not dispute that the restrictive agreement affecting Gloeckner's shares meets the first three requirements. That is, it concedes the stock price at issue was fixed within the redemption agreement . . .").

The Estate represented to the Court that the pricing mechanisms in the Stock Agreement are not mandatory because it "talks about situations if the parties don't agree." Doc. 71 at p. 38. This argument lacks merit. The Stock Agreement clearly states that "[t]he purchase price to be

paid by the Company ***shall be*** the purchase price provided in Article VII . . ." Doc. 53-4, Art. V, Sec. B (emphasis added).  The appraisal obtained by the IRS here provides some evidence that the valuation mechanism in Article VII of the Stock Agreement would have rendered a much higher valuation than $3 million, which seems motivation enough for Thomas and the Estate to disregard it.  *See* Doc. 53-19 at ¶¶ 12, 45.

The Estate argues that the $3 million price "resulted from extensive analysis of Crown C's books and the proper valuation of assets and liabilities of the company. Thomas Connelly, as an experienced businessman extremely acquainted with Crown C's finances, was able to ensure an accurate appraisal of the shares." Doc. 51 at p. 4.  Leaving aside Thomas's obvious self-interest in arriving at a below-market valuation, this argument reveals the frailty of the Estate's position:  the Estate didn't believe that the very specific valuation mechanism in the Stock Agreement produced an accurate value that bound the Estate, but the Court should treat it as if it did.  The Court finds this position as untenable as it is unpersuasive.

### b.    Binding during life and after death

The IRS next argues that the Stock Agreement's terms were not binding throughout Michael Connelly's life and after his death, because Michael, Thomas, and the Estate ignored their obligations under the Stock Agreement.  Doc. 61 at pp. 6–7.  For twelve years, Michael and Thomas failed to execute an Annual Certificate of Value as required under the Stock Agreement; and at Michael's death, Thomas and the Estate ignored the appraisal mechanism in the Stock Agreement.  Doc. 58 at ¶¶ 23–38.  The IRS also argues that the Stock Agreement was not binding because Michael Jr. retained a profits interest in the company, as he and Thomas agreed to split evenly any gains from the future sale of Crown C, so the stock redemption did not

actually account for Michael Sr.'s entire interest in Crown C.  Doc. 61 at pp. 6–7; Doc. 52 at p. 8.

### i.      During life

As discussed in section III.A.2.a, above, the Stock Agreement required shareholders Michael and Thomas to agree on and sign "Certificates of Agreed Value" every year to establish the price-per-share, but they never agreed on the value, or created or signed such certificates. Doc. 61 at p. 5; Doc. 53-4, Art. VII., Sec. A–B.  During life, the parties did not treat that aspect of the Stock Agreement as binding, but the Stock Agreement (for reasons unknown) anticipated that they might not comply with Certificates-of-Agreed-Value provision; accordingly, and insofar as the binding-during-life-and-death analysis goes, the Court does not find the parties' failure in this regard entirely dispositive.  *See* Doc. 53-4, Art. VII., Sec. C.  The Court therefore turns to the question of whether the Stock Agreement was binding after death.

### ii.      After death

The parties' own conduct demonstrates that the Stock Agreement was not binding after Michael's death.  Thomas and the Estate failed to determine the price-per-share through the formula in the Stock Agreement.  *See St. Louis County Bank*, 674 F.2d at 1210–11 (parties' post-execution conduct can determine whether the court applies the terms of a buy-sell agreement for estate-tax purposes); *Estate of Lauder*, 1992 WL 386276, *19 (allowing some minor deviations from the buy-sell agreement's terms, but finding that the family still considered the agreement's terms to be binding because the family executed formal waivers and modifications as the buy-sell agreement required).  As already discussed in section III.A.2.a, Thomas and the Estate did not consider the Stock Agreement to be binding or enforceable on them; they ignored the price

mechanism in Article VII and sold Michael's shares for $3 million without first obtaining any appraisals for Crown C.

The Estate argues that the appraisal process in Article VII was only meant to determine the value of the shares if the parties disagreed over the value, so the $3 million price negotiated between Thomas and the Estate still complied with the Stock Agreement.  Doc. 71 at p. 38; *see also* Doc. 53-4, Art. VII., Sec. C.  The Stock Agreement itself belies this argument, completely.  The Stock Agreement mandates that if the surviving brother did not buy the deceased brother's shares, "the Company ***shall and must*** purchase . . . all of the Deceased Stockholder's Shares[.]"  Doc. 53-4, Art. V, Sec. B (emphasis added).  The Stock Agreement further states that "The purchase price to be paid by the Company ***shall*** be the purchase price provided in Article VII, the purchase price ***shall be paid*** as per the terms provided in Article VIII, and the purchase of the Shares ***shall be closed*** on the Closing Date as provided in Article IX."  *Id.* (emphasis added).

The Stock Agreement does not contain an optional dispute-resolution mechanism; it uses mandatory language ("shall," and "shall and must," which in this context is redundantly mandatory).  Doc. 53-4, Art. V, Sec. B.  This language admits of no discretion or exception, dictating that Crown C redeem Michael's shares, the price at which it must do so, and the timing and terms of its payment.  Thomas and the Estate utterly ignored these mandatory terms, indicating if not demonstrating that the Stock Agreement was not binding after Michael's death.  *See St. Louis County Bank*, 674 F.2d at 1210–11; *Estate of Lauder*, 1992 WL 386276, *19.

The Estate also argues that it negotiated a fair redemption price for Michael's shares, based on the Anders Minkler calculation of value and the stipulation with the IRS affirming the $3.1 million valuation for Crown C.  Doc. 59 at pp. 4–5.  But these points are not relevant to whether the Stock Agreement bound the parties.  The supposed fairness of the redemption price

does not mitigate Thomas and the Estate's failure to follow the pricing mechanism in the Stock Agreement.  Thomas and the Estate did not consider the Stock Agreement to bind their behavior after Michael's death, so the Stock Agreement cannot control the value of Michael's Crown C shares for estate-tax purposes.  *See St. Louis County Bank*, 674 F.2d at 1210–11; *Estate of Lauder*, 1992 WL 386276, *19.

The Court observes that a more likely explanation exists for parties' scrapping the Stock Agreement in favor of the after-the-fact Sale Agreement.  As noted above, the evidence indicates that the valuation under the Stock Agreement's comprehensive appraisal mechanism in Article VII would have been much higher than $3 million.  *See* Doc. 53-19 at ¶¶ 12, 45.  Regardless of whether that is true, Thomas paid nothing to increase his ownership from 22.82% to 100% of Crown C.  Doc. 58 at ¶ 65.  Additionally, the *post hoc* Sale Agreement created an option for Michael Jr. to buy all of Thomas's shares at a below-market value.  *Id.* at ¶¶ 64–66.  If allowed, these maneuvers would effectively: a) reduce the Estate's taxes, b) increase the amount of cash Thomas and Michael Jr. received at the time of sale, c) potentially reduce the taxes Thomas or his estate would eventually pay by setting a below-market price for Michael Jr.'s later purchase of his shares, and d) seemingly defer the larger tax bills for Thomas, Michael, Jr., and Crown C to later tax periods.  *See id.*; Doc. 53-19 at ¶¶ 12, 45, 48, 52, 53–55, 61, and 62 (explaining the "windfall" to Thomas, on which Thomas presumably paid no taxes).  Because the parties do not squarely address these collateral tax effects, the Court does not consider them in its analysis but simply notes them for the record.

24

c.   **Bona-fide business reason and not a substitute for a testamentary disposition for less than full-and-adequate consideration**

The Court already discussed whether the Stock Agreement had a bona-fide business reason and whether it was a substitute for a testamentary disposition for less than full-and-adequate consideration, so the Court need not duplicate the analysis here.  *See* Section III.A.1.a–b, *supra*; *see also Holman*, 601 F.3d at 772 (observing that *St. Louis County Bank*, 674 F.2d at 1210, set out the "bona fide business reason" and "testamentary disposition" factors, which Congress "subsequently adopted" in 26 U.S.C. § 2703(b)).

Based on the undisputed facts in the record, the Court concludes that the Stock Agreement does not establish Crown C's value for estate-tax purposes.

**B.     Fair market value**

Because the Stock Agreement does not control the value of Michael's Crown C shares, the Court must determine the fair market value of Crown C.  *See Estate of True*, 390 F.3d at 1218.  Fair market value is "the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts."  *See* 26 C.F.R. § 20.2031-1(b).  Courts determine the fair market value of property based on the willing-buyer-willing-seller test.  *See* 26 C.F.R. § 20.2031-1(b); *Cartwright*, 411 U.S. at 551 ("Under this test, [it] is clear that if the decedent had owned ordinary corporate stock listed on an exchange, its 'value' for estate tax purposes would be the price the estate could have obtained if it had sold the stock on the valuation date . . .").  Fair market value of a decedent's stock is determined by applying "customary principles of valuation."  *Estate of Huntsman v. Comm'r*, 66 T.C. 861, 876 (T.C. 1976).  "The ultimate determination of fair market value is a finding of fact. The question of

what criteria should be used to determine value is a question of law[.]" *Estate of Palmer v. C.I.R.*, 839 F.2d 420, 423 (8th Cir. 1988).

In valuing shares of closely-held businesses for which no market exists, courts consider factors such as "the company's net worth, prospective earning power and dividend-paying capacity, and other relevant factors." 26 C.F.R. § 20.2031-2(f)(2). This valuation includes the proceeds of life-insurance policies owned by the corporation: "consideration shall also be given to nonoperating assets, including proceeds of life-insurance policies payable to or for the benefit of the company, to the extent that such nonoperating assets have not been taken into account in the determination of net worth." *Id.*

The parties agree that the facts relating to Crown C's fair market value are undisputed, so the only remaining issue is how to allocate the life-insurance proceeds. Doc. 46 at 15; Doc. 61 at 16. The parties' stipulation affirms that the fair market value of Michael's shares was roughly $3.1 million, assuming the exclusion of the life-insurance proceeds from the Crown C valuation. Doc. 48 at ¶¶ 1–3. The Estate and the IRS therefore agree that the fair market value of Crown C was approximately $3.86 million, exclusive of the $3 million in life-insurance proceeds used to redeem Michael's shares. *Id.*; Doc. 58 at ¶ 43, 79–81. The IRS claims, however, that those proceeds must be included in Crown C's value under 26 C.F.R. § 20.2031-2(f)(2), resulting in a $6.86 million fair market value for Crown C.

### 1.    Treatment of the life-insurance proceeds

The Estate urges that the fair market value of Crown C does not include the $3 million in life-insurance proceeds at issue because those proceeds "were off-set dollar for dollar by the obligation to redeem [Michael's] shares" under the Stock Agreement. Doc. 65. According to the Estate, a hypothetical "willing buyer" of Crown C would have to account for substantial

liabilities like Crown C's redemption obligation. *See, e.g., Estate of Dunn v. C.I.R.*, 301 F.3d 339, 352 (5th Cir. 2002) (the value of a corporation's assets is discounted by the corporation's capital-gains liability); *Eisenberg v. Comm'r*, 155 F.3d 50, 57 (2d Cir. 1998) (a hypothetical buyer would pay less for shares in a corporation because of the buyer's "inability to eliminate the contingent tax liability"). The Estate emphasizes that a willing buyer would pay less for a company encumbered with a stock-purchase agreement, to account for the company's future decrease in assets when fulfilling the contractual obligation. *See Estate of Blount*, 428 F.3d at 1346.

The parties agree that the facts of this case present the same fair-market-value issue as *Estate of Blount*, 2004 WL 1059517, at *26 (T.C. 2004), a*ff'd in part, rev'd in part*, 428 F.3d 1338 (11th Cir. 2005). Doc. 52 at 12; Doc. 46 at 6–7. In *Estate of Blount*, a closely-held family company entered into a stock purchase agreement with its shareholders, intending that the company would use life-insurance proceeds to redeem a key shareholder's shares upon his death. 428 F.3d at 1340. When one of the shareholders died, his estate argued that the life-insurance proceeds should not be included in the value of the company, for purposes of determining fair market value of the redeemed shares, because of the company's offsetting contractual obligation to redeem those shares from the estate. *Id.* at 1345.

The Tax Court in *Estate of Blount* included the life-insurance proceeds in the value of the company and the shareholders' shares, determining that the redemption obligation was not like an ordinary liability because the redemption involved the very same shares being valued. 2004 WL 1059517, at *26. The Eleventh Circuit reversed on this issue, holding that the fair market value of the closely-held corporation did not include life-insurance proceeds used to redeem the shares of the deceased shareholder under a stock purchase agreement. *Estate of Blount*, 428

27

F.3d at 1346.  The Eleventh Circuit reasoned that the stock-purchase agreement created a contractual liability for the company, offsetting the life-insurance proceeds.  *Id.* at 1345–46.  The Eleventh Circuit concluded that the insurance proceeds were "not the kind of ordinary nonoperating asset that should be included in the value of [the company] under the treasury regulations" because they were "offset dollar-for-dollar by [the company's] obligation to satisfy its contract with the decedent's estate."  *Id.* at 1346 (citing 26 C.F.R. § 20.2031-2(f)(2)).

The IRS urges the Court to reject the Eleventh Circuit's holding in *Estate of Blount* and apply the Tax Court's reasoning.  Doc. 52 at 12–14.  The IRS contends that the Eleventh Circuit's approach violates customary valuation principles, resulting in a below-market valuation for Crown C and a windfall for Thomas at the expense of Michael's estate.  *Id.*  According to the IRS, a willing buyer and seller would value Crown C at approximately $6.86 million, rather than $3.86 million, because on the date of Michael's death, Crown C possessed the $3 million in life-insurance proceeds that were later used to redeem Michael's shares.  *Id.* at 19.  This, in turn, would make Michael's 77.18% interest in Crown C worth about $5.3 million.  *Id.*  The Estate disagrees, somewhat reflexively arguing that under the Eleventh Circuit's holding in *Estate of Blount*, the Court should not include the $3 million in life-insurance proceeds in the valuation of Crown C because of the redemption obligation in the Stock Agreement.  Doc. 46 at p. 6.  But other than citing the Eleventh Circuit's holding and its own expert opinions (which essentially say that holding controls), the Estate does not really explain *why* it believes the Eleventh Circuit's holding is correct.  *Id.*

Life-insurance proceeds are nonoperating assets that generally increase the value of a company.  26 C.F.R. § 20.2031-2(f)(2); *Estate of Huntsman*, 66 T.C. at 874.  Here, the parties agree that the proceeds are a nonoperating asset that would have increased Crown C's value, but

they dispute whether Crown C's redemption obligation was a liability that offset the proceeds for valuation purposes.  Doc. 52 at pp. 14–15; Doc. 46 at pp. 5–6.   Therefore, to determine the fair market value of Michael's shares as of the date of his death, the Court analyzes whether Crown C's outstanding redemption obligation was a corporate liability that reduced the fair market value of Crown C.

Under the willing-buyer-willing-seller principle, a redemption obligation does not reduce the value of a company as a whole or the value of the shares being redeemed.  A redemption obligation requires a company to buy its own shares from a shareholder, and just like any other contractual obligation, a redemption obligation expends company resources.  But as the Tax Court observed in *Estate of Blount*, a redemption obligation is not a "value-depressing corporate liability when the very shares that are the subject of the redemption obligation are being valued." 2004 WL 1059517, at *25.

Consider what a hypothetical "willing buyer" would pay for a company subject to a redemption obligation.  *See* 26 C.F.R. § 20.2031-1(b).  The willing buyer would not factor the company's redemption obligation into the value of the company, because with the purchase of the entire company, the buyer would thereby acquire all of the shares that would be redeemed under the redemption obligation; in other words the buyer would pay all of the shareholders the fair market value for all of their shares.  The company, under the buyer's new ownership, would then be obligated to redeem shares *that the buyer now holds*.  Since the buyer would receive the payment from the stock redemption, the buyer would not consider the obligation *to himself* as a liability that lowers the value of the company *to him*.  *See Estate of Blount*, 2004 WL 1059517, at *25 (T.C. 2004) ("To treat the corporation's obligation to redeem the very shares that are

29

being valued as a liability that reduces the value of the corporate entity thus distorts the nature of the ownership interest represented by those shares.").

A willing buyer purchasing Crown C on the date of Michael's death would not demand a reduced purchase price because of the redemption obligation in the Stock Agreement, as Crown C's fair market value would remain the same regardless. The willing buyer would buy all 500 of Crown C's outstanding shares (from Michael's Estate and Thomas) for $6.86 million, acquiring Crown C's $3.86 million in estimated value plus the $3 million in life-insurance proceeds at issue. If Crown C had no redemption obligation, the willing buyer would then own 100% of a company worth $6.86 million.

But even with a redemption obligation, Crown C's fair market value remains the same. Once the buyer owned Crown C outright, the buyer could either: 1) cancel the redemption obligation to himself and own 100% of a company worth $6.86 million, or 2) let Crown C redeem Michael's former shares—the buyer (and not Michael's Estate) would receive roughly $5.3 million in cash and then own 100% of a company worth the remaining value of about $1.56 million, leaving the buyer with a total of $6.86 million in assets. Therefore, with or without the redemption obligation, the fair market value of Crown C on the date of Michael's death was $6.86 million.

The Estate urges the Court to follow the Eleventh Circuit's reasoning in *Estate of Blount*, which declared that "nonoperating assets should not be included in the fair market valuation of a company where, as here, there is an enforceable contractual obligation that offsets such assets." 428 F.3d at 1346 (quotation marks omitted). But as the IRS points out, the Court must determine the fair market value of Crown C on the date of Michael's death, not the value in its post-redemption configuration. *See* 26 U.S.C. § 2031. Excluding the insurance proceeds from Crown

C's value impermissibly treats Michael's shares as both outstanding and redeemed at the same time, reducing Crown C's value by the redemption price of the very shares whose value is at issue. This approach ignores the ownership interest represented by Michael's shares; construing a redemption obligation as a corporate liability only values Crown C post redemption (i.e., excluding Michael's shares), not the value of Crown C on the date of death (i.e. including Michael's shares).

Demonstrating this point, exclusion of the insurance proceeds from the fair market value of Crown C and valuing Michael's shares at $3 million results in drastically different share prices for Michael's shares compared to Thomas's. If on the date of his death, Michael's 77.18% interest was worth only $3 million ($7,774/share), that would make Thomas's 22.82% interest worth $3.86 million ($33,863/share) because Thomas owned all other outstanding shares and the residual value of Crown C was $3.86 million. *See* Doc. 53-19 at ¶ 61. The residual value of Crown C is the value of the company apart from the $3 million of insurance proceeds at issue. The parties have agreed that this value was $3.8 million. Doc. 48 at ¶¶ 1–3; Doc. 58 at ¶¶ 43, 79–81. Because Thomas was the only other shareholder of Crown C, his ownership interest must therefore equal the residual value of Crown C: $3.8 million. This outcome violates customary valuation principles because Thomas's shares would be worth 336% more than Michael's *at the exact same time*. *See* Doc. 53-19 at ¶ 61. A willing seller of Michael's shares would not accept this bargain, as it creates a windfall for the buyer (Crown C of which Thomas would now have 100% control), while undervaluing Michael's shares in comparison.

Only by including the insurance proceeds in the fair market value of Crown C do Michael's and Thomas's shares hold an equal value on the date of Michael's death. Michael's 77.18% interest in a $6.86 million company would be worth $5.3 million ($13,782/share) and

Thomas's 22.82% interest would be worth $1.56 million ($13,782/share).  This outcome tracks customary valuation principles, because the brothers' shares have the same value-per-share.  A willing seller of Michael's shares would only accept this outcome, because it assigns the same value to Michael's shares as to Thomas's and neither party's economic position changes through the transaction.

The Eleventh Circuit declared in *Estate of Blount* that 26 C.F.R. § 20.2031-2(f)(2) precludes the inclusion of insurance proceeds in the corporate value when the proceeds are used for a redemption obligation.  428 F.3d at 1345 ("The limiting phrase, 'to the extent that such nonoperating assets have not been taken into account,' however, precludes the inclusion of the insurance proceeds in this case." (citing 26 C.F.R. § 20.2031-2(f)(2))).  But, 26 C.F.R. § 20.2031-2(f)(2) begins with a discussion of the factors considered in determining the fair market value of a closely-held corporation, including "the company's net worth, prospective earning power and dividend-paying capacity, and other relevant factors."  The regulation goes on to state that "[i]n addition to the relevant factors described above, consideration shall also be given to nonoperating assets, including proceeds of life insurance policies payable to or for the benefit of the company, to the extent such nonoperating assets have not been taken into account in the determination of net worth."  *Id.*

While in *Estate of Huntsman* the Tax Court ultimately rejected the Commissioner's valuation as not following customary valuation principles, the court found this regulation to mean that the court "must determine the fair market value of the decedent's stock . . . by applying customary principles of valuation and by giving 'consideration' to the [life-]insurance proceeds."  66 T.C. at 875.  The Eleventh Circuit's holding in *Estate of Blount* notwithstanding, the text of the regulation does not indicate that the very presence of an offsetting liability means

that the life-insurance proceeds have already been "taken into account in the determination of a company's net worth." *See* 26 C.F.R. § 20.2031-2(f)(2).  By its plain terms, the regulation means that the proceeds should be considered in the same manner as any other nonoperating asset in the calculation of the fair market value of a company's stock.  *See id.*  And as already discussed, a redemption obligation is not the same as an ordinary corporate liability.  *See supra* at pp. 29–31.

The Eleventh Circuit's opinion in *Estate of Blount* relied heavily on *Estate of Cartwright*, 183 F.3d 1034, 1037 (9th Cir. 1999), which excluded insurance proceeds from the fair market value of a company when the proceeds were offset by an obligation to pay those proceeds to a shareholder's estate.  *Estate of Blount*, 428 F.3d at 1345.  But *Estate of Cartwright* is distinguishable.  As the Tax Court in *Estate of Blount* explained about *Estate of Cartwright*:

> The lion's share of the corporate liabilities in that case which were found to offset the insurance proceeds were *not obligations of the corporation to redeem its own stock*. Rather, we determined that approximately $4 million of the $5 million liability of the corporation was to compensate the decedent shareholder for services; i.e., for his interest in work in progress. Thus, a substantial portion of the liability was no different from any third-party liability of the corporation that would be netted against assets, including insurance proceeds, to ascertain net assets.

2004 WL 1059517, at *27 (emphasis added).  Unlike in *Estate of Cartwright*, Crown C's redemption obligation simply bought Michael's shares.  *See id.*  The redemption did not compensate Michael for his past work, so it was not an ordinary corporate liability.  *See Estate of Blount*, 2004 WL 1059517, at *27 (T.C. 2004).  While some of the life-insurance proceeds in *Estate of Cartwright* were used for a stock redemption, *Estate of Cartwright* mainly discussed how the insurance proceeds compensated the shareholder for past work, not for his shares in the company.  *See Estate of Cartwright*, 1996 WL 337301, at *7–8 (T.C. 1996), *aff'd in part, rev'd in part by*, 183 F.3d 1034, 1037–38 (9th Cir. 1999).  And to the extent that *Estate of Cartwright*

33

excluded some of the life-insurance proceeds from the company's fair market value because of an offsetting redemption obligation, the opinion contains the same analytical flaw as *Estate of Blount*, 183 F.3d at 1037, i.e. considering a redemption obligation to be a corporate liability that depresses a company's value by ignoring the ownership interest represented by the redeemed shares.

The Court finds the Tax Court's reasoning in *Estate of Blount* persuasive. *Estate of Blount*, 2004 WL 1059517, at *24–27; *see also* Adam S. Chodorow, *Valuing Corporations for Estate Tax Purposes: A Blount Reappraisal*, 3 Hastings Business Law Journal 1, 25 (2006) ("Taking redemption obligations into account leads the court to value the wrong property . . . redemption obligations are different from other types of corporate obligations in that a redemption obligation both shrinks the corporate assets and changes its ownership structure."). A redemption obligation is not an ordinary corporate liability—a stock redemption involves a change in the ownership structure of the company, where the company buys a shareholder's interest—so a redemption obligation does not change the value of the company as a whole *before the shares are redeemed*. Nor can a redemption obligation diminish the value of the same shares being redeemed; the shareholder is essentially "cashing out" his share of ownership in the company and its assets. Moreover, a stock redemption results in the company (and more specifically its remaining shareholder(s)) getting something of equal value for the cash spent, i.e. the decedent's share of ownership in the company; the exchange increases the ownership interest for each of the company's outstanding shares, i.e. the surviving shareholders' shares.

For these reasons, the Court respectfully finds that the Eleventh Circuit's opinion in *Estate of Blount* is "demonstrably erroneous" and there are "cogent reasons for rejecting [it]." *Keasler v. United States*, 766 F.2d 1227, 1233 (8th Cir. 1985) ("[T]he tax decisions of other

circuits should be followed unless they are demonstrably erroneous or there appear cogent reasons for rejecting them." (internal quotation marks and citation omitted)).  Accordingly, the Court holds that the $3 million in life-insurance proceeds used to redeem Michael's shares must be included in the fair market value of Crown C and of Michael's shares.

**2.      Accounting for the insurance proceeds**

The parties stipulated that the fair market value of Michael's shares was $3.1 million, aside from the life-insurance proceeds.  Doc. 48.  The parties further represented, in their briefs and in the hearing on their motions for summary judgment, that the only remaining issue between the parties was how to allocate the life-insurance proceeds.  Doc. 46, 52; *see also* Doc. 71 at 3 (The Estate's counsel:  "[I]t doesn't appear that there are really any factual disputes before the Court, and the real issue is whether the insurance proceeds that were received are excluded from the valuation of the company.").  Because the insurance proceeds are not offset by Crown C's obligation to redeem Michael's shares, the fair market value of Crown C at the date of date of death and of Michael's shares includes all of the insurance proceeds.  Therefore, based on the undisputed facts in the record, the Estate failed to prove that the IRS's tax determination is incorrect and that it is entitled to a tax refund.

**IV.     Conclusion**

The Court grants the IRS's motion for summary judgment, Doc. 51, and denies the Estate's motion for summary judgment, Doc. 45.  The Court further denies both parties' motions to exclude expert testimony as moot.  Docs. 49, 54.

So Ordered this 21st day of September 2021.

_____
**STEPHEN R. CLARK**
**UNITED STATES DISTRICT JUDGE**

35
